UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ST. LUCIE COUNTY FIRE DISTRICT FIREFIGHTERS' PENSION TRUST FUND, On Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MOTOROLA, INC., EDWARD J. ZANDER, GREGORY Q. BROWN, and THOMAS MEREDITH, <br><br> Defendants. | No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, St. Lucie County Fire District Firefighters' Pension Trust Fund ("Plaintiff" or "St. Lucie Fire") alleges the following based upon the investigation by plaintiff's counsel, which included, among other things, a review of the public documents, conference calls and announcements made by Motorola, Inc. ("Motorola" or the "Company") and its executives, United States Securities and Exchange Commission ("SEC") filings, and press releases, wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of persons who purchased the common stock of Motorola between December 6, 2007 and January 22, 2008, inclusive (the "Class Period"). The action is brought against Motorola and several of its current and former key executives and directors for violations of the federal securities laws for making false and misleading public statements concerning Motorola's purported then-present business fundamentals, sales demand for its phones and financial projections during the Class Period.

2.     Motorola is the largest U.S. maker of mobile phones.  The Company's RAZR clamshell-type cell phone was the most popular line of mobile phones ever released until being surpassed by the iPhone 3G in November 2008.  Indeed, following its release in 2004, RAZR sales surpassed the Company's total lifetime projections in its first three months.

3.     By June 2006, the Company had sold over 50 million units.  By the time it was replaced by the RAZR2 in July 2007, Motorola had sold more than 110 million units, boosting its position to second place in the hand-held market, only behind Nokia.

4.     However, despite multiple rereleases of the RAZR and management's repeated promises that the Company was "seamlessly" integrating new technologies to keep up with the advent of so-called "smart phones," Motorola was not.  It was a one trick pony and as defendants would later concede, the RAZR line had since grown "long in the tooth."

5.     Indeed, cell phones are typically replaced every 12 to 18 months and Motorola was too slow in redesigning its model to keep up with the advances of its competitors.  In June 2007, Apple Inc. released its iPhone, a smartphone that effectively integrated internet technology, causing Motorola's market share to begin a freefall from 21% in FY 2007 down to 13% by the end of 3Q 2007 (the quarter ended September 29, 2007).

6.     Motorola released yet another disappointing quarter's results on October 25, 2007, missing guidance for the third quarter in a row.  3Q 07 net income declined 94% to $60 million, from $968 million a year earlier.  Motorola posted sales of $8.81 billion, also down from 2006 third-quarter sales of $10.6 billion.  For the first nine months of 2006, Motorola recorded a $149 million *loss* on sales, down 13% to $30 billion.  ***Analysts were then predicting FY 2007 revenues would decline 14%, to $36.7 billion during FY 2007, down from $42.9 billion in FY 2006.***

7.     Meanwhile, Nokia increased its market share to 38.1% of unit sales in the 3Q 07 from 35.1% a year earlier, according to Stamford, Connecticut-based researcher Gartner Inc. ("Gartner").  Samsung also boosted its market share to 14.5% from 12.2%, while Motorola fell to 13.1% from 20.7%.

8.      In an attempt to assuage the investment community, and to protect their positions of power and prestige at the helm of Motorola, during the Company's October 25, 2007 3Q 07 earnings conference, defendants assured the investment community they had finally turned a corner. Defendants stated that demand for the Company's new RAZR2 released in August 2007, just in time for the Christmas 2007 selling season, was robust, with the Company having already sold 900,000 units between its August 2007 release date and the end of the 3Q 07 on September 30, 2007. Defendants also stated that based on then-current demand and sales, they were projecting earnings per share of $0.12-$0.14 in 4Q 07, then one-third underway.

9.      Yet secretly, defendants knew that in reality the Company had already irreparably lost significant market share to the Apple, Inc. iPhone and other smart phone devices, that consumers were not buying the new RAZR2, that Motorola's share of handset sales was actually declining and that having already slashed prices to maintain market share, there was no way Motorola could report earnings of anywhere near $0.12-$0.14 per share in the 4Q 07.

10.     On November 27, 2007, Motorola announced that Edward J. Zander ("Zander") who served as Chief Executive Officer ("CEO"), Chairman of the Board and Chairman of the Board's Executive Committee since January 2004, was being replaced as CEO effective December 31, 2007 and would not run for reelection to the Motorola Board at the 2008 annual meeting of shareholders. This sudden disclosure spooked the market and the Company's stock price began a downward spiral.

