UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ST. LUCIE COUNTY FIRE DISTRICT FIREFIGHTERS' PENSION TRUST FUND, TOWN OF NORTH BRANFORD PENSION COMMITTEE, on Behalf of Themselves and All Others Similarly Situated,<br><br>                   Plaintiffs,<br><br>    vs.<br><br>MOTOROLA, INC., EDWARD J. ZANDER, THOMAS MEREDITH and GREGORY Q. BROWN,<br><br>                   Defendants. | No. 1:10-cv-00427<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

Court-appointed Lead Plaintiff, St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie Fire"), along with additional named Plaintiff, the Town of North Branford Pension Committee ("North Branford") (collectively, "Plaintiffs"), allege the following based upon the investigation by Plaintiffs' counsel, which included, among other things, a review of the public documents, conference calls and announcements made by Motorola, Inc. ("Motorola" or the "Company") and its executives, United States Securities and Exchange Commission ("SEC") filings, and press releases, wire and press releases published by and regarding the Company, its suppliers and customers, securities analysts' reports and advisories about the Company, its suppliers and customers, and information obtained from speaking with persons currently and/or formerly employed at Motorola, its competitors and/or its suppliers, on the Internet and from national court dockets. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a securities fraud class action on behalf of those persons who purchased the common stock of Motorola between October 25, 2007 and January 22, 2008, inclusive (the "Class Period"). The action is brought against Motorola and three of its current and/or former key executives and directors for – in direct violation of the federal securities laws – issuing false and misleading public statements during the Class Period concerning Motorola's purported, then-present business fundamentals, and prospects, including: (i) the buildup of excess inventory at the Company's mobile device customers (including carriers, retailers and distributors) that defendants knew was not selling during the 2007 holiday sales period; (ii) the resulting significant decline in orders being placed for Motorola's mobile device products by its customers during 4Q 07 for delivery in 1Q 08; (iii) its margin deterioration for its higher costs of semi-conductors, or "chips";

(iv) that Motorola remained on track to achieve $0.12-$0.14 earnings on continuing operations in 4Q 07 as being promised; (v) that Motorola remained on track to achieve "bottom-line" improvement, or improved operating income, in its Mobile Devices division during the 4Q 07, as being promised; and (vi) that each of Motorola's business segments, including its Mobile Devices, would be "profitable" in FY 08.  Defendants' false statements and material omissions caused billions of dollars in artificial inflation in the market price of Motorola's stock during the Class Period.

2.      Specifically, after reporting disappointing earnings in 4Q 06 and quarterly losses in 1Q 07 and 2Q 07 in Motorola's all-important Mobile Devices division that accounted for 66% of FY 06 sales and suffering a dramatic decline in its handset market share, on September 7, 2007, defendants convened Motorola's annual financial analyst conference to lay out their plan for returning Motorola to financial health by the end of 2007, with vast improvements to be seen in Motorola's Mobile Device business by 2008.  Thereafter, defendants opened the Company's 3Q 07 earnings conference on October 25, 2007, the start of the Class Period, by triumphantly declaring that their plan was succeeding: ***"[o]ur third quarter can be characterized by one word, progress***.  We improved our earnings and cash flow significantly compared to the second quarter and made substantial improvement in all key metrics in Mobile Devices."  And despite continued losses in the Company's Mobile Devices division, defendants emphatically stated that "[i]n Mobile Devices, ***we began to move in the right direction***.  We increased unit sales and gross margin percentage while lower[ing] operating expenses," that "estimated market share in the quarter was about 13%" and that "[e]xcluding highlighted items, the operating loss in the quarter was 138 million," noting that was "***a significant improvement over both Q1 and Q2 results***."  Defendants also explained that Motorola's newly released "RAZR 2s began shipping" and were ***"off to a great start,*** meeting the needs of the demanding feature phone users and account[ing] for over 900,000 units in the quarter," and

obliquely comparing it to the early market reaction to Apple's landmark iPhone. Explaining Motorola's "outlook for the fourth quarter," defendants stated they were "encouraged by progress in Mobile Devices as compared to prior quarters," "expect[ed] continued improvement in the fourth quarter," and based on their knowledge of the Company's then-present business metrics ***"expect[ed] fourth quarter earnings per share from continuing operations to be in the range of $0.12 to $0.14."***

[Emphasis added.]

3.       The market was elated. According to *Bloomberg,* Motorola's stock "climbed the most since Jan. 30 [that day], gaining 75 cents, or 4 percent, to $19.30" when the "largest U.S. maker of mobile phones ***posted its first profit in three quarters and gave a forecast that surpassed analysts' estimates. . . .*"  Four days later, on October 29, 2007, Motorola sold $1.4 billion in bonds, priced on the basis of ratings that had been sustained by Motorola's turnaround story. The bond offering was Motorola's first in three years, just in time to pay down $1.2 billion in bond obligations that would come due November 17, 2007. As reported by the *Chicago Tribune* on October 30, 2007, "Moody's Investors Service rated the securities Baa1, its third-lowest level of investment grade, while Standard & Poor's ranked them a step higher at A-" ***after "Motorola last week posted its first profit in three quarters and gave a forecast that surpassed analysts' estimates."*** [Emphasis added.]

4.       Yet, the market's perception of Motorola's asserted "turnaround" would be short-lived. On November 30, 2007, the Company abruptly disclosed that Edward J. Zander ("Zander"), its CEO and Chairman of four years, would step down effective December 31, 2007. Chief Operating Officer ("COO") Gregory Q. Brown ("Brown"), who had only recently been appointed COO and who had virtually no experience running the Company's all-important Mobile Devices

division, would take over in Zander's stead.  By December 5, 2010, the Company's stock closed

down at $15.75 per share.

5.     On December 6, 2007, Motorola Chief Executive Officer ("CFO") Thomas Meredith

("Meredith") took the stage at an investment conference hosted by Lehman Bros. with the expressly

stated purpose of disarming what he described as "great angst" that had suddenly developed in the

investment community following the announcement that Zander was stepping down *without*

*"affirm[ing] guidance on the fourth quarter"* or reassuring the investing public that, contrary to

speculation, the Company *was then* still on track with its plan to return Motorola's Mobile Device

business to financial health.  With only three and a half weeks remaining to reach the quarter's

financial results that had earlier been included in the 4Q 07 guidance, Meredith emphatically stated:

*"let me be real clear,"* Motorola remained on track to achieve both *"earnings from continuing*

*operations in the 0.12 to $0.14 range"* and *"sequential improvement in top and bottom-line in*

*mobile devices."*   Asked about "the timeframe . . . for the handset business to be approaching

breakeven," Meredith responded "[a]s I mentioned *we expected and still expect an improvement in*

*our top and bottom line over last quarter . . . Q3 was a start of progress*."

[Emphasis added.]

6.     These statements had the intended stabilizing effect on the market price of the

Company's stock, which had lost more than $3 per share since the 3Q 07 call on October 25, 2007,

but closed *up* over 3.6% on December 6, 2007 at $16.31 on unusually high trading volume.  Indeed,

the continued propagation of the Motorola Mobile Devices recovery story was imperative to the

Individual Defendants' own financial interests.  Zander, who would be stepping down on January 1,

2008, had millions of dollars of unvested stock options and restricted stock units ("RSUs"), some of

which would not vest until January 5, 2008 and others whose value was incumbent on increasing

Motorola's stock price to the $20-$25 price range.  Meredith's employment contract had been amended on October 4, 2007 to provide that he would step down no later than April 1, 2008, and his equity grants would vest on an accelerating basis once Motorola's stock price exceeded $20 per share for at least ten trading days.

7.     While the false and misleading December 6th assurances were insufficient, alone, to push Motorola's stock over the $20 per share tipping point, the Individual Defendants were positioning Motorola for a restructuring or outright sale that would sharply boost its stock price, but which depended upon the perception that Motorola was resolving its Mobile Devices problems.  As the *Wall Street Journal* later reported based on statements made during the December 6th conference, Motorola's senior management was then considering selling the Mobile Devices division, something the investment community had been pushing for, and the general consensus was then that the Company could be sold "for the value of one year's revenue, or about $20 billion."

8.     This created a tremendous and immediate motive for Zander and Meredith to hide the truth at the December 6th conference.  If such a sale could be consummated before the true 4Q 07 results leaked out, the value of Motorola's stock price could be increased by $8 per share, causing it to trade in the $20-$25 per share range required to vest all of the soon-departing CEO's and CFO's stock options and RSUs.  Indeed, as the *WSJ* stated, market speculation of an impending transaction alone could drive up Motorola's stock price.  However, as the *WSJ* reported, quoting an industry banker, the "cellphone piece could sell for less than one times sales *if its problems aren't fixed*."  Thus, the tantalizing prospect of cashing in on millions of dollars of unvested equity interests provided a compelling incentive to prop up Motorola's façade for the weeks following the December 6th conference.

9.     And, because the defendants' statements confirming that the Company was on track to achieve the 4Q 07 earnings results were so emphatic, and purported to be based on internal factual information at the Company, the investment community was duped into relying upon them, at least in part, throughout the Class Period.  That reliance continued to artificially inflate Motorola's stock price until January 23, 2008 when defendants finally revealed the Company's 4Q 07 results and the effects of the long-known deterioration in Mobile Devices in Motorola's following quarter.  Indeed, on the morning of January 22, 2008, *Bloomberg* reminded the market that Motorola was "set to report Q4 earnings before the market opens tomorrow," reporting that "[c]urrent [analyst] consensus [was] for EPS of $0.13[']" and emphasizing that "[o]n 12/6, the company reaffirmed guidance for Q4 EPS of $0.12-$0.14."

10.     When Motorola released its actual financial results for 4Q 07 (that had ended December 31, 2007) before the opening of trading on January 23, 2008, the market learned for the first time that not only had Motorola badly missed its 4Q 07 earnings targets – ***coming in at only $0.04 cents a share***, nowhere near the $0.12-$0.14 per share defendants had led the market to believe the Company was on track to earn throughout the 4Q 07 – but also that the promised ***"sequential improvement in top and bottom-line in mobile devices,"*** was illusory.  The ***loss*** in Motorola's Mobile Devices unit had instead actually ***ballooned exponentially*** from $138 million in the 3Q 07 to $388 million in 4Q 07 – ***an increase of more than 275%***.  Rather than achieving bottom-line "improvement" in Mobile Devices, Motorola reported its worst quarter of all in the prior two fiscal years.  And this abysmal performance occurred in the quarter which historically performed best because of the bump in sales during the Christmas season, and when global growth in sales of mobile devices had soared ***by 18% for the quarter.***

11.     Specifically, at the January 23, 2007 earnings call, defendants disclosed the Company was taking a $276 million charge to earnings as part of a confidential legal settlement with its primary chip supplier Freescale Semiconductor Inc. ("Freescale") that had been in the works throughout 4Q 07.  While Motorola's senior executives flatly refused to discuss the genesis of this charge that was purportedly extraordinary and so absolved them of their failure to reach the promised guidance, it later came to light through statements by Freescale and disclosures in Motorola's 2007 Form 10-K filed February 28, 2008, that the "settlement" referred to Motorola's payments to satisfy the minimum purchase requirements for chips under its purchase agreement with Freescale.  Thus, defendants' insistence on keeping these matters "confidential" hid both the deterioration in its Mobile Devices margins for the increased costs of good sold ("COGS"), and also the true decline in Motorola's own sales in 2007 that had led it to place lower orders with its chip supplier.  As Freescale explained, "[i]n 2007, Motorola's wireless handset sales decreased significantly compared to 2006 and it lost considerable market share during 2007" and "[a]s a result, [Freescale] experienced a significant reduction in sales of [its] Cellular Products to Motorola" during 2007.  According to Freescale's post-Class Period disclosures, *"during the fourth quarter of 2007,"* senior executives at the two companies had begun negotiating a compromise agreement resulting in Freescale offering Motorola "certain pricing modifications and reliev[ing] Motorola of certain obligations" in exchange for a payments from Motorola to Freescale in 1Q 08.  Indeed, in Motorola's own December 6, 2007 earnings call, Meredith had alluded to then participating in contract renegotiations with its chip suppliers purportedly for diversification purposes.  Thus, Meredith's republishing of the $0.12 - $0.14 in 4Q 07 guidance at the December 6th call, his assertions of "sequential improvements" in Mobile Devices' sales and margins, his concealment of the increases in Motorola's 2007 product costs attributable to the Company's minimum purchase

requirements, and the imminent $277 million "settlement" with Freescale for Motorola's inability to use the chips due to its own reduced sale orders, were a calculated effort to mislead investors about the Company's dire problems.[1]

12.   Critically, at the January 23, 2008 earnings conference, Meredith admitted that "demand for [Motorola's Mobile Device segment] products ha[d] slowed" *since Thanksgiving, two weeks prior to his having republished the $0.12-$0.14 earnings guidance and confirmed that the Company was still on track to achieve top and bottom-line improvement in Mobile Devices*. Several confidential witnesses confirm that the relevant sales data was readily available to Motorola's senior executives, including the Individual Defendants named herein, at that time.  At the January 23, 2008 call, Meredith also revealed the devastating breadth of the Mobile Devices problems he had denied and misrepresented at the December 6th earnings call when he finally described their effects on the following quarter.  According to Meredith, 1Q 08 "Mobile Devices unit sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where defendants' positive statements had led the market to expect a $0.10 per share *profit* in the 1Q 08), and that Motorola again expected to "lose *[even more]* market share in Q1" [08]."

[Emphasis added.]

13.   Any question that the Individual Defendants knew about the devastating deterioration in Motorola's Mobile Devices division by December 2007, is dispelled by the comments secretly made by Gregory Brown on January 4, 2008, only days after he took over the reins as the Company's CEO, in a meeting with one of Motorola's outside accountants.  As revealed by a

---

[1]   Motorola's January 23, 2008 release states the Freescale charge was $276 million while its 2007 annual financial report filed February 28, 2008 states the charge was $277 million.

judge's findings in an action based on breach of fiduciary duty for insider-trading by that accounting firm against one of its own partners, on or before January 4, 2008 "Motorola's CEO had stated in a private meeting that *the company's [4Q 07] performance 'will be significantly worse than anybody's imagined'. . . ."* That same day, the outside accountant purchased put options on Motorola's stock, betting the stock would decline dramatically when Motorola's 4Q 07 financial results were finally disclosed on January 23, 2008.   The rigged bet paid off and the outside accounting partner garnered a 1,400% return on his Class Period "investment" in Motorola when the Company's stock price was pummeled at the end of the Class Period.

[Emphasis added.]

14.     As the *Associated Press* would emphasize in a story run on January 23, 2008 after the close of trading, the defendants' statements had successfully misled analysts, and the truth, once revealed, caused Motorola's stock to plummet and enormous losses to Plaintiffs and other members of the Class:

> Income from continuing operations was 5 cents per share, including charges of 9 cents per share for asset write-downs, layoffs and a legal settlement.  *That was 8 cents less than the consensus estimate of analysts polled by Thomson Financial.*
>
> Motorola executives had told analysts that a series of innovative new cell phones would help break the company out of a slump that began when sales of the iconic Razr phone leveled off and the company had no other hit product to maintain momentum and market share.   The Schaumburg, Ill.-based company showed tentative progress toward a turnaround in the third quarter during a disastrous year which saw its handset sales tumble 33 percent overall from 2006.
>
> But sales from the mobile devices division, dominated by cell phones, sank to $4.8 billion in the fourth quarter *as the company failed to connect with consumers over the holidays.*   The handset unit, its biggest, had an operating loss of $388 million and shipped 40.9 million devices during the quarter, in line with analyst expectations but down sharply from past quarters.

Dave Carpenter, *AP*, "Bleak outlook sends Motorola plummeting," Jan. 23, 2008.  [Emphasis added.]

15.     Indeed, the market's reaction on January 23, 2008 was swift and furious.  As one analyst explained, the *"overall health of the market is fine; these problems are Motorola-specific."* Other analysts were now openly valuing the Company's Mobile Devices division at *zero*.  The Company's stock and debt ratings were slashed.  Motorola's stock price plummeted 18.8%, or $2.31 per share, in a single trading session, closing at $10.01 on January 23, 2008, its lowest level in five years, on unusually high volume of more than 167 million shares trading – over 7.5x the average daily trading volume during the prior 30 days.  Indeed, between the close of trading on January 3, 2008, the night before the outside accountant placed the big bet on Motorola's stock plummeting on its 4Q 07 results, and the close of trading on January 23, 2008, after the full extent of the deterioration in Motorola's Mobile Devices business during 4Q 07 was revealed, the Company's stock price fell precipitously by over $6 per share – more than one-third – *erasing over $13.5 billion in market capitalization.*   By this action, Plaintiffs seek recovery on behalf of investors who purchased Motorola stock on the open market at artificially inflated prices between October 25, 2007 and January 22, 2008, inclusive.

## OVERVIEW AND SUMMARY OF THE ACTION

16.     Defendant Motorola builds, markets and sells products, services and applications that make connections to people, information and entertainment through broadband, embedded systems and wireless networks.  During the Class Period, the Company operated in three primary business segments: Mobile Devices, Networks and Enterprise and Connected Home Solutions.  The most substantial by far was Mobile Devices which accounted for 58% of Motorola's sales in FY 05 and had grown to 66% of sales by the end of FY 06.

**Motorola's Mobile Devices Customers and Sales**

17.    By 2007, almost half of all Motorola's Mobile Devices sales were made in North America, where the market for the purchases of mobile devices was dominated by the major phone operators or carriers who purchased phones from Motorola and which, in turn, were marketed to their retail consumers as part of a package to enter into multi-year phone operator contracts. Motorola's 2007 Form 10-K reports the Mobile Devices segment had "several large customers worldwide, ***the loss of one or more of which could have a material adverse effect on the segment's business,***" including Sprint Nextel, AT&T, Verizon, China Mobile and America Movil, which collectively accounted for ***42% of the Mobile Devices segment's 2007 net sales***.
[Emphasis added.]

18.    Having 42% of the segment's sales concentrated in just five customers gave Motorola's management visibility into its sales orders for "sell in" to the carriers and the carriers' "sell through" numbers which were useful for forecasting follow-on purchases.  The high customer concentration also gave Motorola's management considerable leeway to manipulate the segment's reported revenues through the timing of shipments, which is what occurred in both 4Q 06 and then again in 4Q 07, with significant consequences for the sales results in the following quarters.

19.    Several confidential witnesses explained that to meet quarterly and annual targets, concessions were provided to the major carriers to accept unneeded inventory – which had the effect of stuffing the channel and depressing sales volumes and prices in later quarters.  This was particularly true because the agreements with the major carriers all had "most favored customer" clauses so that a discount offered one carrier had to be provided to every carrier.

20.    While global cell phone sales grew dramatically in FY 07 and in 4Q 07, Motorola was unable to capture any of that growth.  ***In fact, Motorola actually gave back billions of dollars***

11

*worth of market share.*  For instance, at the same time the global handset market *grew 16%* from 980 million units in FY 06 to 1.137 billion units in FY 07, Motorola's shipments *fell 27%* from 217.4 million units in FY 06 to just 159.1 million units in 2007 – *meaning Motorola lost 10% of its global market share in FY 07*.  More specifically, at the same time the global handset market *grew 18%* in 4Q 07, from 285.7 million units sold in 3Q 07 to 336 million units in 4Q 07, Motorola only sold 3.7 million additional units in 4Q 07 (including all holiday sales), *meaning Motorola actually lost .8% of its market share in the 4Q 07*.  But even this poor performance was only accomplished by raiding sales that would otherwise have been made in 1Q 08.