11.     Responding to investor unrest, on December 6, 2007, Motorola Chief Financial Officer Thomas Meredith ("Meredith") appeared at a conference in San Francisco to reassure investors that Motorola's 4Q 2007, then more than two-thirds complete, was succeeding financially. This conference was also taking place two-thirds of the way into the 4Q 07, nearly two weeks after so-called "Black Friday," the Friday following Thanksgiving during which retailers finally become profitable and electronics manufacturers conclusively learn what will and what will not sell in the holiday season that year.

12.     Attempting to dispel legitimate concerns the investment community had with the sudden management flip-flop, Meredith emphatically stated that:

3

[W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. *So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range. I am affirming that.*

[Emphasis added.]

13. Meredith also stated during the 3Q 07 earnings conference that:

[W]e said that we were going to have *sequential improvement in top and bottom-line in mobile devices*, a part of our business that seems to have a lot people quite excited regularly, and *I will affirm that we will have sequential improvement in our top and bottom-line*.

[Emphasis added.]

14. Later during the conference, in response to a request by Lehman Brothers analyst Jeff Kvaal, Meredith commented on projected 4Q margins, again assuring that the Company had turned a corner. As part of that assurance, Meredith quoted comments made by Motorola's incoming and outgoing CEOs from the 3Q 07 earnings conference call and then stated that:

As I mentioned *we expected and still expect an improvement in our top and bottom line over last quarter*. And this is – *Q3 was a start or progress* I think is the words that Ed and Greg have used. *And I believe that's sort of where we are.*

[Emphasis added.]

15. Responding later in the call to Kvaal's questioning about enterprise spending levels, Meredith again confirmed that "*business for us continues to be very robust business and I mentioned earlier that I was affirming our guidance with sequentially up revenues and continuing strong operating margin performance*," adding: "*I love that business*." Following up, Kvaal asked if that was *"[b]ecause of the operating margins, or the growth profile?,"* to which Meredith emphatically responded: "*Both*." [Emphasis added.]

16. As predicted, the market responded exuberantly to this news and the Company's stock price partially recovered. According to *Bloomberg*, "*Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets.*" According to *Bloomberg*, on this announcement

4

"Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading."  [Emphasis added.]

17.    However, the above statements made by Defendants in the pre-Class Period were false and misleading and remained alive in the market during the Class Period, as werethe false and misleading statements defendants made during the Class Period, which began December 6, 2007. The statements were false, misleading and/or incomplete in that:

(a)    The Company knew it was not experiencing the robust demand for the RAZR2 it claimed;

(b)    The Company knew that the thinner RAZR2, which went on sale in the U.S. in August 2007, failed to attract buyers in the 2007 holiday buying season because it was not different enough from the original RAZR to warrant the $299 price tag;

(c)    Motorola knew it was still losing significant market share to Apple, Inc.'s iPhone, Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices;

(d)    After falling from 21% at the end of FY 2006 to 13% at the end of Q3 07, Motorola knew it's market share had not stabilized but was still in a freefall during Q4 07;

(e)    The Company knew it was not on track to bring in anywhere near the $0.12-$0.14 per share in earnings defendants were projecting for Q4 07 purportedly based on results available to defendants two weeks after Black Friday;

(f)    Motorola knew it was not on track to achieve "sequential improvement in top and bottom-line in mobile devices" during its Q4 07;

(g)    The Company knew that the secret settlement talks concerning a resolution of ongoing litigation with Freescale arising out of its spinoff and provision of chips to Motorola would require Motorola to take a very material charge to earnings during the 4Q 07;

(h)    The Company was aggressively buying back its stock on the open market during the 4Q 07 in order to buttress its declining stock price; and

(i)    Defendants knew Motorola was operating with significantly defective internal controls, rendering its publicly disclosed financial results and projections meaningless.

18.      Yet, due to defendants' deception and concealment, the Company's $0.12-$0.14 per share earnings guidance remained alive in the market throughout the Class Period. Indeed, as late as January 11, 2008, *Bloomberg* reported that as of January 4, 2008, average analyst earnings expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share.