21.     Motorola's abysmal sales performance in 1Q 08 versus the rest of its peers was even more striking.  During that quarter, Motorola lost a full 3% share of the 295 million units sold industry-wide, or more than 8.8 million devices.  At Motorola's $120 average selling price, that was a *loss of more than $1 billion in sales in a single quarter*.

22.     Tellingly, the Company's April 24, 2008 1Q 08 earnings release would reveal that after having reported substantial gains in North American handset sales, which increased from 35% of Motorola's total handset sales in FY 06 to 46% in its FY 07 sales, the seismic 1Q 08 decline in Motorola's global handset market share was "*due primarily to a decline in North America.*" Motorola's 1Q 08 Form 10Q, would confirm just how detrimental that market share loss was to Mobile Devices, stating that "[i]n the first quarter of 2008, the segment's net sales . . . *decrease[d] 39%,*" and that the "*39% decrease in net sales was primarily driven by a 40% decrease in unit shipments and a 2% decrease in average selling price ("ASP").*"  As a result, "[t]he segment incurred an *operating loss of $418 million in the first quarter of 2008.*"  According to the 1Q 08 10Q, the "operating loss was primarily due to the decrease in gross margin, *driven by the 39% decrease in net sales. . . . .*"  Indeed, that the massive 1Q 08 market share loss was in North America

further demonstrated that defendants stuffed the channels in North America in 4Q 07 in order to meet their 4Q 07 revenue guidance, but did so at the cost of 1Q 08 sales.

**Motorola's Cell Phones and Declining Performance**

23.     The Company's RAZR clamshell-type cell phone was the most popular line of mobile phones ever released until being surpassed by the Apple iPhone 3G in November 2008.  Indeed, following its release in 2004, RAZR sales surpassed the Company's total lifetime projections in its first three months.  By June 2006, the Company had sold over 50 million units.  By the time the RAZR2 was released in July 2007, Motorola had sold 100 million units, boosting its position to second place in the global hand-held market, only behind Nokia.  At the end of FY 05, Motorola was the largest U.S. and second largest global supplier of wireless handsets, with an estimated 17% global market share.  ***By the close of FY 06, Motorola maintained its #2 position only behind Nokia and had grown its global market share to 22%.***

24.     However, despite multiple re-releases of the RAZR and management's repeated promises that the Company was "seamlessly" integrating new technologies to keep up with the advent of so-called "smart phones," Motorola was not.

25.     Indeed, cell phones are typically replaced every 12 to 18 months and Motorola was too slow in redesigning its model to keep up with the advances of its competitors.  In June 2007, Apple Inc. released its iPhone, a smartphone that effectively integrated internet technology, causing Motorola's market share to begin a freefall from 22% at the end of FY 06 down to 13% by the end of 3Q 07 (the quarter ended September 29, 2007).

26.     As such, as 3Q 07 drew to a close, handset sales and profits in Motorola's Mobile Devices division had begun a downward spiral that defendants could not pull out of – try as they might.  Performance in Mobile Devices, where profits had grown 23% in FY 06 to $2.7 billion on

13

sales that had grown 32% in FY 06 to $28.4 billion, plummeted with Motorola recognizing hundreds of millions of dollars in losses in each of the first three quarters of FY 07.  Adding insult to injury, Connecticut-based researcher Gartner Inc. ("Gartner") reported on November 26, 2007 that Motorola, which had increased its cell phone handset shipments 49% in FY 06 to 217.4 million, gaining more than four percentage points to an estimated 22% of global handset sales by December 31, 2006, had been overtaken by Samsung in 3Q 07.  At 13% of market share, ***Motorola now held the #3 spot behind Nokia and Samsung***.

27.    The following statistics were drawn from Motorola's SEC filings:

### Mobile Devices Segment Performance

| | *Q1* | *Q2* | *Q3* | *Q4* | *FY* |
|---|---|---|---|---|---|
| ***2005*** | | | | | |
| ***Sales*** | $4.4B | $4.9B | $5.6B | $6.5B | $21.4B |
| *sequential change* | (-12%) | +11% | +14% | +16% | +25% |
| ***Operating*** Earnings/(Loss) | $440M | $498M | $597M | $663M | $2.2B |
| *sequential change* | (-17%) | +13% | +19% | +11% | +27% |
| ***Handset Shipments*** | 28.7M | 33.9M | 38.7M | 44.7M | 146M |
| *sequential change* | (-9%) | +18% | +14% | +15% | +40% |
| ***2006*** | | | | | |
| ***Sales*** | $6.4B | $7.14B | $7.03B | $7.8B | $28.37B |
| *sequential change* | (-1%) | +11% | (-1%) | +10% | +32% |
| ***Operating*** Earnings/(Loss) | $702M | $799M | $819M | $341M | $2.66B |
| *sequential change* | +5% | +13% | +2% | (-58%) | +23% |
| ***Handset Shipments*** | 46.1M | 51.9M | 53.7M | 65.7M | 217.6M |
| *sequential change* | +3% | +12% | +3% | +21% | +47% |
| ***2007*** | | | | | |
| ***Sales*** | $5.4B | $4.3B | $4.5B | $4.8B | $19B |
| *sequential change* | (-30%) | (-20%) | +4% | +6% | -33% |
| ***Operating*** Earnings/(Loss) | (-$231M) | (-$264M) | (-$138M) | (-$388M) | (-$1.2B) |
| *sequential change* | *(-167%)* | *(-14%)* | *+47%* | *(-281%)* | *(-154%)* |
| ***Handset Shipments*** | 45.4M | 35.5M | 37.2M | 40.9M | 159M |
| *sequential change* | (-30%) | (-21%) | +4% | +9% | (-26%) |

28.     On September 7, 2007, at its annual analyst conference, Motorola rolled out its turnaround plan to restore the health of its Mobile Devices business and reduce the Company's cost structure.  The market was again emphatically promised on October 25, 2007 and December 6, 2007 that the turnaround had occurred and Motorola was firmly back on the path to profitability.  Despite defendants' emphatic reassurances to the contrary to the market, however, Motorola's Mobile Devices division simply had not made "progress" on its recovery plan or turned a corner in 3Q 07 as they had stated on October 25, 2007.  Nor was Motorola on a recovery path for 4Q 07, as became increasingly apparent to management as the quarter progressed.

**Motorola's Senior Executives Stood to Profit Handsomely on the Deception**

29.     Defendant Zander joined Motorola as CEO, Chairman of the Board and Chairman of the Board's Executive Committee in January 2004.  Zander, who served as Motorola's CEO until December 31, 2007 and as Chairman of its Board and its Executive Committee until May 5, 2008, was largely credited with the highly successful launch of the Company's RAZR phone in 2004 that drove the sharp sales increases in Mobile Devices.  The RAZR was ranked as the most popular consumer U.S. cell phone for several years and Zander had been rewarded handsomely.  Based largely on spiraling RAZR sales, Motorola paid Zander *over $18+ million* in FY 04, *over $15+ million* in FY 05, *over $14+ million* in FY 06 and *over $17+ million* in FY 07.  Yet, as dictated by the terms of his employment agreement, only $1.5 million of Zander's annual compensation came in the form of cash salary, with the remainder being paid largely in restricted stock units ("RSUs"), stock options and other long-term incentive payments*, the value of which was inextricably tied to Motorola's faltering stock price.*

30.     Zander's performance and the fortunes Motorola had paid him came under intense investor scrutiny in 2007 as Motorola ceded its technological leadership to Apple upon the release of

its iPhone – and to Samsung in terms of global sales.  The Company's stock price began falling as the perceived value of the Mobile Devices unit declined.  Bowing to intense pressure from investors to oust Motorola's management, to disgorge unearned 2006 executive bonuses and to break up Motorola and sell off its Mobile Devices division (including a well-funded proxy contest at the 2007 annual shareholder meeting that was only defeated with considerable fight), on November 30, 2007, defendants announced Zander would step down as CEO in January 2008 and that he would not stand for re-election to the Motorola Board of Directors at the Company's May 2008 annual meeting of shareholders.  At that time, Zander was sitting on 377,190 stock options *that would not vest until January 5, 2008* (and which had an exercise price of $12.97, meaning the Company's stock price had to be at or above that price for the options to have any value), 200,000 RSUs that *would not vest until January 5, 2008* and an additional 800,000 stock options *granted to Zander in May 2007* that would only vest if defendants could cause the closing price of Motorola's stock to exceed $22-$25 for at least ten trading days within a thirty-day consecutive trading session.  Zander was also entitled to a multi-million dollar payment under Motorola's Long Range Incentive Plan ("LRIP") for FY 07 that could be significantly enhanced or diminished based on the closing price of Motorola's stock price *on December 31, 2007.*

31.     Defendant Meredith served as Motorola's Acting Chief Financial Officer and Executive Vice President of Motorola between April 1, 2007 and March 1, 2008.  Meredith, who has served as a director of Motorola since 2005, is also the general partner of Meritage Capital, L.P., an investment management firm specializing in multi-manager hedge funds that Meredith co-founded, and chief executive office of MFI Capital.  Like Zander, the executive pay Meredith received from Motorola for serving as its CFO during most of tumultuous FY 07 was largely comprised of RSUs and stock options.  Indeed, Meredith served as Motorola's CFO *for six months* (between April 1,

2007 and September 30, 2007) under an employment agreement that paid him *only $1 per year in salary*, plus 500,000 RSUs and 250,000 stock options.  Like Zander's, Meredith's RSUs would only vest if he was able to increase Motorola's stock price above $20-$24 per share for ten thirty-day durations.  The Company's 2007 annual report expressly conceded the Compensation Committee had designed Meredith's pay to provide him with *"added incentive"* to *"stimulate stock price growth*."

[Emphasis added.]

32.     It had been determined by the fall of 2007 that Meredith would be replaced as CFO and on October 4, 2007, Meredith signed a new employment agreement under which he would be replaced as CFO effective April 1, 2008, *at the very latest*.  While the new October 2007 agreement now afforded Meredith a salary of $75,000 per month ($900,000 per year), like Zander, the RSUs and stock options Meredith had received for serving as Motorola's CFO during the six tumultuous months of 2007 would be worth *nothing* if defendants were unable to increase Motorola's stock price above $20 – a price the Company's stock price had hovered precariously below since January 4, 2007 when Motorola reported the dismal 4Q 06 financial results Meredith was brought in to remedy.  *See* Exhibit A attached hereto and incorporated herein, a graph showing the movements of Motorola's stock price from 2005 through 2008.

33.     Defendant Brown served as President and COO of Motorola from March 2007 through December 2007.  Brown joined the Motorola Board in 2007 and assumed the role of President and CEO of Motorola on January 1, 2008.  Brown had previously served in executive capacities in the Company's Networks and Enterprise Mobility Solutions and the Commercial Government and Industrial Solutions sectors, *but had never led Motorola's all important Mobile Devices division*.  According to a November 30, 2007 *Associated Press* story entitled "Zander's

Turbulent Ride at Motorola Ends," Zander's resignation "left some observers wary about what it might signal about the turnaround effort in the cell-phone unit . . . ." "While Mr. Zander's departure has been the source of speculation for some time, we had thought that an improvement in mobile devices could possibly grant him a stay," said Citigroup's Jim Suva in a research note. ***"We now wonder if today's announcement signals yet another disappointment for the handset segment and more meaningful changes that have to occur."*** The November 30, 2007 *AP* story quoted Brown as refusing to discuss a potential restructuring – or breakup – of Motorola until early 2008. ***But defendants were positioning Motorola for sale to drive up the Company's stock price.***

[Emphasis added.]

34.    In fact, a December 13, 2007 *Wall Street Journal* story entitled "Is Motorola Worth More If It Gets Busted Up?  By Icahn's Math, Selling Phone Unit Would Bump Shareholder Value 50%" explained that while "Motorola Chief Executive Ed Zander [had] rejected Mr. Icahn's proposal [to split up Motorola], . . . he is stepping down" now and "Brown is taking over," adding that "***Brown is seen as a deal maker and open to restructuring."*** The *WSJ* explored Motorola's apparent new-found willingness to consider selling off Mobile Devices, reiterating that "[l]ast week, Mr. Meredith said that while he believed 'there's every opportunity for us to create significant economic value as a whole,' ***that doesn't mean other options aren't viable***,'" and emphasizing Meredith's statement at the December 6, 2007 Lehman Bros. conference that ***"[a] change in circumstance sometimes requires a change in action***." The *WSJ* reemphasized Icahn's recent statements that "carving up Motorola could produce almost $20 billion of additional shareholder value," ***"translate[ing] to nearly $8 more a share and would make the stock worth roughly 50% more than its current price***." The *WSJ* story concluded, stating that "[a]nalysts agree in principle with Mr. Icahn's math, ***although many caution that Motorola needs to fix underlying problems in***

***the handset division to maximize the value of a breakup***." Thus, defendants were well aware that,

to keep the Company's perceived sale value (and stock price) high, it was imperative to successfully

promote the Mobile Devices recovery story.

[Emphasis added.]

35.     Indeed, on December 5, 2007, one day prior to Meredith's appearance at the Lehman

Bros. conference, the *Financial Times* had reported that Dell was potentially interested in acquiring

Motorola's Mobile Devices division, citing "industry sources."  Later that day it was reported that

Dell's volatility had increased substantially on the rumor and that Motorola's stock price increased

$0.25 on the speculation to $15.92 per share.  According to the *Financial Times*, "[i]ndustry bankers

said that Dell might want to compete with listed Apple's iPod and iPhones" and that "Motorola's

handset business might be a fast entry into the mkt said one veteran technology banker, especially

because Dell's consumer products head, Ron Garrigues headed it until a year ago."  The *Financial*

*Times* also emphasized that Dell's former CFO, Tom Meredith, now holds the same position at

Motorola."  On December 10, 2007, *Bloomberg* reported that "Motorola . . . may be an acquisition

candidate for Dell Inc., Hewlett-Packard Co. or Research in Motion Ltd. in 2008," quoting research

analyst David Garrity as stating ***"Motorola may fetch between $22 and $23 a share in a buyout."***

*Bloomberg.com* added that an "[a]nalyst on CNBC" had confirmed the same speculation,

emphasizing that Dell's "former CFO Tom Meredith [was] now CFO" at Motorola.   Though

*Bloomberg* reported Motorola would neither confirm nor deny the speculation, according to

*Bloomberg*, Motorola's stock price "rose 18 cents, or 1.1 percent, to $16.48 at 4 p.m." again that day.

[Emphasis added.]

36.     Thus, beyond needing to maintain – if not increase – Motorola's stock price during

Zander's and Meredith's final days at Motorola's helm, Motorola's three most-senior executives had

another overwhelmingly important reason to overstate the Company's 4Q 07 sales and financial performance in the Mobile Devices unit.  Motorola's larger investors and investment bankers were insisting the sum of the Company's parts were more valuable than the whole and that the Company's true value could only be realized if Motorola's divisions were split up and its Mobile Devices segment sold off – but only if the Mobile Devices business appeared healthy.  Though the Mobile Devices unit's sales were collapsing and the costs of production sky-rocketing because of supply contracts that tied the component costs to sales volume and imposed purchase minimums, so that Mobile Devices' profits were plummeting throughout 4Q 07, defendants knew that if the market became aware of this, the price they could secure upon a break-up and sale of the business unit would diminish, as would any hopes Zander and Meredith had of increasing the Company's stock price above the $20-$25 range required to vest the rest of their stock options and RSUs.

**Defendants Intentionally Mislead the Market with the Fabricated "Turnaround" Story**

37.    In an attempt to assuage the investment community, during the Company's October 25, 2007 3Q 07 earnings conference, defendants assured the investment community Motorola had finally turned the corner.  According to Meredith, management was "encouraged by progress in Mobile Devices as compared to prior quarters" and, purportedly based on improvement that had already occurred, Meredith stated Motorola then "expect[ed] continued improvement in the fourth quarter."  Defendants stated that demand for the Company's new RAZR2 released in August 2007, just in time for the 2007 holiday selling season, was robust, with the Company having already sold 900,000 units between its August 2007 release date and the end of the 3Q 07 on September 30, 2007.  Defendants also stated that based on then-current demand and sales being experienced they "expect[ed] fourth quarter earnings per share from continuing operations to be in the range of $0.12-$0.14."  By the time of this earnings call, the 4Q 07 was then one-third underway.

38.    Zander told the Arlington *Daily Herald* "[w]e've made some progress toward stability," and that "[w]e did what we said we were going to do and actually (made) the numbers in some areas."  The *Daily Herald* also reported on October 26th that "Zander said his top lieutenants are carrying out a turn-around strategy put in place earlier this year," including "cost-cutting and streamlining globally and the elimination of 7,500 jobs."

39.    Yet secretly, defendants knew that in reality the Company had already irreparably lost the technology edge to the Apple iPhone and other smart phone devices, that consumers were not buying the new RAZR2, that Motorola's share of handset sales was actually declining, and that the unit costs of its devices were adversely tied (*i.e.*, increasing) as the volumes purchased from their suppliers fell.  Thus, one-third of the way through 4Q 07, defendants knew there was no way Motorola could report earnings of anywhere near $0.12-$0.14 per share in 4Q 07.

**Zander's Sudden Departure Spooks the Market Threatening
the Credibility of the "Turnaround Story**

40.    On November 30, 2007, Motorola announced that Zander was out as CEO effective December 31, 2007, being replaced by Brown, and that Zander would not run for reelection to the Motorola Board at the 2008 annual meeting of shareholders in May 2008.  This sudden disclosure spooked the market and the Company's stock price began losing ground.  As reported by the *AP* on November 30, 2007: "While Mr. Zander's departure has been the source of speculation for some time, we had thought that an improvement in mobile devices could possibly grant him a stay. . . . ***We now wonder if today's announcement signals yet another disappointment for the handset segment and more meaningful changes that have to occur***."  *24/7 Wall St.* was even more blunt, reminding that you "[n]ever throw out a CEO when he is in the middle of a solid turnaround," stating ***"Zander's departure … is a sign that the quarter must be going very poorly."***

[Emphasis added.]

41.     Activist investor Carl Icahn – who had orchestrated the May 2007 proxy contest – also lashed out – signaling far more would be demanded if the performance in Mobile Devices did not improve.  The *Daily Herald* quoted Icahn on December 1, 2007 stating:  "I believe that the steps announced today do not even begin to address the major problems at Motorola.  ***In my opinion, Motorola should be split into separate companies: a mobile devices company; an enterprise mobility company; a connected home company; and a company focused on mobile networks infrastructure***."  Icahn was stating that the sum of Motorola's parts were worth more than their whole, and there were many others who believed he was right.

[Emphasis added.]

42.     *Crain's Chicago Business'* December 3, 2007 headline summed up the level of investor consternation over the sudden management flip-flop:  "***Brown on Razr's edge; No honeymoon for insider named to top job at Motorola***."  According to *Crain's*, Zander's resignation would not "address the broader problem that has bedeviled Mr. Brown's predecessors: how to squeeze synergies out of a disparate collection of businesses ranging from cell phones to wireless-network equipment to cable television set-top boxes," adding that "Zander tried to tie it all together under a strategy he called 'seamless mobility' that never produced concrete results."

[Emphasis added.]