19.      Finally, on January 23, 2008, defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions were made:

- The Company sold only 1.5 million RAZR2 phones during the 4Q 07;

- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during the 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- Motorola's market share in the Mobile Devices segment had fallen further in the 4Q 07;

- Motorola earned only $0.04 cents a share in the 4Q 07, ***84% less the $0.25 per share earned in the 4Q 06,*** and nowhere near the $0.12-$0.14 per share defendants had claimed the Company was on track to earn throughout the 4Q 07;

- Motorola booked a FY 07 *loss* of $0.02 per share on sales of $36.6 billion, ***down 18.2% from FY 2006's*** sales;

- Instead of "sequential improvement in top and bottom-line in mobile devices" in the 4Q 07, sales in the Mobile Devices segment fell 38% compared to the 4Q 06 and declined from a 4Q 06 operating ***profit*** of $341 million to a 4Q 07 operating *loss* of $388 million;

- FY 2007 sales in the Mobile Devices segment declined by 33% from FY 2006 and the segment incurred an operating *loss* of $1.2 billion compared to operating earnings of $2.7 billion in FY 2006;

- Defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge to resolve litigation arising out of the Freescale spin-off and Freescale's chip supplier status with Motorola;

- The Company had buttressed its falling stock price during the 4Q 07 by using Company funds to purchase more than a half-billion dollars worth of stock on the open market;

- For the 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where defendants' positive statements had led them to expect a $0.10 per share profit); and

- Motorola said it expected to "lose market share in Q1," whereas Apple said its iPhone sales projections were strong, with that company saying it was on track to sell 10 million iPhones in FY 2008.

20.     In response to an analyst's inquiry, defendant Meredith finally expressly conceded that the decline in Motorola handset sales dated back to Black Friday – which occurred that year on Friday, November 23, 2007, nearly two weeks before defendants affirmed 4Q 07 guidance on December 6, 2007:

> [Bear Stearns:] And Thomas, if I could follow up, *going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-off in December or was this weakening through the quarter?*
>
> [Meredith:] *I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated*.

[Emphasis added.]

21.     The market's reaction was swift and furious.  On this news the Company's stock price plummeted 18.8%, or $2.31 per share, in a single trading session to close at $10.01 per share, its lowest level in five years, on unusually high volume of more than 167 million shares trading.  According to a January 23, 2008 *Bloomberg* report, "That's the biggest decline in more than five years and puts the stock at its lowest since September 2003 . . . ."  According to Piper Jaffray & Co's Michael Walkley, "[t]heir phones are just not selling through," adding that *the "overall health of the market is fine; these problems are Motorola-specific."*  Following defendants' disclosures, the Company's stock and debt ratings were slashed.

22.     The Company's global handset market share continued its rapid decline during FY 2008, falling to just 6% by Q1 2009.

23.     As the truth about Motorola's 4Q 07 sales and financial results were finally disclosed, the Company's stock price plummeted, closing at just $10 per share by January 23, 2008, erasing hundreds of millions of dollars in market capitalization.  This Class Period stock price inflation was due to Company-specific misstatements as the S&P 500 Index was relatively flat on a comparative basis during the same December 5, 2007 to January 25, 2008 period reflected below:



## JURISDICTION AND VENUE

24.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

25.     Venue is proper in this district pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred in this District.

## PARTIES

26.     Plaintiff St. Lucie Fire purchased the common stock of Motorola at artificially inflated prices during the Class Period and was damaged thereby, as reflected on the attached certification.

27.     Defendant Motorola, Inc. is a public corporation with its executive offices in this District. Motorola, based in Schaumberg Illinois, is now the largest U.S. maker of mobile phones. The common stock of Motorola trades on the New York Stock Exchange in a highly efficient market, trading tens of millions of shares every day.  Motorola was followed by stock analysts during the Class Period and was constantly in communication with the markets and investors in

1

quarterly conference calls and frequent presentations to investor and analyst conferences. Motorola also files periodic public reports with the SEC, and regularly issues press releases to the financial press. Financial information about Motorola was widely distributed during the Class Period.

28.     Defendant Edward J. Zander ("Zander") served as CEO, Chairman of the Board and Chairman of the Board's Executive Committee from January 2004 until January 2008. Though having entered into a separation agreement on November 27, 2009 terminating his position as CEO effective January 1, 2008, Zander would continue serving as a management consultant through 2009 and as Chairman until the Company's annual meeting of shareholders in May 2008. Zander was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales. Zander was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates.