### Meredith's Desperate Measure to Save the Turnaround Story

43.     Responding to investor unrest, and determined to keep the Company's stock price up, on December 6, 2007, Meredith appeared at the Lehman Bros. conference in San Francisco with the expressly stated purpose of reassuring investors that the recovery effort in Motorola's 4Q 07, ***then more than two-thirds complete***, was succeeding as previously promised.  ***This conference was taking place nearly two weeks after so-called "Black Friday," the Friday following Thanksgiving***

***when retailers finally become profitable and electronics manufacturers are confronted with the immutable facts of what is and what is not selling to the ultimate consumers in the holiday season that year.***

[Emphasis added.]

44.     Meredith opened the session stating: "I suspect that there is probably lots of questions in the audience around our leadership change recently, our guidance ***or the lack of affirmation of that when we announced our leadership*** and just sort of the status of where we are, in terms of our cost reduction efforts and head count actions."   Attempting to dispel legitimate concerns the investment community had with the sudden management flip-flop, Meredith emphatically stated:

> [W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. ***So just to dispel any sort of inadvertent message, let me be real clear.  We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range.  I am affirming that.***

[Emphasis added.]

45.     Meredith also emphatically stated during the 3Q 07 earnings conference that:

> [W]e said that we were going to have ***sequential improvement in top and bottom-line in mobile devices***, a part of our business that seems to have a lot people quite excited regularly, and ***I will affirm that we will have sequential improvement in our top and bottom-line***.

[Emphasis added.]

46.     Again, later in the call, Meredith affirmatively responded to Lehman Bros.' Jeff Kvaal's direct question as to "what is the timeframe you think for the handset business to be approaching breakeven?," citing and confirming Zander's and Brown's previous comments during the 3Q 07 earnings conference held October 25, 2007, that ***"[a]s I mentioned we expected and still expect an improvement in our top and bottom line over last quarter.  And this is – Q3 was a start***

*or progress I think is the words that Ed [Zander] and Greg [Brown] have used.  And I believe*
*that's sort of where we are."*

[Emphasis added.]

    47.    As anticipated (and desired), the market responded exuberantly to this news and the
Company's stock price closed ***up*** 3.6% that day.  According to *Bloomberg*, ***"Motorola, Inc., the***
***largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs***
***and introducing updated versions of the Razr and Q handsets."***  According to *Bloomberg*, on this
announcement "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock
Exchange composite trading."  *CNET News'* December 6, 2007 headline also read: "Mobile phone
maker Motorola backed its forecast for fourth-quarter earnings and revenue growth on Thursday,
sending its shares up as much as 3.5 percent."

[Emphasis added.]

    48.    In addition to alluding to the fact that Motorola was now open to selling off the
Mobile Devices unit if the price was right, at the December 6, 2007 Lehman Bros. conference,
Meredith also made a misleadingly vague reference to the negotiations then well under way with
Freescale that would result in Motorola taking a $277 million 4Q 07 charge that comprised about
$0.07 of the earnings miss in the 4Q 07.  That $0.07 charge, along with about $0.02 attributable to
the Company's employee restructuring and similar charges, would reduce Motorola's reportable
earnings on continuing operations in 4Q 07 to $0.04, significantly missing the Company's now oft-
repeated and oft-emphasized 4Q 07 guidance of $0.12-$0.14.  Having emphatically endorsed and
republished the $0.12-$0.14 guidance and assertions of "bottom-line improvement" in the Mobile
Devices business – and having chosen to speak about the Freescale negotiations then well under way
– Meredith was required to disclose the adverse facts on these subject to dispel the misleading

24

impressions he was creating.  Instead, Meredith compounded the deceit by dissembling about the

Company's chip supplier arrangements that had driven up its costs and undermined its margins:

> <Q>: Tom, historically – recently you folks have talked a little bit more about diversifying your chip supplier base.  Just wanted to see if you have any additional color there in terms of the strategies and the vendors that you folks have been talking to?
>
> <A - Thomas Meredith>: We are continuing down the path of trying to present to our ultimate users a broader swath of devices and ***that may entail some shift in that set of relationships over the course of the next 12 months***.  ***And we're and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months.***  And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space.
>
> <Q - Jeff Kvaal>: Would we expect an announcement in coming weeks and months?
>
> <A - Thomas Meredith>: Can't say.
>
> <Q - Jeff Kvaal>: I'll take that as a maybe.

[Emphasis added.]

49.     Moreover, by republishing and confirming turnaround plans and sales and earnings

forecasts and trends made in earlier presentations, but which were being contradicted by steadily

increasing hard evidence as 4Q 07 progressed, defendants misled investors about both the

Company's current performance and its prospects.  In particular:

(a)     The Company was not experiencing the robust demand for the RAZR2

defendants claimed at the 3Q 07 earnings conference when providing their 4Q 07 guidance;

(b)     The thinner RAZR2, which went on sale in the U.S. in August 2007, failed to

attract buyers in the 2007 holiday buying season because it was not different enough from the

original RAZR to warrant the $299 price tag;

(c)     Motorola was still losing significant market share to Apple, Inc.'s iPhone,

Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices;

(d)     After falling from 21% at the end of FY 06 to 13% at the end of 3Q 07, Motorola's market share had not stabilized but was still in a freefall during 4Q 07;

(e)     The Company was not on track to report anywhere near $0.12-$0.14 per share in earnings in 4Q 07 as it had claimed; and

(f)     Motorola was not on track to achieve "sequential improvement in top ***and bottom-line in mobile devices***" during its 4Q 07, in large part because its per unit average mobile chip costs rose as a result of the minimum purchase requirements of its Freescale contract and Motorola's declining sales orders.

**The Truth Is Finally Revealed to the Market**

50.     On January 23, 2008, defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions dispelled much of the false and misleading impressions about the supposedly improving performance and prospects for the Company's Mobile Devices business that defendants had created:

- The Company sold only 1.5 million RAZR2 phones during 4Q 07;

- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- That, contrary to Zander's statement on the October 25, 2007 earnings call that defendants "actually [thought Motorola's Mobile Devices division] gained share" in 3Q 07, Motorola's market share in the Mobile Devices segment was still on a downward spiral and would come to rest well below 13% by the end of 4Q 07;

- Motorola could report only $0.04 cents a share GAAP earnings in 4Q 07, ***84% less the $0.25 per share earned in 4Q 06,*** and nowhere near the $0.12-$0.14 per share defendants had claimed the Company was on track to achieve throughout 4Q 07;

- Instead of "sequential improvement in top and bottom-line in mobile devices," in 4Q 07, its operating ***loss increased*** by 56% in 4Q 07 to $388 million;

26

- Contrary to their previous statements of "progress" and assurances of having "turned the corner" in Mobile Devices, defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge to fourth quarter 2007 earnings in connection with its contract with Freescale; and

- For 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (a devastating reversal of the expectations which defendants' positive statements had led the market to believe about the Company's improving prospects.

51.     In response to an analyst's inquiry, defendant Meredith also finally expressly conceded that the decline in Motorola handset sales dated back to Black Friday – which occurred that year on Friday, November 23, 2007, nearly two weeks before defendants republished their 4Q 07 guidance on December 6, 2007:

> [Bear Stearns:] And Thomas, if I could follow up, *going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-off in December or was this weakening through the quarter?*
>
> [Meredith:] *I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated.*

[Emphasis added.]

## JURISDICTION AND VENUE

52.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

53.     Venue is proper in this district pursuant to §27 of the 1934 Act and 28 U.S.C. §1391. Acts and transactions giving rise to the violations of law complained of occurred in this District.

54.     In connection with the acts and conduct alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and

telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

55.    Court-appointed Lead Plaintiff St. Lucie Fire is a public pension fund headquartered in St. Lucie, Florida.  St. Lucie Fire administers pension benefits for current and former firefighters and their families.  St. Lucie Fire purchased the common stock of Motorola at artificially inflated prices during the Class Period and was damaged thereby.  During the Class Period, St. Lucie Fire purchased 1,400 shares of Motorola stock at artificially inflated prices on January 22, 2008 and was damaged thereby.

56.    Plaintiff, the Town of North Branford Pension Committee ("North Branford"), is a public pension fund headquartered in North Branford, Connecticut, and administers pension benefits for current and former municipal employees and their families.  North Branford purchased the common stock of Motorola at artificially inflated prices during the Class Period and was damaged thereby, as reflected in the attached Certification.

57.    Defendant Motorola, Inc. is a public corporation with its executive offices located in this District.  Motorola, based in Schaumberg, Illinois, is the largest U.S. maker of mobile phones. The common stock of Motorola trades on the New York Stock Exchange in a highly efficient market, trading tens of millions of shares every day.  Motorola was followed by stock analysts during the Class Period and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences.  Motorola also files periodic public reports with the SEC, and regularly issues press releases to the financial press.  Financial information about Motorola was widely distributed during the Class Period.

58.     Defendant Zander served as CEO, Chairman of the Board and Chairman of the Board's Executive Committee from January 2004 until January 2008. Throughout the Class Period, Zander regularly participated in "Operations Review" meetings with defendants Meredith and Brown, during which the business, operations and finances of the Company's Mobile Devices business was discussed. Though having entered into a separation agreement on November 27, 2007 terminating his position as CEO effective January 1, 2008, Zander would continue serving as a management consultant through 2009 (at full salary) and as Chairman until the Company's annual meeting of shareholders in May 2008. Zander was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales, and as described by several former Motorola executives and employees, had access to even more detailed information on Motorola's and its customers' upcoming sales demand and purchases from suppliers. Zander was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Indeed, as part of his duties as Chairman and CEO, Zander was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's Mobile Devices business. As Chairman and one of the only senior executives on Motorola's Board of Directors, Zander was required not only to keep himself informed of the Company's day-to-day business and finances, but also to keep Motorola's non-management directors apprised of the status of the Company's business and finances. As "senior management" of the Company, each quarter, defendant Zander was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting

judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, Zander was required to discuss the accounting and disclosure of the 4Q 07 Freescale charge with the Company's Audit Committee prior to any such charges being considered or taken.

59.    Zander, along with Brown and Meredith, presented at the Company's September 7, 2007 Analyst Day Conference and the Company's October 25, 2007 3Q 07 earnings conference. While Zander did not present at the December 6, 2007 Lehman Bros. conference, Zander, along with Meredith and Brown, had provided the $0.12-$0.14 4Q 07 earnings guidance during the Company's October 25, 2007 3Q 07 earnings call, along with the relevant factors which would purportedly make that guidance possible, and Meredith at the December 6th Lehman Bros. conference expressly reaffirmed that guidance specifically attributing it back to Zander.  On December 6, 2007, Zander was still CEO of Motorola and had the power to control whether Meredith appeared at the Lehman Bros. conference and the message he delivered.  Meredith's false and misleading comments were extensively reported by analysts and Zander did nothing to correct them.  Zander, in the ordinary course, would also likely have received an immediate update from Meredith that his message had been delivered at the Lehman Bros. conference and, as Meredith's superior, could have directed him and/or others at Motorola to withdraw and/or correct the statements, but did not.

60.    Defendant Meredith served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008.  Meredith has also served as a director of Motorola since 2005. Concomitantly, Meredith served as the general partner of Meritage Capital, L.P., an investment management firm specializing in multi-manager hedge funds that he co-founded, and as chief executive office of MFI Capital.  Throughout the Class Period, Meredith regularly participated in

"Operations Review" meetings with defendants Zander and Brown, during which the business, operations and finances of the Company's Mobile Devices business was discussed.  Meredith was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales, and as described by several former Motorola executives and employees, had access to even more detailed information on Motorola's and its customers' upcoming sales demand and purchases from suppliers.  Meredith was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls.  He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates, including Motorola's November 6, 2007 3Q Form 10-Q.  Indeed, as part of his duties as Acting CFO, Meredith was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's Mobile Devices business.  As CFO and a senior executive on Motorola's Board of Directors, Meredith was required not only to keep himself informed of the Company's day-to-day business and finances, but also to keep Motorola's non-management directors apprised of the status of the Company's business and finances.  As "senior management" of the Company, each quarter, defendant Meredith was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements."  Accordingly, Meredith was required to discuss the accounting and disclosure of the 4Q 07 Freescale charge with the Company's Audit Committee prior to any such charges being considered or taken.

61.     Meredith, along with Zander and Brown, presented at Motorola's September 7, 2007 Analyst Day Conference and at its October 25, 2007 3Q 07 earnings conference.  Meredith also presented at the December 6, 2007 Lehman Bros. conference with the express purpose of assuaging the investment community's "angst" over the potential problems in Mobile Devices that the surprise announcement of Zander's resignation implied, and knowingly and recklessly made false and misleading statements and omissions to dispel analysts' well-placed concerns.

62.     Defendant Brown has served as President and CEO of Motorola since January 1, 2008.  From March 2007 through December 2007, Brown served as President and COO.  From January 2005 through March 2007, Brown served as Executive Vice President and President of the Networks and Enterprise business and from January 2003 through December 2004 he served as Executive Vice President and President of the Commercial Government and Industrial Solutions Sector.  Throughout the Class Period, Brown regularly participated in "Operations Review" meetings with defendants Meredith and Zander, during which the business, operations and finances of the Company's Mobile Devices business was discussed.  Brown was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales, and as described by several former Motorola executives and employees, had access to even more detailed information on Motorola's and its customers' upcoming sales demand and purchases from suppliers.  Brown was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls.  He also reviewed and approved Motorola's SEC filings.  Indeed, as part of his duties as CEO and then as the incoming President and CEO, Meredith was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational

and financial status of the Company's Mobile Devices business.  As COO and a senior executive on Motorola's Board of Directors, and soon-to-be CEO and President, Brown was required not only to keep himself informed of the Company's day-to-day business and finances, but also to keep Motorola's non-management directors apprised of the status of the Company's business and finances.  As "senior management" of the Company, each quarter, defendant Brown was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements."  Accordingly, Brown was required to discuss the accounting and disclosure of the 4Q 07 Freescale charge with the Company's Audit Committee prior to any such charges being contemplated or taken.

63.     Brown, along with Zander and Meredith, presented at Motorola's September 7, 2007 Analyst Day Conference, and at the Company's 3Q 07 earnings conference on October 25, 2007. While Brown did not present at the December 6, 2007 Lehman Bros. conference, Brown, along with Meredith and Zander, had provided the $0.12-$0.14 4Q 07 earnings guidance during the Company's October 25, 2007 3Q 07 earnings call, along with the relevant factors that would purportedly make that guidance possible, and at the December 6th Lehman Bros. conference Meredith expressly reaffirmed the guidance, attributing it in part to Brown.  At that time, Brown was COO of Motorola, but had already been appointed Zander's replacement as President and CEO of Motorola effective January 1, 2008 and as such, Brown had the power to control whether Meredith appeared at the Lehman Bros. conference and the message he delivered.  Meredith's statements were widely reported by analysts, and Brown could have corrected them, but did not.  Brown, in the ordinary course of business, would also likely have received an immediate update from Meredith that his

message had been delivered at the Lehman Bros. conference and would have had the power to direct Brown and/or others at Motorola to withdraw and/or correct the statements if he disagreed with them.

64.     Brown, by his January 4, 2008 comments to Motorola's auditor, admitted his knowledge that the Company was doing far worse than the impression that he and the other Individual Defendants had created.

65.     Defendants Zander, Meredith and Brown (collectively, the "Individual Defendants") ran Motorola as "hands-on" managers, dealing with important issues at the Company, including sales of Motorola products and all aspects of Motorola's financial reporting and projections.  Defendants were also personally familiar with Motorola's diminished revenue prospects as its 4Q 07 progressed, as they continually monitored Motorola's financial results, in particular, its Mobile Devices sales.

66.     By virtue of the Individual Defendants' positions at Motorola, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Specifically, as described by the confidential witnesses, sales and other data that conflicted with defendants' statements was readily available on a wealth of reports and documents on the Company's Compass and other databases, that showed the Company was not "on track" to report earnings of $0.12-$0.14 in 4Q 07 and was not "on track" to report bottom-line "improvement" in Mobile Devices.

67.     By virtue of their high-level positions with the Company, the Individual Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company and were privy to confidential proprietary information concerning the Company and its sales, costs, accounting charges, and earnings, as alleged herein.  The defendants were involved in disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

68.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

69.     The Individual Defendants either participated in, or were responsible for, the dissemination of the September 7, 2007 Analyst Day Conference, the October 25, 2007 3Q 07 earnings conference, and the December 6, 2007 Lehman Bros. conference statements and omissions complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board of Director memberships and/or executive and managerial positions for Motorola, each of the Individual Defendants had actual knowledge of and access to the adverse

undisclosed information about Motorola's actual 4Q 07 operating earnings loss as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered positive representations made by or about Motorola materially false and misleading.

70.      The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  As such, each of the defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

71.      Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Motorola securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

72.      The scheme: (i) deceived the investing public regarding Motorola's business and operations, as well as the intrinsic value of Motorola securities; (ii) to maintain artificial inflation in the Company's stock price during the Class Period in order to permit certain stock options and RSUs granted to Meredith and Zander to vest profitably; (iii) to maintain a false public perception that Motorola's Mobile Devices division had "turned the corner" and was more valuable than it was in order to either attract a buyer for the Company and/or its Mobile Devices division during the Class Period, or to at least retain the public perception that the Mobile Devices division could be sold for $20 billion during the Class Period; and (iv) to permit Motorola to sell the $1.4 billion in bonds in order to fund Motorola's $1.2 billion 4.608% senior note obligation due November 16, 2007.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND TO THE CLASS PERIOD

73.     The Motorola RAZR (pronounced "razor"), a series of clamshell mobile camera phones, was first developed in July 2003 and introduced by Motorola in August 2004, just in time for the 2004 holiday selling season.  The RAZR was quickly identified as the "iPod" of mobile phones.  Being the slimmest phone during its release in 2004, it easily stood out among other phone models.  Indeed, sales of the RAZR, the most popular mobile phone ever released, until being surpassed by the iPhone 3G in November 2008, surpassed the Company's total lifetime projections in its first three months.

74.     Because of its striking appearance and thin profile, the RAZR was initially exclusively marketed as a fashion phone, but within a year, its price was lowered and it was wildly successful – selling over 50 million units by July 2006.  By July 2007, Motorola had sold 100 million RAZR units, boosting its position to second place in the handheld market behind Nokia.  Indeed, *PC World* would list the RAZR at #12 in *The 50 Greatest Gadgets of the Past 50 Years* released on December 24, 2007.

75.     While, in 2007, Motorola continued to heavily rely on the RAZR, its peers, such as Nokia, Apple and Samsung, developed phones with more functionality and new features, and Motorola's market share and its profit margins began to erode.  After reporting significant losses in its Mobile Devices business in the first two quarters of 2007, in September 2007 Motorola announced a plan to turn around the business which relied upon expected sales from new higher priced versions of the RAZRs and limited new product releases, and largely focused on improved cost efficiencies to protect the Company's margins.  Defendants, however, misled the market about being "on track" with their turnaround plan, and their reported healthy earnings guidances concealed

the depth of the revenue losses and the increases in expense attributable to its volume-based supplier agreements, particularly with its key chip provider, Freescale.

## II.  MOTOROLA'S DRAMATIC REVENUE AND EARNINGS DECLINE PRIOR TO THE START OF THE CLASS PERIOD

76.    By January 2007, Motorola would report that it had garnered 23.3% of the global market share in handsets by the end of FY 06.[2]  Indeed, Motorola's 4Q 06 earnings release issued January 19, 2007 stated the Company had shipped 65.7 million handsets, 47% more than shipped in the 4Q 05, resulting in $7.8 billion in sales in its Mobile Devices segment, 19% more than 4Q 05. Importantly, Motorola also stated it "[c]ontinued as the clear No. 2.player in the world's wireless handset industry."   The Company's annual report on Form 10-K also stated that "[d]ue to the segment's increase in unit shipments *outpacing overall growth in the worldwide handset market, which grew approximately 20% in 2006,* the segment believes that it expanded its global handset market share to an estimated 22% in 2006."