29.     Defendant Gregory Q. Brown ("Brown") has served as President and CEO of Motorola since January 1, 2008. From March 2007 through December 2007, Brown served as President and Chief Operating Officer. From January 2005 through March 2007, Brown served as Executive Vice President and President of the Networks and Enterprise business and from January 2003 through December 2004 he served as Executive Vice President and President of the Commercial Government and Industrial Solutions Sector. Brown was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales. Brown was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates.

30.     Defendant Thomas J. Meredith ("Meredith") served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008. Meredith has also served as a director of Motorola

since 2005.  Concomitantly, Meredith served as the general partner of Meritage Capital, L.P., an investment management firm specializing in multi-manager hedge funds that he co-founded, and as chief executive office of MFI Capital.  Meredith was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales.  Meredith was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls.  He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates.

31.    Indeed, Defendants Zander, Brown and Meredith (collectively the "Individual Defendants") ran Motorola as "hands-on" managers, dealing with important issues at the Company, including sales of Motorola products and all aspects of Motorola's financial reporting and projections.  Defendants were also personally familiar with Motorola's diminished revenue prospects as its 4Q 2007 progressed, as they continually monitored Motorola's financial results.

## BACKGROUND TO THE CLASS PERIOD

32.    Motorola RAZR (pronounced "razor"), a series of clamshell mobile camera phones, was first developed in July 2003 and introduced in August 2004, just in time for the 2004 holiday selling season.  The RAZR was quickly identified as the "iPod" of mobile phones.  Being the slimmest phone during its release in 2004, it easily stood out among other phone models.  Indeed, sales of the RAZR, the most popular mobile phone ever released until being surpassed by the iPhone 3G in November 2008, surpassed the Company's total lifetime projections in its first three months.

33.    Because of its striking appearance and thin profile, the RAZR was initially exclusively marketed as a fashion phone, but within a year, its price was lowered and it was wildly successful selling over 50 million units by July 2006, making it the most popular clamshell phone.  During the RAZR's run until July 2007, Motorola sold more than 110 million units, boosting its position to second place in the handheld market behind Nokia.  *PC World* would list the RAZR at #12 in *The 50 Greatest Gadgets of the Past 50 Years* released on December 24, 2005.

3

34.     But competition increased dramatically in June 2007 when Apple introduced its iPhone, which blended the iPod media player with an e-mail-equipped handset.  Apple sold out of the iPhone at most of its stores less than a week after the product's debut.

35.     In July 2007, Motorola discontinued sales of the original RAZR, replacing it with a release of the new upgraded Motorola RAZR2 series.  Marketed as a more sleek and more stable design of the RAZR, the RAZR2 included more features, improved telephone audio quality, and a touch sensitive external screen.  That same month, the struggling cell-phone maker warned investors of a 2Q 07 loss.

36.     Motorola posted yet another disappointing quarter October 25, 2007, with 3Q 07 net income declining *94%* to $60 million, from $968 million a year earlier.  Motorola posted sales of $8.81 billion, also down from 2007 third-quarter sales of $10.6 billion.  For the first nine months of 2007, Motorola recorded a $149 million loss on sales, down 13% to $30 billion.  ***Analysts were then predicting FY 2007 revenues would decline 14%, to $36.7 billion, down from $42.9 billion in FY 2006.***

37.     Meanwhile, Nokia increased its market share to 38.1% of unit sales in the 3Q 07 from 35.1% a year earlier, according to Gartner.  Samsung boosted its share to 14.5% from 12.2%, while Motorola fell to 13.1% from 20.7%.

38.     On November 30, 2007, Motorola suddenly announced that Zander, its Chairman and CEO, had resigned as CEO effective December 31, 2007.  Zander would continue to serve as Motorola's Chairman until the 2008 annual meeting of stockholders in May 2008.  But Zander would not be nominated, or stand for re-election, to the Board of Directors at the 2008 annual meeting of stockholders.  Beginning January 1, 2008, Zander would serve as Strategic Advisor to the incoming CEO, a non-officer employee position, through January 5, 2009.  During this time, Zander would continue to receive his regular base salary and benefits.  The Company also announced on November 30, 2007 that Brown, who had served as Motorola's President and Chief Operating Officer since March 21, 2007, would replace Zander as President and CEO of Motorola effective January 1, 2008.