[Emphasis added.]

77.    However, Motorola also then disclosed in its January 19, 2007 earnings release that its "ASP ["average selling price"] decreased approximately 11% compared to 2005," stating the "overall decrease in ASP was driven primarily by an *unfavorable geographic and product-tier mix*."   Essentially, the Company had significantly increased total unit sales during 4Q 06 by selling a higher volume of cheaper phones (and as would later be learned, by stuffing the channel through shipments to carriers and distributors of devices that could not yet be "sold through" to their retail clients).   As a result, the Mobile Device segment's operating earnings were only $341 million, compared with the $663 million in operating earnings reported in 4Q 05.

---

[2]      Gartner placed Motorola's market share at 22.2% on December 31, 2007.

78.     The investment community was aghast and demanded that Motorola "right the ship." On January 26, 2007, activist investor Carl C. Icahn notified the Motorola Board that he would nominate himself and would seek to have himself elected to the Motorola Board of Directors at the annual shareholder meeting in May 2007.  On January 30, 2007, the Company disclosed receipt of the Icahn letter in a current event report filed with the SEC.  The Company's 2007 annual meeting had not been set yet.

79.     On February 16, 2007, Motorola announced that Ronald G. Garriques, Executive Vice President and President of the Company's Mobile Devices business, was being terminated "effective immediately."  Ray Roman, Senior Vice President, Global Sales, and Terry Vega, Senior Vice President, Global Devices, would assume responsibility as interim co-heads of the Mobile Devices business.

80.     On March 12, 2007, Motorola distributed its preliminary proxy statement to shareholders for the May 2007 annual meeting.  That same day, Icahn distributed a proxy challenge, requesting that shareholders elect him to the Motorola Board.

81.     On March 21, 2007, Motorola announced that Brown had been elevated to the position of President and Chief Operating Officer of the Company, effective immediately.  Motorola also disclosed on March 21, 2007 that Meredith, a member of Motorola's Board of Directors since January 2005, would become the Company's Acting CFO effective April 1, 2007.  During the Company's conference call to discuss the management shift that day, Zander disclosed that for the full year of FY 07, the Company "expect[ed] overall sales profitability and operating cash flow to be ***substantially below*** . . . prior guidance."  However, Zander also stated Motorola "expects to be profitable for the full year and have positive operating cash flow for the year," including "expect[ing] the Mobile Device business to experience a gradual recovery in the second half of 2007

39

and have an operating profit for the full year." Zander also explained that Motorola "anticipate[d] lowering [its] annualized cost structure by $400 million, which include[d] a previously-announced work force reduction of 3,500 and acceleration of site rationalizations," and that the Company would "continue to make further adjustments to our cost structure in line with the revised revenue expectations, as necessary."

82.     On March 27, 2007, the Company disclosed the financial terms of Meredith's employment arrangement with Motorola, disclosing that:

> In connection with becoming acting Chief Financial Officer of the Company, Mr. Meredith on March 27, 2007 entered into an employment agreement with a term of one year that provides him: ***(1) a base salary of $1 per year;*** (2) 250,000 stock options with an exercise price equal to closing price for a share of Motorola common stock on April 2, 2007, a one year vesting period and a ten year duration; (3) 500,000 performance-based restricted stock units to be granted on April 2, 2007 that vest only if and to the extent the closing price of the Company's Common Stock meets or exceeds the dollar amount set forth below for at least ten trading days during any thirty consecutive trading days all of which fall within the two years following the date of grant of such award:

> | Dollar Amount | Percent Vested |
> | --- | --- |
> | $20.00 per share | 33% |
> | $22.00 per share | An additional 33% |
> | $24.00 per share | The final 34% |

[Emphasis added.]

83.     According to Motorola, the RSUs Meredith received were valued at over $5.4 million. The exercise price on the 250,000 stock options Meredith received was $17.56 per share, with an estimated value of over $1.5 million.

84.     On April 18, 2007, the Company issued disappointing 1Q 07 financial results. The release quoted Zander as stating, "[a]s I said a few weeks ago, the performance in our Mobile Devices business in the first quarter is unacceptable and we are committed to restoring it to an appropriate level of profitability." Brown added that in Mobile Devices, the Company was "very

focused on improving operating cash flow and profitability," and that "[a]cross the company, the previously announced cost reduction actions are on schedule."  1Q 07 Mobile Devices segment sales were $5.4 billion, down 15% from 1Q 06.  The segment incurred *an operating loss* of $231 million in 1Q 07, compared with *operating profits* of $701 million in 1Q 06.  The Company's April 18th release stated Mobile Devices' "[l]ower sales and earnings [were] attributable to lower overall unit volumes, particularly in the emerging markets and Europe," stating that Motorola's share of the global handset market had fallen to 17.5%.

85.    During the Company's conference call that day, Meredith laid out his plan to improve the profitability of the mobile device business:

> Now let's talk about our plans to make significant enhancements to our cash flow and profitability.  It starts with our cost savings initiative.  In January we announced a $400 million savings program, which included a 3,500 person headcount reduction, realization of cost synergies from our acquisitions and site rationalizations.  The charges for the reduction in force will be completed by the end of the second quarter.  We expect to have 18% fewer sites by the end of the year versus what we have today, and lastly, we are starting to realize cost savings from our acquisitions.
> It is important to note that Ed, Greg and I are determined to reduce costs.  We know what we have announced is not enough.  We plan to give you an update by June 1 regarding these additional actions.  *I want to be very clear — these actions will be all about improving our cash flow from operations and profitability.  At the same time, rest assured we will prioritize investments for sustainable growth.  So stay tuned.*

[Emphasis added.]

86.    Meredith also reiterated during the 1Q 07 earnings call that Motorola would become profitable company-wide – and specifically in Mobile Devices – *by the end of FY 2007*:

> For the full year, we expect to see gradual quarterly improvements in both sales and operating margin in the second half.  *We expect to be profitable and to generate positive operating cash flow.  In Mobile Devices we expect a gradual recovery in the second half and to be profitable for the full year.*

[Emphasis added.]

41

87.     That same day, April 25, 2007, Icahn issued a release suggesting that Institutional Shareholder Services was recommending that shareholders elect Icahn to the Board.  Later that day, Motorola disclosed Glass Lewis recommended shareholders vote against Icahn.  On April 26, 2007, Icahn announced that Proxy Service, Inc. was recommending that shareholders elect Icahn.

88.     On May 7, 2007, Motorola's shareholders rejected Icahn's proxy contest, and reelected management's slate to the Board of Directors.  However, a "say on pay" shareholder proposal on executive compensation was approved as was another shareholder proposal regarding recouping previously unearned management bonuses.

89.     On May 14, 2007, Motorola disclosed in a current report filed with the SEC that "[o]n May 8, 2007, the Compensation and Leadership Committee ("Committee") of the Board of Directors of Motorola, Inc. ("Motorola" or the "Company"), with the concurrence of the independent directors of the Company's Board of Directors ("Board"), granted to Edward J. Zander, the Company's Chairman and Chief Executive Officer, performance-based stock options to purchase 800,000 shares of the Company's common stock under the Company's Omnibus Incentive Plan of 2006."  According to the Company's release, the "options ha[d] an option exercise price of $17.70 per share" and would "vest only if and to the extent the closing price of a share of the Company's common stock [met] or exceed[ed] [that price] on at least ten trading days within any thirty consecutive trading days all of which fall within the two years following the date of grant of such award:

| Dollar Amount | Options Vested |
|---|---|
| $22.00 per share | 300,000 |
| $25.00 per share | 500,000 |

90.     However, competition in the wireless handset segment increased dramatically in June 2007 when Apple introduced its iPhone.  The Apple iPhone blended the iPod media player with an

e-mail-equipped handset.  Apple sold out of the iPhone at most of its stores less than a week after the product's debut.

91.     On July 11, 2007, the Company issued a release announcing "preliminary estimates of second quarter 2007 financial results," stating it "expect[ed] second quarter sales to be in the range of $8.6 billion to $8.7 billion" and "a second quarter GAAP loss per share from continuing operations in the range of $(0.02) to $(0.04)."  According to Motorola's July 11, 2007 release, the "company's shortfall in sales and earnings for the second quarter [was] primarily attributable to lower overall unit volumes in the Mobile Devices business in Asia and Europe."  "The company expect[ed] second quarter Mobile Devices shipments to be approximately 35 to 36 million handsets," and its "Mobile Devices business [was] expected to have a larger operating loss in the second quarter as compared to the first quarter."  Most detrimentally, "[f]or the full year 2007, ***the company no longer expect[ed] the Mobile Device business to be profitable.***"

[Emphasis added.]

92.     Separately, Motorola announced that "Stu Reed, executive vice president of Motorola's Integrated Supply Chain organization, ha[d] been named president of Motorola's Mobile Devices business," promising that "Motorola [would] provide an update on the company's strategy and progress at the company's financial analyst meeting which, as a result of the management changes and other recent business realignments, ha[d] been rescheduled to September 2007."

93.     On July 19, 2007, the Company issued its final 2Q 07 earnings release, disclosing that "Mobile Devices segment sales were $4.3 billion, down 40 percent compared with the year-ago quarter," and that "the segment incurred an operating loss of $264 million, compared with operating earnings of $804 million" in the 2Q 06.  "Lower sales and earnings [were] attributable to lower

43

overall unit volumes, particularly in Asia, and the Europe, Middle East and Africa region" and "Motorola's share of the global handset market for the quarter [was then] estimated to be 13.5%."

94.     In July 2007, Motorola released the new upgraded Motorola RAZR2 series. Marketed as a sleeker and more stable design of the RAZR, the RAZR2 included more features, improved telephone audio quality, and a touch-sensitive external screen.  Indeed, describing the purported turnaround then taking place in Mobile Devices, Motorola's July 19, 2007 earnings release explained:

> During the quarter, Mobile Devices:
>
> - Shipped 35.5 million handsets, with continued leadership in North America and Latin America
>
> - Shipped the 100 millionth RAZR
>
> - ***Began shipping several new products, including the EV-DO RAZR2, the Q9, the MOTO Z8 and the Linux/Java platform-based GSM RAZR2 and ROKR Z6***
>
> - Earned recognition by J.D. Power and Associates for the highest rating in a U.S. consumer satisfaction survey for mobile phones, citing strengths in design, operation and features
>
> "***We are committed to improving the performance of the Mobile Devices business. We announced strong new leadership, began shipping a number of new products, and are implementing aggressive cost controls***," said Greg Brown, president and chief operating officer.

[Emphasis added.]

### III.     THE MOBILE DEVICES TURNAROUND STORY

95.     On September 7, 2007, the Company held its annual financial analyst meeting. Addressing the market's response to the Company's new product offerings, defendants reported that consumer response was overwhelmingly positive.  Specifically as to the Mobile Devices segment, Brown's presentation promised "Mid-to-high single-digit sales growth" and "Solid double-digit OM

[operating margins].”   ***Meredith followed up stating “For 2008, expect . . . Profitable in all businesses.”***

[Emphasis added.]

96.     During his presentation, Meredith demonstrated in vivid color what had gone wrong at Motorola during the 1Q 07, blaming a combination of declining sales growth and diminishing operating margins:





97.     Specifically addressing "profitability," Meredith noted the "chart looks like it was fairly consistent up until last year and certainly the first two quarters of this year," reminding that "you heard Stu talk about in particular what he and his team are doing to fundamentally right that ship and get back on track to double-digit OE [operating earnings] in that business."

98.     But Meredith was most critical of Motorola's growing lengthy delays in the devices' business or "cash conversion" cycle ("CCC").  According to Meredith, CCC was "simply a formula about a company's operational efficiency. It's about how fast we take a dollar of investment and convert it hopefully into more than a dollar of income, how fast we convert our receivables plus our inventories into--minus our payables--net cash."  Meredith also emphasized that there was a "high correlation between a stock price and one cash conversion cycle."

99.     Importantly, what this initiative entailed was reducing the lead times for Motorola's suppliers, and avoiding the purchase of obsolete components and manufactured items that would sit in Motorola's inventory and ultimately be scrapped, by increasing the "transparency" between Motorola and its customers, the carriers, operators and distributors in the "sell through" of Motorola devices to the ultimate retail consumers, or in the words of Motorola's chief procurement officer, "to collaborate" on sales forecasting, planning and replenishment.

100.    The consequence of this signature project that Meredith repeatedly invoked to analysts was that he personally had greater and earlier knowledge of carriers' sell-through sales, and therefore more reliable Motorola future sales forecasts based on the need to replenish carriers' phone inventories for their future sales to consumers.

101.    Thus, *e.g.*, on December 6, 2007, one week after the announcement of Zander's termination as CEO and to reassure investors that the management change did not suggest reversals in the Company's mobile phone business (since Motorola's stock price had declined), Meredith

appeared at the Lehman Bros. conference and touted the progress on the CCC project and its implications.  Meredith, with the stated purpose of dispelling analysts' apparent "great angst" over Zander's termination, reiterated 4Q 07 guidances of $0.12 - $0.14 per share and asserted that, "*we are going to have sequential improvement in* top and *bottom-line in mobile devices*."

[Emphasis added.]

102.    Meredith also pointed to improvements in the CCC to convince the assembled analysts that he had personally confirmed that the supposed improvement in the Mobile Devices business would continue into later periods:

> Well, as I think many people that have followed what we've been saying for the last eight or so months.  We are very focused on our cash conversion cycle and frankly our value chain more broadly.  I'm pleased with the progress we've made, not satisfied.  As I mentioned, the job of a CFO is never to be satisfied.  We have gone from 56-day cash conversion cycle to now 43 at last quarter.  *And we feel to be in a position to say, that we effectively just went through our planning process for 2008, 2009.  And each of the business unit heads, the business unit heads not the finance leaders spoke at some length around the drive and the activity they have ongoing around improving their own cash conversion cycle as well as value chain.*

[Emphasis added.]   Information provided by the Confidential Witnesses confirms that, by December 6, 2007, sales data on the Company's expected 1Q 08, as well as 4Q 07, sales was readily available to Meredith.

103.    As would be revealed just six weeks later, on January 23, 2008, Motorola, in fact, did not earn $0.12 - $0.14 in 4Q 07 (because of its $277 million in component costs attributed to a "confidential settlement" with Freescale, which also contributed to Motorola's Mobile Devices segment loss of $330 million in the quarter.  This poor performance was particularly telling because the fourth quarter was generally the strongest because of the Christmas holiday.  But what really shocked analysts was defendants' report that Motorola's Mobile Devices sales projection for 1Q 07 was devastating, a report that ultimately proved to be all too true.  For 1Q 08, Motorola's industry

market share of worldwide mobile devices dropped by an astounding 3% – which translated into a loss in sales versus its peers' of more than 8.8 million devices, or at Motorola's average sales prices, ***more than $1 billion in sales lost in a single quarter***.

## IV   MOTOROLA'S VOLUME-BASED PURCHASE ARRANGEMENT WITH FREESCALE

104.    Freescale is an American semiconductor manufacturer.   It was one of the first semiconductor companies in the world, having started as a division of Motorola in 1949.   On October 6, 2003, Motorola announced it was spinning off Freescale.   On July 21, 2004, Freescale was taken public through an initial public stock offering.   As part of the spinoff transaction, Freescale and Motorola entered into a supply agreement which obligated Motorola to continue purchasing semiconductors, or "chips," from Freescale.

105.    Indeed, following completion of the spin-off, Freescale's new "Cellular Products" division would continue producing semiconductor components and platform-level products for use in the design and manufacturing of mobile devices.   The division's offerings were designed for and sold almost exclusively for Motorola for use in its cellular handsets.

106.    As would later be revealed by Freescale and through new "risk" disclosures in Motorola's 2007 Form 10-K filed after the Class Period, Motorola was obligated to make minimum purchases from Freescale under agreement, which Motorola failed to do because of its own declining sales.

107.    Freescale was taken private again on December 1, 2006 when it was acquired by a consortium of private equity funds.   According to the proxy statement disseminated to Freescale's shareholders seeking their approval of this $17+ billion "going private" transaction, ***"[n]early 90% of [Freescale's] revenues were derived from the cellular handset market in 2005 and 2006, with Motorola representing [its] largest customer."***

[Emphasis added.]

108.    Because Motorola's minimum purchase commitments were so material to Freescale's enterprise value, as part of this going private transaction, Freescale's private equity purchasers required that Freescale's executives obtain at least an additional two year commitment from Motorola to continue its semiconductor purchases from Freescale.  On February 8, 2007, Motorola and Freescale announced that their "strategic relationship" had been continued through 2009.  In 2007, Motorola, e*ven with its handset business declining, accounted for 94% of Freescale's 2007 Cellular Product division sales.*  And Motorola's obligations to purchase semi-conductors from Freescale remained a major component of Motorola's cost of sales, and hence a key factor in determining the gross margins for Motorola's Mobile Devices business segment, a major focus of analysts during the Class Period.

109.    While, during the Class Period, defendants assured the market of its turnaround in its Mobile Devices sales and the improving profitability of its Mobile Devices business, and as late as December 6, 2007 reiterated that the Company would be making its $0.12 - $0.14 earnings guidance for 4Q 07, defendants concealed that Motorola's product costs per unit had increased as a result of its failure to meet the minimum purchase obligations in its agreement with Freescale, and that those higher product costs undercut the assurances of improving profitability and made the attainment of the earnings guidances virtually impossible.  Ultimately, at the end of the Class Period, defendants revealed that the Company's Mobile Devices segment had incurred $388 million in losses for 4Q 07 *up 56% from the $138 million loss in 3Q 07* – hardly the turnaround that had been promised – largely as a result of the $277 million owed to Freescale.

110.    In announcing Motorola's 4Q 07 results, defendants attributed the 4Q 07 $277 million charge to a confidential "legal settlement" with Freescale.  Because, however, the

50

business terms of the confidential "legal settlement" drove major aspects of both companies' 2007 financial statements, and were critical to an understanding of their 2008 prospects that were discussed throughout the Class Period and thereafter, Motorola's and Freescale's agreement to keep their "settlement" terms under wraps was neither permitted under the federal securities laws, nor indeed even possible if Motorola was to publicly file with the SEC annual financial statements that were audited and approved by its independent auditor.

111.    Thus, in its 2007 Form 10-K, Motorola was forced to disclose that the $277 million due Freescale was part of its cost of goods sold that had resulted in the lower reported 2007 margins for its Mobile Devices business.  The Form 10-K, through its purported "risk" disclosures, also revealed that these costs were likely attributable to Motorola's failure to satisfy the minimum purchase requirements in its contract with Freescale:

> ***We have negotiated favorable pricing terms with many of our suppliers, some of which have volume-based prices.   In the case of volume-based pricing arrangements, we may experience higher than anticipated costs if current volume-based purchase projections are not met.   Some contracts have minimum purchase commitments and we may incur large financial penalties if these commitments are not met.***

[Emphasis added.]