4

## DEFENDANTS' PRE-CLASS PERIOD MISSTATEMENTS THAT REMAINED "ALIVE" IN THE MARKET DURING THE CLASS PERIOD

39.     On September 7, 2007, the Company held a financial analyst meeting.  Addressing the market's response to the Company's new product offerings, defendants reported that consumer response was overwhelmingly positive.  Specifically as to the Mobile Devices segment, Brown's presentation promised "Mid-to-high single-digit sales growth" and "Solid double-digit OM [operating margins]."  Meredith followed up stating "For 2008, expect . . . Profitable in all businesses."

40.     On October 25, 2007, Motorola released its 3Q 07 financial results.  The earnings release defendants issued that day reported 3Q 07 sales of $8.8 billion, $4.5 billion of which were in the Mobile Devices segment, down 36% from the 3Q 06.  The Mobile Devices segment incurred an operating *loss* of $138 million in the 3Q 07, compared to an operating *profit* of $843 million in the 3Q 06.  But the Company's October 25, 2007 release affirmatively stated "Motorola's share of the global handset market for the quarter *is estimated to be 13 percent*."  Zander was quoted in the October 25, 2007 release, stating management was "***pleased with the improvement in the financial performance of mobile devices and we look forward to building upon the progress we have made.***" The quote from Zander also assured that "***[w]ith our focus on . . .the initiatives we are taking in mobile devices we will further improve our performance and create long-term shareholder value***."  As to the Company's "Outlook," the October 25, 2007 release stated the "company's outlook for earnings per share from continuing operations in the fourth quarter *is $0.12 to $0.14.*"  [Emphasis added.]

41.     Defendants Zander, Brown and Meredith also held an earnings conference that day to discuss the current status of the Company's sales and 3Q 07 financial performance and the ongoing 4Q 07 quarter with the investment community.  Concerning the Company's 3Q 07 performance, especially in its Mobile Devices segment, defendants stated:

- [Zander:] "***Our third quarter can be characterized by one word, progress***.  We improved our earnings and cash flow significantly compared to the second quarter and made ***substantial improvement in all key metrics in Mobile Devices***."

- [Zander:] "*In Mobile Devices, we began to move in the right direction.  We increased unit sales and gross margin percentage while lower operating expenses.  These improvements resulted in significantly lower operating loss.*"

- [Brown:] "Our estimated market share in the quarter was about 13%."

- [Brown:] "Compared to last quarter, gross margin percentage improved, again as a result of our new product offerings, *which are collectively running at higher margins than the mature products in the portfolio*."

- [Brown:]  "Moving on to the products in the feature phone segment, *RAZR and KRZR continued to be top sellers globally*.  We sold over 8 million RAZRs, bringing us to a total of now over 110 million RAZRs and in the quarter, nearly 3 million KRZRs.  *RAZR 2s began shipping in all regions and technologies.  It's off to a great start*, *meeting the needs of the demanding feature phone users and accounted for over 900,000 units in the quarter. We . .  just recently we announced the RAZR 2 Luxury Edition in time for the holiday selling season*."

- [Brown:]  "So to recap, *the operational changes we have made in Mobile Devices are beginning to yield results* and *we are making progress*.  We improved gross margin percentage . . . ."

- [Bear Stearns analyst:] ". . . you've been losing share in a bunch of regions around the world. And I wonder if you expect to gain a little bit of the share back in the fourth quarter or whether that little bit of drop is going to continue for a while."  [Zander:] ". . . I think you're referring to mobile devices.  *We actually think we gained share*."

- [Brown:] ". . . *we're pretty pleased with RAZR2 sales out of the gate* with over 900,000 units in the quarter and now being made available in all technologies and geographies."

- [Zander:] "We are pleased with RAZR2s.  I think we did almost 1 million units.  I would say that was done in 80 days.  I must say that the popular product everybody talks about today also did about 1 million units in 90 days.  So *we're pretty excited about the additional acceptance with the RAZR2 product*."

[Emphasis added.]

42.    Defendants also provided a very favorable outlook for the Company's 4Q 07, then well underway:

- [Zander:]  "Q3 was about execution, doing what we said we were going to do, but we also recognized there is lot more work to do.  *Our management team is committed to returning the company to our financial targets as outlined during the September Analyst meeting*."

- [Meredith:]   "Moving on to our outlook for the fourth quarter, we are encouraged by progress in Mobile Devices as compared to prior quarters.  *We expect continued improvement in the fourth quarter*."