112.    The fact that, in late 2007, Motorola had failed to place minimum purchase orders worth hundreds of millions of dollars with Freescale was a key fact that, had it been revealed during the Class Period, would have disclosed to investors that not only were the ***2007 product costs*** of Motorola's Mobile Devices division being misrepresented, but that Motorola's depressed component orders to Freescale (which necessarily preceded Motorola's shipments of finished goods to its customers) signaled that ***Motorola's own sales orders for deliveries in 1Q 08*** were plummeting to disastrous levels.  All these facts were known to Meredith (and the other defendants), but were concealed from investors, when on December 6, 2007, he appeared at the Lehman Bros. conference

to calm investors' "angst" and reiterate Motorola's pre-existing earnings guidance and purportedly improving Mobile Devices financial performance.  Indeed, at that conference, Meredith expressly stated that he was then finalizing the Company's deal arrangements with its chip suppliers, purportedly to diversify Motorola's supply of chips – so there is no question that Meredith then knew of the sky-rocketing 2007 product costs that had resulted from Motorola's declining sales orders.

113.    In January 2008, at its own earnings conference, Freescale, too, found it difficult to fully keep "confidential" the terms of its "settlement" with Motorola, because it affected the valuation of billions of dollars of intangible assets on its balance sheet, and, indeed, the very viability of its Cellular Division going forward – since Motorola was responsible for 94% of its sales in that business.

114.    Thus, Freescale, on January 30, 2008, reported a $449 million impairment charge on its 2007 income, in principal part, for amendments to its supply agreement with Motorola, "to reflect the new business conditions."  When pressed by analysts at its earnings conference about the new terms, and what had led Motorola to agree to pay Freescale hundreds of millions of dollars, Michael Meyer, Freescale's CEO, stated:

> Guy, so first of all I am somewhat limited in what we can disclose to you because of the confidentiality agreement that we have with Motorola, which is normal.  I mean because this is part of an ongoing commercial relationship between two large companies with give and take constantly, if you want.  And so the change – so I am going to dance a little bit around and I apologize for that because I am trying to remain within the frame of what I can talk about.  ***The agreement amended*** and extended, as I said, ***a supply agreement that was a large agreement*** between two companies, ***which*** was – ***had been built at a time where the Motorola business outlook was different than what it is now.  So one can imagine that there were commitments made on a number of things that were more difficult to meet with new conditions***, that's one.  ***The second thing, part of the discussions were linked to hidden fees and movement of cash, if you want, between two companies when certain payments are made and things like that.  And so that the balance of those discussions resulted into some cash changing hands***, I mean – and going forward,

let me talk about the Motorola relationship for a second here since we have on the line a lot of people.  I have repeatedly said if you listen to me and will get tired after a few years here, I have repeatedly said that as more and more of the Motorola portfolio becomes 3G, they will diversify their supply because they – in 2 and 2.5G they were not 100% Freescale.  And they should not as they switch to 3G be 100% Freescale.

Now the thing that is a little bit I don't want to say an issue, but *the thing that makes that natural diversification a little bit more of a problem moving forward is the fact that their revenue has been going down and so it's a smaller pie to share.*  But other than that, we don't see anything happening here that is not something we thought was going to happen naturally.  They do need to diversify their 3G as they move their entire portfolio to be 3G and going beyond.  So going forward we are competing for their new product designs in the future.  We have advantages and we have things to overcome.  We have the advantage of being able to run their existing software and other things and we have to fight on cost and so we intend to be competitive and as we win more and more business outside, we tend to remain competitive.  So that's a long answer to the question of what's behind, but *the main thing that's behind the changes, the significant reduction in Motorola's business outlook*.

[Emphasis added.]

115.    Freescale was somewhat clearer in its 1Q 08 earnings call when its CFO explained, "we entered into an amended and extended agreement with Motorola whereby we received cash proceeds, provided certain pricing concessions *and relieved Motorola of certain obligations.*" These purchase "obligations," and the fact that Motorola had failed to satisfy them because of its own declining sales orders, were material concealed facts that belied Meredith's statements at Motorola's December 6, 2007 conference about the current state of Motorola's Mobile Devices business, and its prospects.

[Emphasis added.]

V.    **CONFIDENTIAL WITNESSES**

116.    Confidential Witness # 1 ("CW1") was a National Accounts Account/Sales Manager at Motorola between 2002 and 2008 when CW1 left the Company.  Serving in different capacities, by the time he left, CW1 had worked at Motorola for approximately 20 years.  CW1 was stationed

near CW1's biggest national account's headquarters during CW1's last six years at Motorola.  That national retailer serviced by CW1 had over 6,000 locations, offering a broad selection of technology products, including mobile devices, accessories, and services, as well as items for personal and home technology and power supply needs.

117.     According to CW1, CW1 reported sales from this national retailer and CW1's other Motorola accounts via telephone conversations and e-mails, *on a weekly basis*, to the Motorola Vice President at the Company's Illinois headquarters.  CW1 stated CW1 had access to *daily inventory figures* for Motorola mobile phones at CW1's biggest national retailer account.

118.     Confidential Witness #2 ("CW2") also worked at Motorola for approximately 20 years before being laid off in November 2008.  CW2's final position at the Company was as a Senior Quality Assurance Specialist, focusing on customer loyalty, within the Mobile Devices group.

119.     CW2 stated that CW2 had attended numerous meetings with members of Motorola's Supply Chain division prior to, during and after the Class Period, in which specific customer inventory level data was provided and discussed.  CW2 explained that customer data on their inventories of Motorola phones was provided to Motorola by specific phone models, along with the corresponding location of the inventory, in report form in order to identify the customers that were holding on to high levels of Motorola phone inventory.  CW2 explained that Motorola held these customer inventory tracking meetings so that Motorola's Customer Satisfaction group would be better informed.

120.     CW2 stated that the inventory data was kept very current.  The inventory tracking meetings, according to CW2, were part of a wider ongoing initiative underway at Motorola during 2007 and 2008 that emphasized monitoring product inventories at all Mobile Devices customers in

order to permit Motorola's executives to understand what was selling-through to the ultimate phone consumers and what was not.

121.    According to CW2, in the months leading up, and during the Class Period, Motorola's relationship with many of its customers had become strained because the Company had become heavy-handed with its customers in the wake of its RAZR successes and was not treating Mobile Devices customers as the true "partners" it once had.  Instead, CW2 said that Motorola was dictating what Mobile Devices customers would buy, without seeking or acknowledging the customer's input.  Moreover, while many customers were reporting their dissatisfaction with having unwanted merchandise forced upon them, due to the state of flux in the Company's upper management, their complaints fell on deaf ears.

122.    CW2 was aware that the spin-off and/or sale of Motorola's Mobile Devices division was being contemplated during FY 07, well in advance of the Company's formal announcement to the investment community in January 2008, following Meredith's having alluding to a possible split up during the December 6, 2008 Lehman Bros. conference.  Indeed, CW2 was tasked with providing the colleagues in his division with information regarding what needed to be done within their division to make the split happen.

123.    According to CW2, the Compass database was widely used by Motorola employees during the Class Period as a repository for Company-wide financial, sales and operating data.  In CW2's role at Motorola, CW2 used Compass to share customer satisfaction and loyalty surveys and customer scorecards.  CW2 said that the documents and information available on Compass to employees and customers changed on a project-by-project basis.  Managers could set up specific security and access levels for each individual project.

124.   Confidential Witness #3 ("CW3") worked for Motorola for a total of 28 years prior to leaving in November 2009.  During the Class Period, CW3 was a business Operations Director for the Global Mobile Devices post-sales support teams.  These teams handled global warranty repair and other post-sales support functions.  In this capacity, CW3 handled the business operations for the teams, including planning and reporting and all the back-office support so that the teams could focus on repairing phones.  CW3's tasks included tracking key performance indicators, planning, and developing cost information for the repair/post-sales processes.  CW3 reported directly to the head of Global Repair.

125.   CW3 confirmed that Motorola prepared quarterly reports detailing the wireless device models being shipped, the quantity shipped and the customer locations where the product was being shipped.  CW3 received these reports so that he could ensure service readiness before items were shipped.  Further, these reports provided CW3 and others with a "roadmap" so that CW3 could order the requisite replacement parts needed for anticipated repairs.  Motorola tracked one month ahead of time in a rolling forecast that was updated to reflect issues such as:

- changes in market demand;

- trends at Motorola's distribution customers; and

- transparency into what the Company's competitors were doing.

126.   CW3 specifically stated that during the time identified as the Class Period:

- Motorola was constantly adjusting the sales numbers down, that is, each week they were lowering the handset unit numbers; and

- The selling price was consistently "degraded" or lowered.

127.   CW3 stressed that there were a number of factors contributing to this, including that all of the big vendors had "most favored customer" clauses in their contracts.  According to CW3,

these clauses required Motorola, if it gave one vendor a special deal, to match that deal for all the other big vendors.

128.    CW3 stressed that in the RAZR heydays, Motorola could sell 100 million units globally.  Apple's iPhone was not the biggest part of the problem during the Class Period.  Indeed, iPhone numbers never approached 100 million units in 2007.  Instead, CW3 said that the problem was that while Apple made $300 per phone, Motorola made nothing, or very little, per phone it was selling.

129.    Confidential Witness # 4 ("CW4") worked at Motorola during the late 2000 through November 2009 time period.  During the 2007 through 2008 timeframe, CW4 was a Marketing Manager in new business development, working directly with Nextel/Sprint and with the developers for Motorola products sold to those companies.

130.    According to CW4, during FY 07 and 08, Motorola was suffering financially due to the after-effects of the 2005 merger of Nextel and Sprint.  Prior to the merger, Nextel and Motorola had an exclusive relationship in which all 22 million Nextel subscribers were required to purchase Motorola iDen phones.  Motorola's exclusive agreement with Nextel provided a good chunk of Motorola's sales, according to CW4.  CW4 also said the relationship was important because Motorola did not have exclusivity with other providers.  For example, Motorola phones made up only about a 20% share of AT&T or Verizon's product lines.

131.    Following the Sprint/Nextel merger, however, Nextel's business began to decline significantly.  By October 2007, Sprint stock had plunged 30%, CW4 recalled.  And although Sprint tried to convert Nextel customers to Sprint, many of the Nextel customers went to AT&T, where Motorola had only about a 20% market share of devices.  CW4 stressed that because of the merger,

Motorola's losses were "very significant," pointing out that more than 50% of Sprint's handheld device business was through Nextel.

132.    CW4 also stated that prior to the merger, Motorola and Sprint did not have a good relationship, and that the merger opened up an opportunity for Motorola to sell phones to Sprint. Sprint used a CDMA network, which supported the RAZR and RAZR2 Motorola phones. Therefore in 2007, CW4 said there was an increase in CDMA sales to Sprint of the RAZR and RAZR2. However, CW4 stated the sales did not make up for the huge losses tied to the Motorola iDen phones, as Nextel lost millions of customers each month. Because Sprint had close relationships with manufacturers like Sanyo and Samsung that were built prior to the merger, Motorola was limited in the number of CDMA devices it could sell to Sprint. CW4 noted that even with a gain in CDMA sales to Sprint/Nextel, there was a significant net loss in items sold to Sprint/Nextel because of the Nextel losses.

133.    CW4 also explained that in general, Motorola's marketing and sales divisions worked directly with customers to forecast customer sales. CW4 said the forecasts were made approximately one month out. The carriers made a commitment level to Motorola and would report on their progress to a team at Motorola. Carriers would report numbers based on loading, churn numbers and the number of subscribers they were adding. For example, CW4 explained that if the carrier originally forecast that they would sell 20,000 handsets, but then only sold 15,000 there would then be a "delta" of 5,000 handsets, and CW4 would be instructed to work with the carrier to close that gap.

134.    The sales team, including CW4, would work with Sprint, for example, to close the gap. If they exceeded the gap amount, their bonuses would go up. CW4 reported that there were "significant gaps" during 4th quarter 2007 compared to the numbers forecast by Sprint and Nextel.

Those gaps would have been reported one month before the actual sales, so projected gaps for December 2007 would have been reported in November 2007, for example. These numbers were tied into the planning and sales software system at Motorola and were ultimately reflected in the Compass system.

135.    In the mobile business, CW4 stated that it is all about the latest and greatest handset. The rule of thumb in the mobile handset field is that six months is equal to 12 months in any other business in terms of the interest and viability of a product lasting. According to CW4, when you release a handset, you have three to six months to get as much margin as possible. Within six months, the competition will release newer, better, cheaper items. To keep meeting quotas, a company needs to increase the percentage of volume, which requires price concessions that eat up margins.

136.    According to CW4, at the time that RAZR entered the Sprint world, RAZR was at the end of its product life. RAZR was already getting marginalized, and there was a market shift starting toward smart phones.

137.    CW4 stated that AT&T was another "losing story." AT&T, when it was called Cingular, sold RAZR as its flagship product and originally poured huge amounts of money into publicizing it. Then in 2007, AT&T stopped ordering the same quantity of the RAZR and switched its investment to iPhones.

138.    Confidential Witness #5 ("CW5") was a U.S. Regional Account Executive at Motorola and part of a seven-person team that was stationed throughout the country. CW5's team focused on rural carriers such as Alltel, Cricket, Metro PCS, and U.S. Cellular. The team's main role was to train customers and run promotions. CW5 covered and worked for Motorola from 2006 until early 2008. CW5 stated that CW5 left Motorola (after the end of the Class Period). CW5 said

that Motorola's Mobile Devices sales as a whole declined significantly from the time CW5 joined the Company in 2006.

139.    CW5 said that top management would talk about its "plan" to boost sales when they all got together for the national conference.  CW5 said that in 2006 the Company's annual sales conference took place in Panama.  Morale was high at the Panama conference, as the Company was then the number two mobile phone manufacturer in the world and had initiated a campaign to become number one.

140.    CW5 said the next annual conference in 2007 was smaller and took place on Amelia Island in Florida.  At this point, the Company was showing slight signs of decline.  CW5 said "top management" spoke at the national sales conference in 2007 about how shareholders wanted a new operating system.  According to CW5, management said at the conference that other companies might come out with new technologies before them and admitting that Motorola was taking longer than competitors to develop a new operating system (the Android).  Management said that the Android would lead to a turnaround for Motorola.

141.    CW5 said that in 2008 Motorola canceled its annual sales conference at the last minute because sales were so far down.

142.    Confidential Witness #6 ("CW6") worked at Motorola for approximately ten years. Before being laid off in early 2007, CW6 worked as a Global Portfolio Manager in Motorola's Mobile Devices division.  In CW6's role as a Global Portfolio Manager, CW6 had two major responsibilities: forecasting where the market was headed in terms of mobile devices and working closely with Motorola's development team to produce concepts for new products.

143.    Since leaving Motorola (prior to the start of the Class Period), CW6 has worked in sales for Samsung and Nokia, with Latin America being CW6's region in both positions.  Although

CW6 did not work at Motorola during the Class Period, or in Motorola's sales department when CW6 did work at Motorola, CW6 provided background on Motorola products and strategy, as well as insight into how and when sales numbers are generally reported to mobile device manufacturers – an industry CW6 continued to work in during the Class Period.

144.    According to CW6, based on several years of experience in sales at Samsung and Nokia and from conversations with sales people at Motorola, during the Class Period sales visibility (whether a product is a slow mover or not) and inventory status would have been available to sales people at Motorola *within one or two weeks of receipt of the phones by carriers*.  CW6 also stated that salespeople are required to report these numbers to their Directors.  CW6 stated that unlike many business industries, there is a close relationship in telecom between OEMs (original equipment manufacturers) and customers (carriers such as AT&T and Verizon) because the two work in partnership.  CW6 stated once a new product is launched, salespeople know quickly if their "numbers are going to be toast."

145.    CW6 stated that the RAZR's heyday was between 2004 and 2006, with the peak of sales coming in 2006, which is when Motorola became the number two OEM in the world behind Nokia.  CW6 stated that by early 2007, Motorola was still trying to "milk" the RAZR for all the revenue it could, by creating new reiterations of the phone, and that its strategy was to push stylish, low-segment phones.  CW6 stated Motorola pushed the RAZR because the resources required to put out a reiteration of the phone were minimal and the returns were huge.  CW6 also stated managers at Motorola were under pressure to hit numbers and the RAZR would hit every time.  However, CW6 said that *by early 2007 the "writing was on the wall" that the RAZR wasn't going to last*.  CW6 stated Ron Garriques left Motorola for Dell around the same time because he knew the Company's strategy of pushing the RAZR wasn't going to work moving forward.

146.    CW6 said that if a product did not sell, Motorola would have to do one of two things: either credit the carrier a dollar-value figure for each product in the form of a letter of credit or promise lower prices to carriers for future products.

147.    Confidential Witness #7 ("CW7") was a Senior Vice President of Consumer Products and Services with Verizon Wireless during the Class Period.  According to the Company's 2008 Form 10-K, Verizon was one of Motorola's top five mobile carrier customers that collectively accounted for 42% of the Company's sales during FY 07.  CW7 retired from Verizon in 2008. Though CW7's interactions with Motorola concerned data products and services specifically, CW7 was generally knowledgeable about how contracts between Verizon and Motorola for mobile devices were generally formed and constituted.

148.    According to CW7, Verizon, in a standard contract, would have agreed to buy a certain volume of phones from Motorola.  Although a contract would be signed by both parties, Verizon would leave itself the flexibility to back out of a deal by paying a penalty.  Depending on the volume agreed upon in the contract, the penalties were usually small compared to the amount of money the carrier had originally agreed to pay for the phones.  CW7 stated a contract might be broken, if, for example, a new and better phone was released.  But even as the penalties were considered small, it was very rare that Verizon, or a carrier like AT&T, would completely back out of a contract because the company would have laid out a substantial amount of money into the development and marketing of the mobile device.

149.    CW7 provided one example of what "backing out" of a contract would likely comprise: if a carrier agreed to purchase 10 million phones, they would back out and only buy seven million phones.  CW7 was confident that Motorola executives would have known whether a

contract with a carrier was falling apart (*e.g.*, Verizon was not going to purchase all the units specified in the contract) at least two months ahead of time, but likely earlier.

150.    Confidential Witness #8 ("CW8") worked as a Director of Strategy & Business Operations for Mobile Devices Supply Chain at Motorola in Illinois from 2005 until 2009.  In this role, CW8 dealt with general strategic issues and short-term tactics pertaining to the Company's supply chain and reported to a Senior Vice President for Supply Chain at Motorola.

151.    Though CW8 was not directly privy to the Company's 4Q 07 sales figures for the Mobile Devices during the Class Period, CW8 recalled Motorola's poor performance during 4Q 07. CW8 also recalled hearing about the December 6, 2007 investor conference call given by CFO Thomas Meredith at the Lehman Bros. conference.

152.    Regarding 4Q 07, CW8 commented that "there definitely was awareness within the organization that it would be a challenging quarter."  Although CW8 was never directly privy to any senior executive meetings, discussions or memoranda regarding the sales figures, CW8 said that CW8 believed senior executives, including Meredith, had to have known that the sales figures for the quarter would be dismal by the time of the December 6, 2007 conference call.  As a basis, CW8 stated that "these are highly experienced people, each with fifteen to twenty years in the business" and "they know the trajectory of the business and they were receiving week by week sales numbers."

153.    CW8 also confirmed that it was well known inside Motorola throughout 4Q 07 – and certainly by Black Friday of that year – that Motorola was performing poorly.  The RAZR2 had been "a complete flop," unlike the iPhone, which had come out at approximately the same time and "knocked the whole industry on its ass."  Additionally, Motorola had no new or exciting products to offer the market for the 2007 holiday season.  In fact, it was not until two years later – in October 2009 – when Motorola finally did come out with such a product (the Droid).