- [Meredith:]  *"We expect fourth quarter earnings per share from continuing operations to be in the range of $0.12 to $0.14."*

- [Brown:] "In closing, as we look overall, third quarter operating performance, we're seeing results from the changes we've implemented. *We will continue the momentum and drive further improvements in the coming quarter.* With continued execution, our global brand, and healthy market trends across key businesses, we're well positioned for the long term."

- [Zander:] "I think what we need to do in the last six months is to put the operational discipline and execution back into Mobile Devices. *It's not dependent on a one-hit wonder such as RAZR even though everybody would like to have that. And I think we're doing that*."

- [Meredith:] "In terms of mobile devices, *we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line*."

- [Brown:] "The overall guidance as we reflected is $0.12 to $0.14. Within the line items, we wouldn't give that breakdown. Just on gross margin percentage, we have sequentially improved it for I think three quarters in a row and also for three quarters in a row in Mobile Devices. *So it's a very regimented and disciplined stair step and we're working hard on all levers: pricing, product efficiencies, new product, higher gross margin, richer experiences and that's the cadence of what we're going to continue to drive from an overall portfolio standpoint over time*."

[Emphasis added.]

43.     On November 14, 2007, defendant Brown appeared at the UBS Global Technology & Services Conference. Asked about the Company's 4Q 07 forecast, Brown reiterated that "what we said in the . . . Q3 earnings call is that we thought units would be growing sequentially along with revenue and bottom line OE [operating earnings] would improve sequentially as well."

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD

44.     At the start of the Class Period, at 7:30 a.m. PST on December 6, 2007, Defendant Meredith appeared at the Lehman Bros. conference in San Francisco officiated by Jeff Kvaal, analyst with Lehman Bros., and webcast. Meredith opened up his presentation by promising that the recent elevation of Brown to "the CEO position effective January 1st . . . was part of a very orderly and disciplined process." Meredith then attempted to mollify legitimate concerns the investment community had with the management flip-flop, emphatically stating:

[W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. *So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show*

*earnings from continuing operations in the 0.12 to $0.14 range.  I am affirming that.*

[Emphasis added.]

45.    Meredith also confirmed that:

[W]e said that we were going to have *sequential improvement in top and bottom-line in mobile devices*, a part of our business that seems to have a lot people quite excited regularly, and *I will affirm that we will have sequential improvement in our top and bottom-line*.

[Emphasis added.]

46.    Later during the call, in response to Kvaal's request that Meredith comment on 4Q margins, Meredith again confirmed, quoting defendants Brown and Zander from the 3Q 07 earnings conference call, that:

As I mentioned *we expected and still expect an improvement in our top and bottom line over last quarter*.  And this is – Q3 was a start or progress I think is the words that Ed and Greg have used.  And I believe that's sort of where we are.

[Emphasis added.]

47.    Responding later in the call to Kvaal's questioning about enterprise spending levels, Meredith again confirmed that "*business for us continues to be very robust business and I mentioned earlier that I was affirming our guidance with sequentially up revenues and continuing strong operating margin performance*," adding: "*I love that business*."  Following up, Kvaal asked: "[b]ecause of the operating margins, or the growth profile?," to which Meredith responded: "*Both*."  [Emphasis added.]

48.    As expected, even desired, the market responded positively to this news.  According to *Bloomberg*, "*Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets*."  According to *Bloomberg*, on this announcement "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading."  [Emphasis added.]

49.    Due to defendants' deception and concealment, the Company's $0.12-$0.14 per share earnings guidance remained alive in the market throughout the Class Period.  Indeed, as late as

8

January 11, 2009, *Bloomberg* reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share.

50.     The false and misleading statements defendants made in the pre-Class Period that remained alive in the market during the Class Period (¶¶39-43) and the false and misleading statements defendants made during the Class Period which began December 6, 2007 (¶¶44-48) were false, misleading and/or incomplete because:

(a)     The Company was not experiencing the robust demand for the RAZR2 it claimed;

(b)     The thinner RAZR2, which went on sale in the U.S. in August 2007, failed to attract buyers in the 2007 holiday season because it was not different enough from the original RAZR to warrant the $299 price tag;

(c)     Motorola was losing significant market share to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

(d)     After falling from over 21% at the end of FY 2006 to 13% at the end of Q3 07, Motorola's market share had not stabilized but was still in a freefall during Q4 07;

(e)     The Company was not on track to bring in anywhere near the $0.12-$0.14 per share in earnings defendants were projecting for Q4 07 *purportedly based on results available to defendants two weeks after Black Friday*;

(f)     Motorola was not on track to achieve *"sequential improvement in top and bottom-line in mobile devices"* during its Q4 07;

(g)     The secret settlement talks concerning a resolution of ongoing litigation with Freescale arising out of its spinoff and provision of chips to Motorola would require Motorola to take a very material charge to earnings during the 4Q 07;

(h)     The Company was aggressively buying back its stock on the open market during the 4Q 07 in order to buttress its declining stock price; and

(i)     Defendants knew Motorola was operating with significantly defective internal controls, rendering its publicly disclosed financial results and projections meaningless.