154.    CW8 confirmed that while Meredith and other senior executives may not have known the specific data on sales figures from Black Friday or the number of orders for the remainder of the year by December 6, 2007, they certainly would have had a "directional awareness" about how "the quarter was trending."  CW8 explained this was because carriers generally place most of their orders for the holiday season by September or October, and that the most aggressive push by Motorola to begin shipping into the channel occurs in October.  In other words, the Company gets a good sense of how the quarter will shape up in December by the amount of orders they receive and shipments they make a few months prior to that.  Furthermore, Motorola knew in September and October of 2007 that its late-quarter sales would be constrained because the Company had no new or exciting products to offer in the winter season.

155.    CW8 explained that while orders by carriers are often placed two to three months before shipment, *Motorola accounts for sales upon its shipment of products to the carriers*. Motorola's mobile devices that are sold in North America are built in China and then sent to a distribution center in Fort Worth, Texas.  *As soon as the phones leave the distribution center on route to the carrier, Motorola records the sale*.  CW8 described this sale/shipment to carriers as the "sell in."

156.    According to CW8, even though they are not accounted for as sales for Motorola, the data regarding the "sell through" – which CW8 described as when the carrier ultimately sells the product to a consumer – were also very important to the Company.  This data is generated by the individual carriers and provided to Motorola.  CW8 said that the sell-through numbers are very important because they will give an indication about future orders, if the product is not selling through by the carriers, then future orders will be poor.

157.     While CW8 said that Motorola did not really institute the technology to track "real time" sell-through until 2009, CW8 confirmed that prior to instituting that technology, Motorola's senior employees within the Mobile Devices division had close enough relationships with the carriers to know how well Motorola's products were being sold-through to consumers at any time during the 4Q 07.  CW8 explained that information about sell-through would have been "filtered through to" Meredith and other senior executives by the Motorola sales employees keeping regular contact with the carriers.

158.     Confidential Witness #9 ("CW9") worked for Motorola in Illinois from 1999 to 2009. During the Class Period, CW9 was part of the Public Relations Team, and was Manager, Global Public Relations.  CW9's tasks included preparing executives for media appearances, interviews and speeches, as well as helping with product launches.

159.     CW9 stated that from CW9's vantage point, senior executives such as Zander and Meredith would have had access to Motorola's latest sales/orders/shipment figures and would have looked at those sales/orders before making major presentations.  CW9 went on to explain that in the Americas, two major systems that tracked primary sales to carriers and were used in distribution were called T-Cop and ROAM.

160.     According to CW9, at the end of 2007, the RAZR2 was not doing nearly as well as Motorola had hoped.  When asked what Zander and Meredith might have been referring to in the bullish October and December 2007 conference calls, when they were making bullish statements about RAZR2 sales, CW9 commented, "Everyone remained optimistic, but the bottom line just was not happening.  Those in the business units accepted that and certainly by November knew it was not a good year."

161.     CW9 said that in 4Q 07, as CW9 recalled, the number of units shipped to carriers did not come anywhere near what it was expected to be.  CW9 added that Motorola had to reduce the Average Selling Price ("ASP") so much that the margins were too low to make any significant profit. According to CW9, everyone, including senior management, had a pretty good idea before they even entered 4Q 07 that 2007 and the fourth quarter, specifically, were not going to be good – but they were not telling anyone.  CW9 said CW9 did not know what Meredith knew specifically, but in CW9's opinion, Zander certainly knew because Zander was very hands-on at that point.

162.     According to CW9, what was considered a "sale" varied by product and by customer. It depended on what the deal was and when Motorola accrued the revenue.  With the RAZR2, there was no future revenue accruing to Motorola beyond the sale of the product to the carrier, so once it was shipped from Motorola's distribution center to the carrier, it was considered "sold."

163.     CW9 had exposure to many different areas.  As CW9 recalled, prior to and during the Class Period, product teams told CW9 that they had only shipped half of the units that they thought they would.  Internal research groups within Motorola would track the sales of product by carrier. They could tell by the number of orders placed that carriers were not even placing replacement orders.

164.     According to CW9, in terms of reporting methods, Motorola grouped all the RAZR2 sales together so that the numbers would look larger.  For example, if the Company only sold 10,000 units to AT&T, but sold 50,000 to Verizon, Motorola could announce "60,000 units sold," but, this number held no indication of the amount of money made on each unit or the price for each unit.

165.     In terms of "channel stuffing," CW9 said that this was a term that CW9 did not use, however, as he recalled, Motorola would offer the carriers rebates on items or agree to sell a certain number of units at a special price if they could ship more product to them.

166.    Confidential Witness #10 ("CW10") worked as an Account Manager at Motorola in its Mobile Devices until December 2007.   Between 2005 and 2007, CW10 managed one of Motorola's major sponsorships within a sports industry.

167.    According to CW10, the RAZR had "run its time" by 4th-quarter 2007 and was being replaced by other Motorola phones.   According to CW10, Motorola was marketing the RAZR to distributors as a free product they could provide to their customers. CW10 believed there were two-for-one deals going on at the time.

168.    CW10 said that by the end of FY 2007, all the different U.S. distributors--including Verizon, Sprint, T-Mobile, and Virgin--were carrying the RAZR.   CW10 opined that this was a bad sign because exclusivity with distributors was positive for Motorola because the Company could garner higher prices for their devices if they were being offered through exclusivity arrangements.

169.    Confidential Witness #11 ("CW11") worked at Motorola for a total of 30 years before leaving in mid-2008.  Between 2006 and CW11's mid-2008 departure, CW11 worked as a Materials Analyst in the Supply Chain for Motorola in the Southeastern United States.   In this role, CW11 analyzed excess and obsolete materials/products relating to Motorola's outsourced manufacturers, mostly located in China. These plants manufactured the Motorola iDen phones.   There were three to four people who worked in CW11's department.

170.    According to CW11, in general, there could be an increase in excess and obsolete items for a number of reasons, such as products reaching the end of their life or a reduction in demand for products.   In some cases, CW11 said, it may not have been Motorola's "fault."   ***Since product had to be ordered three to four months in advance, if customers changed their minds, Motorola might be stuck with excess product***.

171.    CW11 said that CW11's department reported on a quarterly basis for the Corporate Reserve Meetings, presenting the numbers for products that there was no other way to "get off the books" except to junk/discard the product.  CW11 and CW11's team had to submit their reports to the Finance Team (at headquarters) by the first or second week of December 2007 for that quarter's figures, which would be used to help formulate the reserve amounts set for the first quarter of 2008.

172.    In general, as sales fell, product would build up in warehouses and need to be discarded from the system.  So while not a direct correlation, CW11 said that there was a "trickle down" effect from slumping sales to excess inventory.  CW11's figures would have provided some indication as a lagging indicator of sales.  CW11 could not really say that CW11 saw a significant downturn in moving the iDen phone at the end of 2007, but the iDen phone was a very old item, having been introduced even as early as the late 1990s.  CW11commented that "certain products would spike in demand, then there would be instances when the product dropped."

173.    Reserves would be set, but not all the reserve funds were always used in scrapping product and getting it off the books.  There would be reserves for potential items that might need to be scrapped and potential items with no other way to get them off the books.

174.    There were Daily Production Meetings with CW11's staff, the Marketing Team and the Operations people.  These meetings looking at daily numbers for items received in from the manufacturers in China and shipments out of the distribution centers to customers such as Sprint.  As CW11 recalled these numbers were entered into the Compass database system and that Compass was still in use at the end of 2007 and the start of 2008.  ***According to CW11, because of the use of Compass, production and shipment numbers were available on a daily basis not only to lower level staff, but also to top management.***

175.    There were internal inventory audits on a weekly basis and an annual audit.  ***In addition there were periodic "cycle audits" that involved comparing the numbers in the Compass database with the actual physical items in the warehouse/distribution centers.***  Based on customer orders, requests for manufacturing were put in the system.  CW11 thought that the Marketing Team put the orders in the system based on discussions with customers.

176.    Commenting on the general situation at Motorola, CW11 said "[t]he last few years I was there, it was terrible working for them.  Every day you went in thinking 'Is this my last day?'"  CW11 continued, saying that the state of the Company at the end of 2007 was "terrible."  CW11 thought that there was a drop in customer orders and "things were just not as great as they used to be."

177.    Confidential Witness #12 ("CW12") worked for Motorola for 24 years until 2009.  During the last twelve years at the Company, CW12 was a Manager of Mobile Depot Operations in Mobile Devices.  In this role, CW12 bought Motorola mobile phones that had been sold in other countries, reconfigured the software to work in the United States, and then redistributed the reconfigured phones to people within the Company to use in trade shows, marketing and public relations.  CW12 worked with all the Motorola divisions, teams and platforms that developed the mobile phones (for example, platform teams including Windows, Linux and Bluetooth) as well as vendors, including Sprint, T-Mobile and Verizon.

178.    In CW12's job, CW12 worked across platforms, and worked intimately with all the groups.  CW12 could graphically see that there was no cooperation from team to team.  Because CW12 distributed "companion products," CW12 also worked with all the product managers and all the vendors.  According to CW12 , CW12 sensed at the end of 2007 that everyone across the board knew that everything was "going down."  There was talk of Motorola "not doing as well as they said

we were doing." CW12 said that while things were not as bad as at Enron, there was a lot of "whoo-haa" building up about what we were doing, while the Company was not doing well. CW12 said there was never an official announcement (internally) by management in the 4th quarter 2007 about the status of sales figures or the results of Black Friday, rather CW12 knew how things were going unofficially because CW12 would communicate with the factories and knew how much the factories were/were not shipping. When official financial forecasts came out, CW12 said, "We knew inside what was really going on. . . ." To be sure, CW12 was careful to state that the numbers of phones CW12 distributed did loosely track the sales numbers reported. That is, as real sales went up, CW12 would distribute more phones for marketing and public relations. When real sales went down, so would CW12's distribution. CW12 did not experience a significant slump in CW12's distribution until October 2008 when the economy crashed.

179.    Confidential Witness #13 ("CW13") worked as a financial analyst for Motorola's Mobile Devices Strategy Group in Illinois from early 2007 until early 2009. CW13's responsibilities included managing the budgets for various consulting and research projects.

180.    CW13 said that the sales of mobile devices were tracked Company-wide through a Hyperion database. These figures came directly from third-party vendors who were selling Motorola mobile devices, such as T-Mobile and AT&T. CW13 said that finance employees were running sales numbers every day and generating various sales reports on at least a monthly basis. According to CW13, reports summarizing total sales and gross margins for each individual mobile device were prepared each month. Generally, there was a five business-day lag after the close of each month (as data was still coming in) for these reports to be finalized. CW13 said that these reports were being viewed by "senior executives," including the head of CW13's division, the Senior VP/CFO of the Mobile Devices Sales Division.

181.    Despite the fact that formal monthly sales reports were being generated, CW13 said that at any time executives could look at sales numbers in the Hyperion database on any given day to get a sense of what the sales figures were.  CW13 did not know how often executives looked at the sales numbers, however.

182.    Confidential Witness #14 ("CW14") worked at Motorola from 2001 to 2009. Between 2006 and 2009, CW14 was a Senior Financial Analyst in Motorola's supply chain group, working in Arlington Heights, Illinois.  CW14's focus was on procuring parts for Motorola products across all its business lines, including mobile devices.

183.    According to CW14, CW14 had full access to the reporting of sales numbers for all mobile devices at anytime.  This information could be accessed by running a report in the Company's SAP system, which certain employees, such as CW14's and other financial analysts and executives, could access with a login code.  Additionally, reports detailing sales goals versus actual sales could be run through this SAP system at any time.  CW14 said the standard time period at Motorola for analyzing a specific product's sales numbers to determine how well it was doing was 30 days.  CW14 said it was important that CW14 had access to sales numbers because CW14 needed to keep suppliers aware of whether they needed to ramp up or slow down production of parts for products.

184.    CW14 said that if a carrier was unable to sell a phone, it was not sent back to Motorola; instead the phones were usually scrapped by the carriers.  CW14 said that if a product did not sell, the carriers would ask for a deal in return.  CW14 said the deals varied depending upon the product.

185.    According to CW14, the mobile device manufacturing process at Motorola began when the supply chain group was provided with demand estimates from the market research group.

71

186.     When asked about demand for the RAZR2, CW14 said that the phone was introduced when the market was shifting to smart phones, saying that demand for the phone was probably not as high as expected.

187.     ***CW14 stated that a supplier required seven to 13 weeks of notice in order to provide Motorola with an order for parts, and the time from which volumes were decided upon until the device was manufactured and shipped was 15 to 18 weeks.***   Payment terms to suppliers were 90 days.

188.     CW14 stated that Motorola initiated a change in its manufacturing process in 2007. The Company stopped manufacturing a majority of the parts for its mobile devices and began outsourcing that work to other companies, such as Foxconn Technology Group.  This process went on through 2007 and 2008.  CW14 said the initiative saved Motorola money to a small extent.

## VI     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD

189.     On October 25, 2007, Motorola released its 3Q 07 financial results.  The earnings release defendants issued that day reported 3Q 07 sales of $8.8 billion, $4.5 billion of which were in the Mobile Devices segment, down 36% from the 3Q 06.  The Mobile Devices segment incurred an operating loss of $138 million in the 3Q 07, compared to a 2Q 07 operating loss of $264 million, a sequential quarter improvement of 47%.  The Company's October 25, 2007 release affirmatively stated "Motorola's share of the global handset market for the quarter is estimated to be 13 percent." Zander was quoted in the October 25, 2007 release, stating management was "***pleased with the improvement in the financial performance of mobile devices and we look forward to building upon the progress we have made.***"  The quote from Zander also assured that "***[w]ith our focus on . . .the initiatives we are taking in mobile devices we will further improve our performance and create long-term shareholder value***."  As to the Company's "Outlook," the October 25, 2007 release

*stated the "company's outlook for earnings per share from continuing operations in the fourth*

*quarter is $0.12 to $0.14.*"

[Emphasis added.]

190.    Defendants Zander, Brown and Meredith also held an earnings conference that day to

discuss the Company's 3Q 07 financial performance and the ongoing 4Q 07 quarter with the

investment community.  Concerning the Company's 3Q 07 performance, especially in its Mobile

Devices segment, defendants touted its turnaround and the success of its new RAZR2 product:

- [Zander:] "*Our third quarter can be characterized by one word, progress*.  We improved our earnings and cash flow significantly compared to the second quarter and made *substantial improvement in all key metrics in Mobile Devices*."

- [Zander:] "*In Mobile Devices, we began to move in the right direction.  We increased unit sales and gross margin percentage while lower operating expenses.  These improvements resulted in significantly lower operating loss.*"

- [Brown:]  "Our estimated market share in the quarter was about 13%."

- [Brown:] "Compared to last quarter, *gross margin percentage improved*, again as a result of *our new product offerings*, *which are collectively running at higher margins than the mature products in the portfolio*."

- [Brown:]  "Moving on to the products in the feature phone segment, *RAZR and KRZR continued to be top sellers globally*.  We sold over 8 million RAZRs, bringing us to a total of now over 110 million RAZRs and in the quarter, nearly 3 million KRZRs.  *RAZR 2s began shipping in all regions and technologies.  It's off to a great start*, *meeting the needs of the demanding feature phone users and accounted for over 900,000 units in the quarter.*  We . . . just recently we announced the RAZR 2 Luxury Edition in time for the holiday selling season."

- [Brown:]  "So to recap, *the operational changes we have made in Mobile Devices are beginning to yield results* and *we are making progress*.  We improved gross margin percentage . . . ."

- [Bear Stearns analyst:] ". . . you've been losing share in a bunch of regions around the world.  And I wonder if you expect to gain a little bit of the share back in the fourth quarter or whether that little bit of drop is going to continue for a while."  [Zander:] ". . . I think you're referring to mobile devices.  *We actually think we gained share*."

- [Brown:] ". . . *we're pretty pleased with RAZR2 sales out of the gate* with over 900,000 units in the quarter and now being made available in all technologies and geographies."

- [Zander:] "We are pleased with RAZR2s. I think we did almost 1 million units. I would say that was done in 80 days. I must say that the popular product everybody talks about today also did about 1 million units in 90 days. So *we're pretty excited about the additional acceptance with the RAZR2 product*."

[Emphasis added.]

191.   Defendants also provided a very favorable outlook for the Company's 4Q 07, then well under way and reiterated the financial targets announced in the September 7th analyst meeting (*i.e.*, that by 2008 the Company would be profitable in all its businesses):

- [Zander:] "Q3 was about execution, doing what we said we were going to do, but we also recognized there is lot more work to do. *Our management team is committed to returning the company to our financial targets as outlined during the September Analyst meeting*."

- [Meredith:] "Moving on to our outlook for the fourth quarter, we are encouraged by progress in Mobile Devices as compared to prior quarters. *We expect continued improvement in the fourth quarter*."

- [Meredith:] *"We expect fourth quarter earnings per share from continuing operations to be in the range of $0.12 to $0.14."*

- [Brown:] "In closing, as we look overall, third quarter operating performance, we're seeing results from the changes we've implemented. *We will continue the momentum and drive further improvements in the coming quarter.* With continued execution, our global brand, and healthy market trends across key businesses, we're well positioned for the long term."

- [Zander:] "I think what we need to do in the last six months is to *put the operational discipline and execution back into Mobile Devices.* It's not dependent on a one-hit wonder such as RAZR even though everybody would like to have that. And I think *we're doing that*."

- [Meredith:] "In terms of mobile devices, *we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line*."

- [Brown:] "The overall guidance as we reflected is $0.12 to $0.14. Within the line items, we wouldn't give that breakdown. Just on gross margin percentage, we have sequentially improved it for I think three quarters in a row and also for three quarters in a row in Mobile Devices. *So it's a very regimented and disciplined stair step and we're working hard on all levers: pricing, product efficiencies, new product, higher gross margin, richer experiences and that's the cadence of what we're going to continue to drive from an overall portfolio standpoint over time*."

[Emphasis added.]

192.    After the earnings release, Zander told the Arlington *Daily Herald* "[w]e've made some progress toward stability," and that "[w]e did what we said we were going to do and actually (made) the numbers in some areas." ***The Daily Herald also reported on October 26th that "Zander said his top lieutenants are carrying out a turn-around strategy put in place earlier this year."*** [Emphasis added.]

193.    On this news, the Company's stock price increased $0.75 to a close of $19.30 per share on unusually high trading volume of over 40 million shares, more than twice the average daily trading volume over the preceding 30 trading days.

194.    Yet consumers were not buying the new RAZR2 and Motorola's share of handset sales was actually declining.  In addition, the guidance for 4Q 07 and the statements about the September 2007 targets were false and misleading, because they conflicted with sales information already on hand and which defendants knew, or recklessly failed to check at the time of their statements.  Having persuaded Motorola's customers, particularly the major carriers, to take on far more product than they would likely sell through to consumers in the 4Q 07, defendants knew or recklessly disregarded that Motorola's 1Q 08 sales and profits would plummet as the carriers worked down the inventory on hand, and demanded credits or pricing concessions on follow-on purchases (as the confidential witnesses describe).

195.    On November 14, 2007, defendant Brown appeared at the UBS Global Technology & Services Conference.  ***Asked about the Company's 4Q 07 forecast, Brown reiterated that "what we said in the . . . Q3 earnings call is that we thought units would be growing sequentially along with revenue and bottom line OE [operating earnings] would improve sequentially as well."***  These statements were false and/or misleading for the same reasons described above.

[Emphasis added.]