## THE TRUTH BEGINS TO EMERGE

51.     On January 23, 2008, defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions were made:

- That the Company only sold only 1.5 million RAZR2 phones during the 4Q 07;

- That "demand for [Motorola's Mobile Device segment] products ha[d] slowed" during the 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- Motorola's market share in the Mobile Devices segment had continued falling in the 4Q 07;

- Motorola earned only $0.04 cents a share in the 4Q 07, *84% less the $0.25 per share earned in the 4Q 06,* and nowhere near the $0.12-$0.14 per share defendants had claimed the Company was on tract to achieve throughout the 4Q 07;

- Motorola booked a FY 07 *loss* of $0.02 per share on sales of $36.6 billion, *down 18.2% from FY 2006* sales;

- Instead of "sequential improvement in top and bottom-line in mobile devices" in the 4Q 07, sales in the Mobile Devices segment fell 38% compared to the 4Q 06 and declined from a 4Q 06 operating *profit* of $341 million to a 4Q 07 operating *loss* of $388 million;

- FY 2007 sales in the Mobile Devices segment declined by 33% from FY 2006 and the segment incurred an operating *loss* of $1.2 billion compared to operating earnings of $2.7 billion in FY 2006;

- Defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge to resolve litigation arising out of the Freescale spin-off and Freescale's chip supplier status with Motorola;

- The Company had buttressed its falling stock price during the 4Q 07 by using Company funds to purchase more than a half-billion dollars worth of stock on the open market;

- For the 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where defendants' positive statements had led them to expect a $0.10 per share profit); and

- Motorola said it expected to "lose market share in Q1," whereas Apple said its iPhone sales projections were strong, with that company saying it was on track to sell 10 million iPhones in FY 2008.

52.     In response to an analyst's questioning, defendant Meredith expressly conceded that the decline in handset sales dated back to Black Friday – which occurred on Friday, November 23, 2007, nearly two weeks before defendants affirmed 4Q 07 guidance on December 6, 2007:

> [Bear Stearns:] And Thomas, if I could follow up, ***going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-off in December or was this weakening through the quarter?***
>
> [Meredith:] ***I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated***.

[Emphasis added.]

53.     The market's reaction was swift and furious.  On this news the Company's stock price plummeted 18.8%, or $2.31 per share, to close at $10.01 per share on January 23, 2008, its lowest level in five years, on unusually high volume.  According to a January 23, 2008 *Bloomberg* report, "That's the biggest decline in more than five years and puts the stock at its lowest since September 2003 . . . ."

54.     According to Piper Jaffray & Co.'s Michael Walkley, "[t]heir phones are just not selling through," adding that ***the "overall health of the market is fine; these problems are Motorola-specific."*** [Emphasis added.]  Due to defendants' deception, the Company's $0.12-$0.14 per share earnings guidance remained alive in the market throughout the Class Period.  Indeed, as late as January 11, 2008, *Bloomberg* reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share.

55.     Following defendants' disclosures, the Company's stock and debt ratings were slashed. Fitch cited "[l]imited visibility and expected further delays in returning the mobile devices business to consistent profitability and sustainable market share," the "company's slower than anticipated progress in turning around the mobile devices business," and less than optimal margin improvements in the 4Q 07.  Moody's Investors Services cited "the company's recently announced downward guidance for Q1 2008 and the continued delays in turning around the handset business." Moody's stated that it had been led to expect improvements in Motorola's business by early 2008.

Standard & Poor's slashed Motorola's debt ratings to two levels below investment grade, stating the Company's new handsets failed to catch on with consumers. There are "limited signs of recovery" because the RAZR2 had not met expectations according to Standard & Poor's.