196.    On November 30, 2007, Motorola suddenly announced that Zander, its Chairman and CEO, had resigned as CEO effective December 31, 2007. Zander would continue to serve as Motorola's Chairman until the 2008 annual meeting of stockholders in May 2008. But Zander would not be nominated, or stand for re-election, to the Board of Directors at the 2008 annual meeting of stockholders. Beginning January 1, 2008, Zander would serve as Strategic Advisor to the incoming CEO, a non-officer employee position, through January 5, 2009. During this time, Zander would continue to receive his regular base salary and benefits. The Company also announced on November 30, 2007 that Brown, who had served as Motorola's President and Chief Operating Officer since March 21, 2007, would replace Zander as President and CEO of Motorola effective January 1, 2008.

197.    Later on November 30, 2007, Icahn issued a press released "comment[ing] on the announcement by Motorola . . . that it was replacing Edward J. Zander as Motorola's CEO." Icahn's November 30, 2007 release was also filed with the SEC on a Form 14A Definitive Proxy Statement, indicating Icahn was once again launching a proxy fight for control of Motorola. Icahn's November 30, 2007 release quoted him stating that:

> ***[T]he steps announced today do not even begin to address the major problems at Motorola.*** In my opinion, ***Motorola should be split into separate companies***: a mobile devices company; an enterprise mobility company; a connected home company; and a company focused on mobile networks infrastructure. ***In particular, I believe that the best opportunity for the mobile devices' business to attract top flight management and to prosper and grow is to establish it as a stand alone business.***

[Emphasis added.]

198.    On December 3, 2007, shortly after it became public that defendant Zander would be stepping down, Chief Technology Officer Padmasree Warrior's employment with Motorola was also suddenly terminated. On December 3, 2007, *CNET News* suggested that "Motorola was unable to

come up with a second act that would have kept the business rolling . . . . [t]hat would have been Warrior's responsibility, as head of Motorola Labs and the company's 'early-stage accelerators,' which were responsible for coming up with new ideas."

199.    By the close of trading on the evening of December 5, 2007, Motorola's stock price had declined to $15.75 on investor concern about Motorola's continuing decline in market share and Zander's and Warrior's sudden departures.  The exercise price on 377,190 stock options Zander was holding that would not vest until January 5, 2008 was $12.97, meaning if the stock price continued declining, these options would have no value upon vesting.  Moreover, any chance of reaching the $20-$25 price range required to vest the rest of Zander's and Meredith's stock options and RSU grants was vanishing as the stock price continued declining.  More importantly, the growing market perception that Mobile Devices was not making "progress" and had not "turned the corner" would make it difficult, if not impossible, to sell the Mobile Devices unit at a price that would generate the $8 per share bump that was then being predicted Motorola could garner if the Mobile Devices business was split into separate companies as Icahn was publicly advocating, potentially increasing Motorola's stock price into the $20-$25 range required to vest the rest of Zander's and Meredith's stock options and RSUs.

200.    At 7:30 a.m. PST on December 6, 2007, defendant Meredith appeared at the Lehman Bros. conference in San Francisco officiated by Jeff Kvaal, analyst with Lehman Bros., and webcast with the stated purpose of deflecting the message implied by the recent and abrupt personnel changes – *i.e.*, that Motorola, and particularly its Mobile Devices business, was floundering.  Thus, Meredith opened up his presentation by falsely representing that the recent elevation of Brown to "the CEO position effective January 1st . . . was part of a very orderly and disciplined process."  Meredith then

acknowledged that Zander's leaving could be interpreted as suggesting that there were undisclosed

problems at the Company, but emphatically insisted that nothing had gone awry:

> *[W]hat we failed to take into account frankly*, when we made the announcement just recently, that he was becoming the CEO *is that you would have great angst over the fact that we made this announcement* and didn't affirm our guidance on the fourth quarter. *So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range. I am affirming that.*

[Emphasis added.]

201.    Meredith also emphatically represented that the turnaround in the Mobile Devices

business was continuing:

> [W]e said that we were going to have *sequential improvement in top and bottom-line in mobile devices*, a part of our business that seems to have a lot [of] people quite excited regularly, and *I will affirm that we will have sequential improvement in our top and bottom-line*.

[Emphasis added.]

202.    Later during the call, in response to Kvaal's request that Meredith comment on 4Q

margins, Meredith again confirmed, quoting defendants Brown and Zander from the 3Q 07 earnings

conference call, that:

> As I mentioned *we expected and still expect an improvement in our top and bottom line over last quarter. And this is – Q3 was a start or progress I think is the words that Ed and Greg have used.* And I believe that's sort of where we are.

[Emphasis added.]

203.    To persuade analysts that there was a concrete factual basis for his assurances about

the improved financial and business performance and prospects for Motorola's Mobile Devices,

Meredith pointed to the changes in the cash conversion cycle (changes which should have given him

greater visibility into customer inventories and therefore future sales orders), and his recent meetings

with the heads of the relevant business units about their 2008 and 2009 business plans:

Well, as I think many people that have followed what we've been saying for the last eight or so months [sic]. We are very focused on our cash conversion cycle and frankly our value chain more broadly. I'm pleased with the progress we've made, not satisfied. As I mentioned, the job of a CFO is never to be satisfied. We have gone from 56-day cash conversion cycle to now 43 at last quarter. And we feel to be in a position to say, that *we effectively just went through our planning process for 2008, 2009. And each of the business unit heads, the business unit heads, not the finance leaders spoke at some length around the drive and the activity they have ongoing around improving their own cash conversion cycle as well as value chain.* So in a relatively short period of time we've changed the lexicon and frankly raised the level of importance inside our own company around all about the cash. And I meant what I said at the September financial analyst meeting, our goal is to be at 20 to 30 days next year, by year end, this time next year and frankly I'd be sorely disappointed if we can't get there.

<Q - Jeff Kvaal>: *How tightly timed to, is your margin structure and your cash conversion cycle?*

<A - Thomas Meredith>: *I'd say it's not one-to-one, but it's pretty tightly correlated. And in fact, ROIC is driven largely by the investment, obviously in capital but also the 'R' part. And let's just say you can't, I don't think physically compress your time around your value chain including cash, cash-to-cash without actually also improving your 'R', the return. So I'd say pretty tight.*

[Emphasis added.]

204.    At the end of the December 6, 2007 question and answer session, Meredith was questioned about the Company's efforts to diversify its chip supplier base, *i.e.*, to extend its purchases of semi-conductors beyond Freescale. Meredith admitted that he had been involved in discussions and that new arrangements were in the process of being finalized. Meredith, however, was noticeably silent about the fact that he was in the process of negotiating payments by Motorola of hundreds of millions of dollars, for amendment of its agreement with Freescale and that, for 2007, Motorola owed Freescale $277 million for Motorola's failure to satisfy its minimum purchase commitments. Thus, Meredith was asked the following question and gave the following response:

<Q>:   Tom, historically – recently you folks have talked a little bit more about diversifying your chip supplier base. Just wanted to see if you have any additional color there in terms of the strategies and the vendors that you folks have been talking to?

<A - Thomas Meredith>:  We are continuing down the path of trying to present to our ultimate users a broader swath of devices and that may entail some shift in that set of relationships over the course of the next 12 months.  *And we're and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months.  And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space.*

[Emphasis added.]

205.   These statements were false and misleading, and indeed were calculated to be so.  Meredith also concealed known material facts, the disclosure of which was necessary to correct the false and misleading impression that he was creating.  As the confidential witnesses describe, the sales information on the poor 4Q 07 results was readily available on several of the Company's systems by December 6, 2007.  As Meredith himself later admitted, he knew about the poor fourth quarter sales by November 23, 2007, at the latest.

206.   In 4Q 07, mobile phone sales had improved only marginally in 4Q 07 over 3Q 07 (up 7%) given the holiday season, and the sharp increase in industry sales in those sequential quarters (18% growth in industry-wide units).  Moreover, even this anemic growth had been accomplished only by stuffing the channel and offering price concessions particularly among the major U.S. carriers.  The sequential 3Q 07 to 4Q 07 mobile phone operating earnings sharply deteriorated from $138 million in 3Q 07 to $388 million in 4Q 07.  And the true deterioration of this business over 4Q 07 was to be reflected in the 1Q 08 results, since the 4Q 07 shipments that remained unsold to the ultimate users would depress 1Q 08 results – the very point of Meredith's CCC project that he repeatedly touted.  Indeed, this phenomenon – that excessive and unwanted shipments in one quarter led to increased CCCs in the next – was borne out when, in 1Q 08, Motorola's CCC increased to 45 days from the 26 days in 4Q 07.  Moreover, Brown explained in the 1Q 08 earnings call that the decline in U.S. mobile device sales (where the major carriers were concentrated) was principally

responsible for the Company's 3% loss in market share during that quarter.  Thus, all facts point to the conclusion that the devastating drop-off in customer demand for Motorola's phones occurred during 4Q 07 and was well known by defendants at that time.

207.    The false and misleading statements defendants made on October 25, 2007 and that Meredith implied remained alive by his December 6, 2007 comments adopting the earlier statements about the segment's continuing improvement, were false, misleading and/or incomplete because:

(a)    The Company was not experiencing the robust demand for the RAZR2 defendants claimed at the 3Q 07 earnings conference when providing their 4Q 07 guidance;

(b)    The thinner RAZR2, which went on sale in the U.S. in August 2007, failed to attract buyers in the 2007 holiday buying season because it was not different enough from the original RAZR to warrant the $299 price tag;

(c)    Motorola was still losing significant market share to Apple, Inc.'s iPhone, Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices; and

(d)    After falling from 21% at the end of FY 06 to 13% at the end of 3Q 07, Motorola's market share had not stabilized but was still in a freefall during 4Q 07.

208.    As expected, the market responded positively to Meredith's false and misleading statements at the December 6, 2007 conference.  According to *Bloomberg*, "Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the RAZR and Q handsets."  According to *Bloomberg*, on this announcement, "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading."  *CNET News* reported that day that "[t]he news was a relief for some investors who had worried that last week's announcement that Chief Executive Ed Zander was stepping down was a sign that Motorola would miss its targets," emphasizing that Meredith had

"backed Motorola's forecast for earnings from continuing operations of 12 cents to 14 cents per share, and said its mobile device unit would see sequential revenue and bottom-line improvements."

The *AP* too reported that "Motorola shares up after CFO reaffirms fourth-quarter guidance," stating:

> Schaumburg-based Motorola's shares are up today after a senior official with the cell-phone maker affirmed the company's fourth-quarter outlook.
>
> The remarks by Chief Financial Officer Tom Meredith came at an investor conference in San Francisco with Motorola in the process of changing chief executives.
>
> ***Ed Zander's resignation last Friday had prompted concerns among investors that the company could be in the midst of another disappointing quarter.***
>
> ***Meredith says he expects improvement in both sales and profits from the company's handset business, continuing the progress made in the third quarter.***
>
> ***Motorola shares are up 39 cents, or 2.5 percent, to $16.14 in afternoon trading.***

[Emphasis added.]

209. *Reuters* too reported that day that "[m]obile phone maker Motorola Inc. backed its forecast for fourth-quarter earnings and revenue growth on Thursday, sending its shares up 3.6 percent," quoting Oppenheimer analyst Lawrence Harris stating "[i]t was very helpful for the company to make this statement today," and ***describing "Motorola's share rise as a relief rally."*** *Reuter's* December 6, 2007 story also emphasized Meredith's alluding to a possible spin off – or sale – of Mobile Devices:

> ***BREAK-UP?***
>
> Asked about a recent call by activist investor Carl Icahn for Motorola to break into several units, Meredith would not rule out structural changes.
>
> "I believe there's every opportunity for us to create significant economic value as a whole. ***Does that mean other options aren't viable? Not at all. A change in circumstance sometimes requires a change in action***," he said.
>
> While Icahn advocated a split of the company into several different parts, ***other investors have called for just a sale*** or spin-off ***of the network equipment unit*** while some have suggested a divestiture of the set-top box division.

[Emphasis added.]

210.    The *Chicago Tribune* highlighted on December 7, 2007 that Motorola's stock had risen $0.56, or 3.6%, to $16.31 and that "Chief Financial Officer Thomas Meredith said the firm expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets."

211.    Indeed, defendants' false statements about the Company's 4Q 07 earnings and the purported improvements in the Mobile Devices business continued to dupe analysts even after the close of the year.  On January 7, 2008, Ehud Gelblum at JP Morgan issued a report stating: "***We believe Q4 results for all segments are relatively on track with guidance – including Mobile Devices – as reiterated by CFO Tom Meredith on Dec. 6.***"  On January 11, 2008, *Bloomberg* reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share.  On January 15, 2008, Citigroup Global Markets issued a report stating Motorola was scheduled to report 4Q 07 earnings on January 23, 2008 and stating that analyst consensus was still that ***Motorola would report 4Q 07 EPS of $0.13 and Mobile Devices sales of $5.074 billion and handset unit sales of 42 million.***  And *Bloomberg* confirmed after the close of trading on January 22, 2008 that market consensus on Motorola's 4Q 07 earnings was still $0.13 per share.

[Emphasis added.]

## VII.    THE TRUTH BEGINS TO EMERGE

212.    On January 22, 2008, research analyst Tai Liani at Merrill Lynch's Telecom Equipment-Wireless Cellular division issued an estimate change report, the day before Motorola released its 4Q 07 earnings report.  According to Liani, Merrill Lynch's ***"supply chain checks suggest steeper than normal order declines in December, leading [Merrill Lynch] to lower [its] 1Q***

*2008 EPS estimate from 12c to 9c"* and to "lower[ its] 2008/2009 estimates from $0.75/$1.15 to

$0.65/$1.06." Merrill Lynch's report (based on its own direct "channel checks" with Motorola's

suppliers and other research) also ***detailed the rapid decline in orders Motorola was placing with its***

***suppliers for delivery in the 1Q 08***:



Motorola Inc

22 January 2008

**Supply chain trends pointing to weakening trends**

Motorola's suppliers posted weak order and shipment trends (in the case of low-end ODM Compal Comm) in the month of December, which also leads us to be more conservative in our 1Q outlook. Component makers such as Unimicron, Catcher, Silitech, and Hirose finished off December with somewhat steeper order declines than in prior years. We believe this suggests that some inventory may have persisted heading into Q1, with the bias being towards higher-end phones. This was seconded by comments from Samsung with respect to the US handset business. We also note that US carriers in particular did not end their promotions at the end of the holiday season and extended them into 1Q, another sign of potential inventory. Thus, even if this inventory sells through, handset makers could still be impacted by a need to ship-in fewer phones.

Chart 1: Average MoM % Chg. In orders/shipments from Hirose, Unimicron, Compal Comm, Catcher, Largan, and Merry (Note Dec. 2007 exacerbated by Catcher's 45% MoM % Chg)



Source: Company reports, Merrill Lynch estimates

Merrill Lynch's report confirms what the various confidential witnesses stated, that future sales were

largely known long in advance because significant lead time was required to order the parts and

manufacture the devices before they were shipped to Motorola's customers.

[Emphasis added.]

213.     Defendants' decision to dramatically reduce orders to suppliers during the 4Q 07 demonstrates they knew by early December 2007, *at the very latest,* that the Company's Mobile Devices division had not "turned a corner" and that instead it was rapidly deteriorating, which would lead to the massive 1Q 08 earnings guidance reduction announced January 23, 2008.

214.     On January 23, 2008, defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions were finally made:

- The Company sold only 1.5 million RAZR2 phones during 4Q 07;

- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during the 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- That contrary to Zander's statement on the October 25, 2007 earnings call that defendants "actually [thought Motorola's Mobile Devices division] gained share" in 3Q 07, Motorola's market share in the Mobile Devices segment was still on a downward spiral and would come to rest well below 13% by the end of 4Q 07;

- Motorola could report only $0.04 cents a share GAAP earnings in 4Q 07, *84% less the $0.25 per share earned in 4Q 06,* and nowhere near the $0.12-$0.14 per share defendants had claimed the Company was on track to achieve throughout 4Q 07. The previously undisclosed costs owed Freescale accounted for $0.07 per share of this earnings miss;

- Instead of "sequential improvement in top and bottom-line in mobile devices" in 4Q 07, given sales increases attributable to normal seasonability as between the 3rd and 4th quarters, Motorola's true sequential sales performance had deteriorated. This was particularly apparent by reference to the sales performance of Motorola's peers – industry data showed that global mobile device sales units had grown by 18% between 3Q 07 and 4Q 07;

- Contrary to their previous statements of "progress" and assurances of having "turned the corner" in Mobile Devices, defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge associated with Freescale "during the fourth quarter of 2007." As would later be revealed, this charge reduced the margins of the mobile phone segment and was attributable to Motorola's failure to meet its minimum purchase commitments during FY 07;

- ***For 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where defendants' positive statements had led the market to expect a $0.10 per share profit in the 1Q 08)***; and

- Motorola said it expected to "lose market share in Q1."

[Emphasis added.]

215.   The deterioration in Motorola's Mobile Devices business and prospects revealed by these disclosures was particularly stunning in light of the strong industry-wide growth in unit sales during this period.  In response to an analyst's questioning at the January 23, 2008 conference call, defendant Meredith revealed that, when speaking on December 6th, he fully understood the deteriorated state of Motorola's sales performance:  Meredith admitted that Motorola's decline in handset sales dated back to November 23, 2007 (the day after Thanksgiving), and nearly two weeks before he had adamantly affirmed the Company's 4Q 07 guidance and the continuing improvement in the sales and profits of the Mobile Devices business:

> [Bear Stearns:] And Thomas, if I could follow up, ***going back to early December, you talked a little bit more bullishly about the handset business overall.  Was there really a major drop-off in December or was this weakening through the quarter?***
>
> [Meredith:] ***I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated***.

[Emphasis added.]

216.   The market's reaction was swift and furious.  On this news, the Company's stock price plummeted 18.8%, or $2.31 per share, to close at $10.01 per share on January 23, 2008, its lowest level in five years, on unusually high volume over 7.5x the average daily trading volume over the preceding 30 days.  According to a January 23, 2008 *Bloomberg* report, "That's the biggest decline in more than five years and puts the stock at its lowest since September 2003 . . . ."

86

217.    According to Piper Jaffray & Co.'s Michael Walkley, "[t]heir phones are just not selling through," adding that *the "overall health of the market is fine; these problems are Motorola-specific."*

[Emphasis added.]

218.    JP Morgan's Ehud Gelblum's report issued January 23, 2008 stated Motorola's 4Q 07 Mobile Devices revenues of $4.81 billion missed JP Morgan's estimate of $4.98 billion, blaming lower ASPs (or "average selling price") of $118 on handset units Motorola sold during the 4Q 07, $3 below Motorola's ASPs in 3Q 07 and $2 below JP Morgan's estimate for the 4Q 07 of $120. Gelblum also blamed handset shipments of 40.9 million being below his 41.5 million estimate, down 38% from 4Q 06, and 600,000 below what JP Morgan had been led to expect. JP Morgan also stated that Motorola's "Q1 EPS guidance of $(0.05-0.07) [was] well below [its] $0.09 est," and reduced its estimates for Motorola's APS in the 1Q 08 from $113 to $110. *JP Morgan's report concluded that its "conservative" sum-of-the-parts valuation of Motorola's three operating divisions now "implie[d] zero value for Mobile Devices."*

[Emphasis added.]

219.    As the *Associated Press* emphasized on January 23, 2008 after the close of trading:

Income from continuing operations was 5 cents per share, including charges of 9 cents per share for asset write-downs, layoffs and a legal settlement. *That was 8 cents less than the consensus estimate of analysts polled by Thomson Financial*.