## CLASS ACTION ALLEGATIONS

56.     This is a class action on behalf of purchasers of Motorola common stock between December 6, 2007 and January 22, 2008 inclusive, excluding defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the defendants, and all partners and employees of the Company's outside auditors. Class members are so numerous that joinder of them is impracticable.

57.     Common questions of law and fact predominate and include whether defendants: (a) violated the Securities Exchange Act of 1934 (the "1934 Act"); (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; and (d) artificially inflated the price of Motorola common stock and the extent of and appropriate measure of damages.

58.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

59.     At all relevant times, the market for Motorola's common stock was an efficient market for the following reasons, among others:

(a)     Motorola's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's FY 2007 annual financial report filed with the SEC on Form 10-K, as of January 31, 2008, there were over 2.255 billion shares of Motorola common stock outstanding. During the Class Period, on average, approximately 30 million shares of

Motorola stock were traded on a daily basis, demonstrating a very active and broad market for Motorola stock and permitting a very strong presumption of an efficient market;

        (c)        As a regulated issuer, Motorola filed periodic public reports with the SEC;

        (d)        Motorola regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

        (e)        Motorola was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

        (f)        Numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Motorola stock at all times during the Class Period; and

        (g)        Unexpected material news about Motorola was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

        60.        As a result of the foregoing, the market for Motorola common stock promptly digested current information regarding Motorola from publicly available sources and reflected such information in Motorola's stock price. Under these circumstances, all purchasers of Motorola common stock during the Class Period suffered similar injury through their purchase of Motorola common stock at artificially inflated prices, and a presumption of reliance applies.

        61.        Plaintiff is also entitled to the *Affiliated Ute* presumption of reliance to the extent that defendants' statements were materially misleading in failing to disclose material facts about Motorola that would have caused Plaintiff and the Class not to have purchased Motorola stock at the artificially inflated prices at which such securities traded during the Class Period.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

        62.        The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein either were not identified as "forward-looking statements" when

made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Motorola who knew that those statements were false when made.

## LOSS CAUSATION

63.     During the Class Period, as detailed herein, defendants made false and misleading statements by means of concealment and obfuscation of critical information concerning Motorola's handset sales, business fundamentals and key financial metrics and engaged in a scheme to deceive the market.  This artificially inflated Motorola's stock price and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Motorola's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of Motorola securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

64.     As the truth about Motorola's 4Q 07 sales and financial results was finally disclosed, the Company's stock price plummeted, closing at $10 per share by January 23, 2008, erasing hundreds of millions of dollars in market capitalization.  This Class Period stock price inflation was due to Company-specific misstatements as the S&P 500 Index was relatively flat on a comparative basis during the same December 5, 2007 to January 25, 2008 period reflected below:





### FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

65.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

66.    Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Motorola common stock, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

67.    During the Class Period, defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Motorola common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (c) cause Plaintiff and other members of the Class to purchase Motorola common stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein, in violation of §10(b) of

15

the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

68.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Motorola's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

69.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

70.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Motorola common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Motorola common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Motorola stock during the Class Period at artificially high prices and were damaged thereby.

71.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were not disclosed by defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Motorola shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

72.     By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

73.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

74.     The Individual Defendants acted as control persons of Motorola within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

75.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

76.     Motorola controlled each of the Individual Defendants.

77.     By reason of such wrongful conduct, the Individual Defendants and Motorola are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 21, 2010                          ST. LUCIE COUNTY FIRE DISTRICT
                                                  FIREFIGHTERS' PENSION TRUST FUND


                                                  _____s/Jeffrey A. Leon_____


                                                  FREED & WEISS LLC
                                                  ERIC D. FREED
                                                  JEFFREY A. LEON
                                                  JULIE D. MILLER
                                                  111 West Washington Street, Suite 1331
                                                  Chicago, IL 60602-3455
                                                  Tel: 312-220-0000
                                                  Fax: 312-220-7777

                                                  SCOTT+SCOTT LLP
                                                  ARTHUR L. SHINGLER III
                                                  MARY K. BLASY
                                                  600 B Street, Suite 1500
                                                  San Diego, CA 92101
                                                  Tel:  619-233-4565
                                                  Fax: 619-233-0508

                                                  and

DAVID R. SCOTT
108 Norwich Avenue
Colchester , CT 06415
Tel:  860-537-3818
Fax: 860-537-4432

*Attorneys for Plaintiff St. Lucie County Fire
District Firefighters' Pension Trust Fund*