Motorola executives had told analysts that a series of innovative new cell phones would help break the company out of a slump that began when sales of the iconic Razr phone leveled off and the company had no other hit product to maintain momentum and market share. The Schaumburg, Ill.-based company showed tentative progress toward a turnaround in the third quarter during a disastrous year which saw its handset sales tumble 33 percent overall from 2006.

*But sales from the mobile devices division, dominated by cell phones, sank to $4.8 billion in the fourth quarter as the company failed to connect with consumers over the holidays. The handset unit, its biggest, had an operating loss of $388 million*

***and shipped 40.9 million devices during the quarter, in line with analyst expectations but down sharply from past quarters.***

Dave Carpenter, *AP*, "Bleak outlook sends Motorola plummeting," Jan. 23, 2008.

[Emphasis added.]

220.    Following defendants' disclosures, the Company's stock and debt ratings were slashed. Fitch cited "[l]imited visibility and expected further delays in returning the mobile devices business to consistent profitability and sustainable market share," the "company's slower than anticipated progress in turning around the mobile devices business," and less than optimal margin improvements in the 4Q 07. Moody's Investors Services cited "the company's recently announced downward guidance for Q1 2008 and the continued delays in turning around the handset business." Moody's stated that it had been led to expect improvements in Motorola's business by early 2008. Standard & Poor's slashed Motorola's debt ratings to two levels below investment grade, stating the Company's new handsets failed to catch on with consumers. There are "limited signs of recovery" because the RAZR2 had not met expectations according to Standard & Poor's.

## VIII.   POST-CLASS PERIOD EVENTS CONFIRM THE SEVERITY OF MOTOROLA'S DECLINE AND DEFENDANTS' SCIENTER

221.    As would be revealed in a lawsuit brought in Delaware Chancery Court by Deloitte & Touche LLP against Thomas P. Flanagan, one of Deloitte's own audit partners, Brown was not only aware long before January 23, 2008, that Motorola was not about to achieve $0.12 - $0.14 earnings from continuing operations in the 4Q 07, nor see bottom-line improvement in Mobile Devices, but he was also secretly telling others about the devastating decline in Motorola's business:

> Flanagan is also alleged to have improperly traded in options of Motorola Corporation ("Motorola"), another of Deloitte's clients.  On January 4, 2008, Flanagan received an email from a Deloitte partner in Boston informing him that ***Motorola's CEO had stated in a private meeting that the company's performance "will be significantly worse than anybody's imagined" and that a huge, across-the-board, cost reduction was in the works.***  On January 14, Flanagan purchased Motorola put options through the Flanagan BOA account.  The following week,

Motorola issued its earnings release, causing shares to plummet.  Flanagan sold his put options on the day of the announcement for a 1,400% return.

*Deloitte LLP v. Flanagan*, Memorandum Opinion, No.: C.A. No. 4125-VCN (Del. Chan. Dec. 29, 2009).

[Emphasis added.]

222.     In another securities fraud class action against Motorola and certain of its officers for an earlier class period, Judge Moran in *Silverman v. Motorola*, No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008), analyzed scienter allegations charging Zander and Brown with fraudulent misstatements in connection with their knowledge of the Mobile Devices division's failing financial performance:  ***"it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company.  Zander himself stated that he had a staff meeting or call 'every week' to monitor the status of the 3G phones."***

[Emphasis added.]

223.     According to ¶65 of the operative *Silverman* complaint (which was filed after significant discovery was had in that case, including scores of depositions), "[b]y virtue of the Individual Defendants' positions at Motorola, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  ***Specifically, each Individual Defendant had direct access to a wealth of reports and documents on the Company's Compass document database that showed the***

***Company's 3G handsets were not on track for timely delivery in 2006*** and would result in the 4Q 06 earnings miss.  Based on access to these same sources of information, Plaintiffs in this case similarly allege that Motorola's Compass document database would have alerted defendants ***in 4Q 07*** to the fact that Motorola was achieving nowhere near the sales performance required to meet its $0.12 - $0.14 4Q 07 earnings guidance, particularly once the $277 million of Freescale costs were included in the calculation of earnings.

224.    Performance in Motorola's Mobile Devices division ***has never recovered following the end of the Class Period***, and its devastating decline has thwarted the success of efforts to profitably split the Company and sell off the business.  On February 1, 2008, Icahn appeared on CNBC, again demanding that Mobile Devices be spun off.  Icahn emphasized that Motorola's handset sales had declined 38% in the 4Q 07, calling the division's handset offerings "arcane."

225.    On February 22, 2008, Motorola announced Meredith's replacement as CFO.  Paul Liska, a former private equity firm partner who was a restructuring expert, had been appointed CFO of Motorola to replace Meredith at some point between October 2007 and February 22, 2008.  That day, the *New York Times Dealbook* reported there was "[s]ome doubt that Motorola will find a buyer for its handset business," and that "[i]nvestors certainly seem doubtful: After an initial pop, Motorola's stock has fallen back below the level where it was before the company said it was exploring a strategic transaction."  The *New York Times* also cited Mark Sue, an analyst at RBC Capital Markets "offer[ing] this skeptical take on a potential sale: 'A strong stomach and some Rolaids will be required for whomever is interested in buying Motorola's handset division.  If it's an existing handset vendor, order some Tums too.'"

226.    On March 3, 2008, Brown appeared at a Morgan Stanley conference stating Motorola was still "focused on fixing" the Mobile Devices unit and still evaluating strategic options for the

money-losing division. Stu Reed, who had been appointed to lead Mobile Devices in 2007 was fired. Days later, Mike Walkley, a stock analyst at Piper Jaffray, who reported Motorola's announcement that it was spinning off Mobile Devices confirmed that the Company "couldn't sell it at the price it wanted."

227. On March 27, 2008, the *New York Times* reported that "[a]fter a two-month strategic review of its businesses, Motorola said on Wednesday that it would split itself into two separate publicly traded companies, spinning off its unprofitable mobile phone unit to investors." According to the *New York Times* ***"[s]elling [Mobile Devices] to a competitor was one option that Motorola pursued, according to a person involved in those discussions, but there were no takers."*** [Emphasis added.]

228. On April 24, 2008, Motorola released its 1Q 08 financial results, reporting that ***the Company's market share had fallen by 3%, equating to approximately $1 billion in lost sales.*** At the earnings conference call discussing this stunning decline, Brown revealed that it was attributable to the loss of sales in North America – where the large carriers are dominant customers, and confirming the lack of sell-through of Motorola's devices shipped in 4Q 07. This quarter, the Company's CCC increased 13 days over the CCC in 4Q 07, another indicator that the channels had been stuffed in 4Q 07. Motorola disclosed a 1Q 08 ***loss*** of $0.09 per share, on $7.45 million in sales. Mobile Devices segment sales were $3.3 billion, down 39% compared to the 1Q 07, and the segment's operating loss was a staggering $418 million.

229. A May 24, 2008 *New York Times* exposé entitled "Cellphone Pioneer Struggles to Stay Relevant" disclosed "Motorola's reversal of fortune has been striking. The Schaumburg, Ill., company shipped about 27 million handsets during the first quarter of 2008, ***putting its share of the***

*global market below 10 percent — a plunge from its 22 percent market share in 2006, when its*

*Razr flip phone was a top seller*."

[Emphasis added.]

## IX.  ADDITIONAL INDICIA OF SCIENTER

### A.  The Individual Defendants' Motive and Opportunity

230.    In addition to the direct and circumstantial evidence that defendants knew their

material statements and omissions were false or misleading when made, or that they acted recklessly

in making these statements and omissions, as alleged throughout this Complaint, the inference of

scienter is further buttressed by facts showing that each of the Individual Defendants were highly

motivated by the terms of their compensation agreements with Motorola to inflate the Company's

stock price in their final days at the helm of Motorola.  *Indeed, the overwhelming majority of their*

*compensation was tied directly to the Company's stock price*.

#### 1.  Zander

231.    On January 5, 2004, pursuant to his employment agreement, Motorola granted Zander

an option to purchase 1,508,760 shares of Common Stock with an exercise price of $12.97 per share.

The stock option had a term of 10 years and vested in four equal annual installments commencing on

January 5, 2005, *with the final installment vesting on January 5, 2008*.  In addition, on January 5,

2004, Motorola granted Zander 400,000 restricted stock units, 50% of which vested on January 5,

2006 *and the remainder of which vested on January 5, 2008* ("RSUs convert to shares of our

Common Stock when they vest, so they have a gross value at the time of vesting equal to the then-

current market value of our Common Stock.").  Additionally, Motorola granted Zander 800,000

market-based options on May 8, 2007.  These options would only vest and become exercisable as

follows: (1) 300,000 options would vest if the closing price for a share of the Company's Common

Stock met or exceeded $22.00 for 10 trading days out of any 30 consecutive trading days from

May 8, 2007 until May 8, 2009, and (2) an additional 500,000 options would vest if the closing price for a share of the Company's Common Stock met or exceeded $25.00 for 10 trading days out of any 30 consecutive trading days from May 8, 2007 until May 8, 2009.

232.    These grants alone provided Zander with significant financial motive to artificially inflate Motorola's stock price during the Class Period.  Specifically, Zander had 377,190 stock options vesting on January 5, 2008 with an exercise price of $12.97.  As a result of defendants' fraud, following vesting of Zander's stock options on Saturday, January 5, 2008, the Company's stock price traded over $15 on the following Monday, transferring over $5.66M in fraud-inflated value to Zander on the stock options alone.  Once the truth about Motorola's actual 4Q 07 results and reduced 1Q 08 projections were revealed on January 22, 2008, Motorola's stock price dropped to $10.01, demonstrating the stock options would have been worth nothing had the truth been disclosed prior to their vesting.  The 200,000 RSUs that vested to Zander on January 5, 2008 were worth another $3M based on the fraud-inflated price Motorola's stock was then trading at.  As additional motive, Zander had been granted the 800,000 market-based options on May 8, 2007 (following Icahn's proxy challenge and just months before Zander's resignation would be announced) that only vested to Zander if the Company's stock price exceeded $22-$25 per share for limited durations during the Class Period.  Though Zander was not ultimately successful in inflating Motorola's stock price high enough to vest the RSUs, this definitely provided him with motive to do so during the Class Period.

233.    Zander was also paid a Long Range Incentive Plan ("LRIP") bonus for three-year periods, the last of which Zander knew would be calculated based on the closing price of Motorola's stock on December 31, 2007.  The financial component of the LRIP was based on Motorola's actual reported sales revenues, but it also included a multiplier based on the closing price of the Company's

share price as of December 31, 2007.  The LRIP multiplier calculation required that Motorola's December 31, 2004 closing share price be deducted from its December 31, 2007 closing share price, resulting in a total shareholder return ("TSR").  If the TSR was within the top 50 percentile in Motorola's peer group, Zander would receive the entire LRIP bonus.  Had this been the case, Zander would have received a LRIP bonus of $3.75M for FY 07.  Had Motorola's TSR been in the 35%-50% percentile, Zander would have received 75% of his target bonus.  Zander's LRIP bonus was reduced to 33% of target based on the closing price of Motorola's stock price on December 31, 2007, but Zander still received a $1.25M LRIP bonus.

### 2.    Meredith

234.    Meredith, a director since 2005, began serving as Motorola's CFO on April 1, 2007 pursuant to an employment agreement that ran through October 2007.  Pursuant to that agreement, Meredith was paid $1 per year salary plus 250,000 stock options and 500,000 RSUs *that would only vest* to the extent defendants were able to successfully inflate Motorola's stock above $20, $22, $24 per share for 10-30 day trading durations.  According to the Company's 2007 annual proxy statement, "[t]he Committee granted the market-based RSUs to provide Mr. Meredith *added incentive* to make the performance improvements necessary *to stimulate stock price growth*."  On October 4, 2007, shortly before Zander's termination was announced, Meredith's employment contract was amended to provide for a $75,000 monthly salary ($900,000 per year) plus stock options.  However, the October 2007 agreement *terminated Meredith's employment effective April 1, 2008*.

[Emphasis added.]

235.    Meredith's knowledge throughout the Class Period that the only compensation he would receive for serving as Motorola's CFO for the tumultuous six-month period running from

April 1, 2007 to October 4, 2007, the 250,000 stock options and 500,000 RSUs Meredith knew would only vest with value if he could increase Motorola's stock price above $20/$22/$24 provided Meredith with ample motive to artificially inflate Motorola's stock price during the Class Period.

### B.    The Bond Sales Provide Additional Motive for the False Statements

236.    Defendants were motivated to misstate Motorola's ongoing business metrics and financial condition on October 25, 2007 in order to permit Motorola to complete a $1.4 billion bond offering on October 29, 2007.  The $1.4 billion was desperately needed to repay $1.2 billion in notes coming due November 17, 2007, less than three weeks later.  Had defendants disclosed Motorola's true financial condition, the Company's corporate debt ratings would have been slashed to "junk" as they were at the end of the Class Period, significantly increasing Motorola's cost of capital.

### CLASS ACTION ALLEGATIONS

237.    This is a class action on behalf of purchasers of Motorola common stock between October 25, 2007 and January 22, 2008 inclusive, excluding defendants (the "Class").  Excluded from the Class are current and former officers and directors of the Company as well as their families and the families of the defendants, and all partners and employees of the Company's outside auditors.  Class members are so numerous that joinder of them is impracticable.

238.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Motorola common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Motorola or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class actions.

239.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

240.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

241.    Common questions of law and fact predominate and include whether defendants: (a) violated the Securities Exchange Act of 1934 (the "1934 Act"); (b) omitted and/or misrepresented material facts, including allowing false statements to be attributed to them; (c) knew or recklessly disregarded that their statements were false; and (d) artificially inflated the price of Motorola common stock and the extent of and appropriate measure of damages.

242.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

243.    Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

244.   At all relevant times, the market for Motorola's common stock was an efficient market for the following reasons, among others:

(a)   Motorola's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   According to the Company's FY 07 annual financial report filed with the SEC on Form 10-K, as of January 31, 2008, there were over 2.5 billion shares of Motorola common stock outstanding.  During the Class Period, on average, over 22 million shares of Motorola stock were traded on a daily basis, demonstrating a very active and broad market for Motorola stock and permitting a very strong presumption of an efficient market;

(c)   As a regulated issuer, Motorola filed periodic public reports with the SEC;

(d)   Motorola regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)   Motorola was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f)   Numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Motorola stock at all times during the Class Period; and

(g)   Unexpected material news about Motorola was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

245.     As a result of the foregoing, the market for Motorola common stock promptly digested current information regarding Motorola from publicly available sources and reflected such information in Motorola's stock price.   Under these circumstances, all purchasers of Motorola common stock during the Class Period suffered similar injury through their purchase of Motorola common stock at artificially inflated prices, and a presumption of reliance applies.

246.     Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance to the extent that defendants' statements were materially misleading in failing to disclose material facts about Motorola that would have caused Plaintiffs and the Class not to have purchased Motorola stock at the artificially inflated prices at which such securities traded during the Class Period.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' FALSE STATEMENTS

247.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. First, the pertinent statements pleaded herein were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Indeed, no cautionary statements were provided during the December 6, 2007 Lehman Bros. conference, and the cautionary statements issued with the October 25, 2007 3Q 07 earnings conference were boilerplate.   Alternatively, to the extent that the statutory safe harbor provided during the October 25, 2007 3Q 07 earnings conference did apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker(s) knew there was no basis for their statements, the statements were contradicted by undisclosed facts and/or the speaker did not believe the opinions he was espousing.

# LOSS CAUSATION

248.   During the Class Period, as detailed herein, defendants made false and misleading statements by means of concealment and obfuscation of critical information concerning Motorola's business fundamentals and key financial metrics and engaged in a scheme to deceive the market. This artificially inflated Motorola's stock price and operated as a fraud or deceit on the Class.  Later, when the truth became revealed to the market, Motorola's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of Motorola securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

249.   Specifically, following defendants' 3Q 07 false and misleading presentation on October 25, 2007, the Company's stock price became inflated and rose $0.75 per share, or approximately 4%, on more than twice the average daily trading volume over the prior 60-day trading period.

250.   Again, following Meredith's false and misleading statements and omissions on December 6, 2007, Motorola's stock price became further inflated and actually closed ***up*** over 3.6%.

251.   As the truth about Motorola's actual financial results and prospects were finally disclosed on January 23, 2008, the Company's stock price plummeted, closing at $10.01 per share on January 23, 2008, erasing over $13 billion in market capitalization from where it was trading in early January 2008.  Leakage began negatively impacting Motorola's stock price beginning January 4, 2008 as the supply of shares for sale began outstripping demand for shares for purchase, but because there was no actual disclosure of the deleterious 4Q 07 financial performance and downgrade in Motorola's 1Q 08 earnings until January 23, 2008, the Company's stock price remained artificially inflated through and including January 22, 2008.

252.   This Class Period stock price inflation was due to Company-specific misstatements as the S&P 500 Index was relatively flat on a comparative basis during the same October 25, 2007 to January 23, 2008 period reflected below:



253.   Moreover, the October 25, 2007 stock price increase was accompanied by unusually high trading volume of more than twice the average daily over the preceding 30 trading days, as was the December 6, 2007 stock price increase.   The January 23, 2008 stock price decline was also accompanied by unusually high trading volume, with the January 23, 2008 trading volume being 7.5x the average daily trading volume of the preceding 30 days.

## FIRST CLAIM FOR RELIEF

### For Violations of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

254.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

255.    Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Motorola common stock, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

256.    During the Class Period, defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Motorola common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (c) cause Plaintiffs and other members of the Class to purchase Motorola common stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  These defendants are sued both as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

257.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Motorola's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete and

accurate information.   SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

258.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

259.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Motorola common stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price of Motorola common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased Motorola stock during the Class Period at artificially high prices and were damaged thereby.

260.    Had Plaintiffs and the other members of the Class and the marketplace known of the true facts, which were not disclosed by defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Motorola shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

261.    By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.   17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

262.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

263.    The Individual Defendants acted as control persons of Motorola within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, Board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

264.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

265.    Motorola controlled each of the Individual Defendants.

266.    By reason of such wrongful conduct, the Individual Defendants and Motorola are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for Class purposes;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: June 11, 2010

FREED & WEISS LLC
PAUL WEISS
111 West Washington Street, Suite 1331
Chicago, IL 60602-3455
Tel: 312-220-0000
Fax: 312-220-7777

*Liaison Counsel to Lead Plaintiff and Plaintiff Town of North Branford Pension Committee*

SCOTT+SCOTT LLP
ARTHUR L. SHINGLER III (*pro hac vice*)
MARY K. BLASY (*pro hac vice*)

/s/ Mary K. Blasy

MARY K. BLASY

600 B Street, Suite 1500
San Diego, CA 92101
Tel:  619-233-4565
Fax: 619-233-0508

and

DAVID R. SCOTT (*pro hac vice*)
156 South Main Street
Colchester , CT 06415
Tel:  860-537-3818
Fax: 860-537-4432

and

BETH A. KASWAN
500 Fifth Avenue, 40th Floor
New York, NY  10110
Tel:  212-223-6444
Fax:  212-223-6334

and

GEOFFREY JOHNSON
12434 Cedar Road
Cleveland Heights, OH 44106
Tel:  216/229-6088
Fax:  216/229-6092

*Lead Counsel for Lead Plaintiff St. Lucie County
Fire District Firefighters' Pension Trust Fund
and Plaintiff Town of North Branford Pension
Committee*