IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ST. LUCIE COUNTY FIRE DISTRICT FIREFIGHTERS' PENSION TRUST FUND, TOWN OF NORTH BRANFORD PENSION COMMITTEE, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) ) | Case No. 10 C 427 Judge Virginia M. Kendall |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MOTOROLA, INC., EDWARD J. ZANDER, GREGORY Q. BROWN, and THOMAS MEREDITH | ) ) ) ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund and the Town of North Branford Pension Committee (together "Plaintiffs") filed suit against Motorola, Inc., ("Motorola"), Edward J. Zander ("Zander"), Gregory Q. Brown ("Brown"), and Thomas Meredith ("Meredith") (together "Defendants") alleging, in their Second Amended Complaint, violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("1934 Act") and violations of Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants move to dismiss for failure to state a claim and for failure to meet the heightened pleading standards required in securities class actions. For the following reasons, the Court grants Defendants' Motion to Dismiss with prejudice.

## STATEMENT OF FACTS

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir.

1995).  Defendants included several exhibits, including SEC filings and transcripts of shareholder meetings and conferences that are referenced and excerpted in Plaintiffs' Second Amended Complaint.  The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment.  *See, e.g., Stavros v. Exelon*, 266 F. Supp. 2d 833, 844 n. 8 (N.D. Ill. 2003).  The Court may also examine the documents included in Defendants' Motion to Dismiss because they are referred to in Plaintiffs' Second Amended Complaint and they are central to Plaintiffs' claims.  *See Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

## I.     Motorola Mobile Devices

Motorola is a technology company that operates in three primary business segments: mobile devices, networks and enterprise, and connected home solutions.  (Second Amd. Compl. ¶ 16.) From October 25, 2007 until January 22, 2008 ("Class Period") the largest of these was mobile devices.  (*Id*.)  The mobile device division had 42% of its 2007 net sales concentrated in several large phone operators.  (*Id*. ¶ 17.)  This high level of concentration gave Motorola's management access to sales data that was useful for forecasting future purchases.  (*Id*. ¶ 18.)  According to Plaintiffs' confidential witnesses, Motorola provided concessions to the major cell phone carriers to accept unneeded inventory (a process known as "channel stuffing" that depresses sales volumes in later quarters) to meet quarterly and annual targets.  (*Id*. ¶ 19.)

By the close of fiscal year 2006 Motorola was the second largest global supplier of wireless handsets with an estimated global market share of 22%.  (*Id*. ¶ 23.)  Indeed, Motorola's RAZR cell phone was the most popular line of mobile phones ever released until it ceded that title to Apple's iPhone 3G in November 2008 (the iPhone 3G was released in June 2007).  (*Id*.)  Motorola sold 100

million units of the RAZR through July 2007, the month that the RAZR2 was released. (*Id.*) By the end of the third quarter ("3Q") in 2007, however, Motorola's global market share was down to 13%. (*Id.* ¶ 25.) Its profits and sales were similarly down, and Motorola recognized hundreds of millions of dollars in losses during the first three quarters of 2007. (*Id.* ¶ 26.)

On September 7, 2007, at its annual analyst conference, Motorola announced a turnaround plan to restore the health of its mobile devices unit. (*Id.* ¶ 28.) This turnaround plan was reaffirmed on October 25, 2007 and again on December 6, 2007. (*Id.* ¶¶ 26, 213.)

## II.    Motorola Officers

Zander joined Motorola as CEO, Chairman of the Board and Chairman of the Board's Executive Committee in January 2004. (*Id.* ¶ 29.) Zander served as Motorola's CEO until December 31, 2007 and as Chairman of its Board and its Executive Committee until May 5, 2008. (*Id.*) Zander received a salary of over $14 million in 2006 and over $17 million in 2007, however the vast majority of this compensation came in the form of restricted stock units ("RSUs"), stock options, and other long-term incentive payments. (*Id.*) Zander's RSUs would not vest unless Motorola's stock price closed above $22; Zander's stock options had an exercise price of $12.97, which rendered them valueless if Motorola's stock was trading below that amount. (*Id.* ¶ 30.)

Meredith served as Motorola's Acting Chief Financial Officer and Executive Vice President between April 1, 2007 and March 1, 2008. (*Id.* ¶ 31.) Like Zander, Meredith received a substantial portion of his 2007 compensation in stock options and RSUs. (*Id.*)

Brown served as President and Chief Operating Officer of Motorola from March 2007 through December 2007. (*Id.* ¶ 33.) Brown assumed the role of President and CEO on January 1, 2008. (*Id.*)

## III. October 25, 2007: 3Q Earnings Conference

Motorola released its 3Q 2007 financial results on October 25, 2007, reporting that sales were down 36% from 3Q 2006 in the mobile device segment. (*Id*. ¶ 202.) The mobile device segment also incurred a 3Q 2007 operating loss of $138 million, compared to a second quarter ("2Q") 2007 operating loss of $264 million. (*Id*.)

Zander, Brown, and Meredith also held an earnings conference on October 25, 2007 to discuss 3Q 2007 and look ahead to the fourth quarter ("4Q") of the year, which was already underway. (*Id*. ¶ 203.) Zander stated that "[o]ur 3Q can be characterized by one word, progress." (*Id*.) Zander continued, "We . . . made substantial improvement in all key metrics in mobile devices." (*Id*.) Zander further represented that "We increased unit sales and gross margin percentage" and "lower[ed] operating expenses," concluding that Motorola had already sold 900,000 units of the RAZR2 phone. (*Id*.)

Turning to 4Q 2007, Meredith stated that "we are encouraged by progress in mobile devices as compared to prior quarters. We expect continued improvement in the 4Q." (*Id*. ¶ 204.) Meredith then specified that "[w]e expect 4Q earnings per share from continuing operations to be in the range of $0.12 to $0.14." (*Id*.) Meredith continued, "we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line." (*Id*.) Zander stated that the management team "is committed to returning the company to our financial targets as outlined during the September Analyst meeting." (*Id*.) Brown concluded that "[w]e will continue the momentum and drive further improvements in the coming quarter." (*Id*.)

Motorola's stock price closed up $0.75 to reach $19.30 per share on unusually high trading volume. (*Id*. ¶ 206.)

## IV. December 6, 2007 Lehman Brothers Conference

By early December, investors were concerned with Motorola's viability—whether the company would be broken up and sold—as well as the recent announcement that Zander would be stepping down as CEO. (*Id*. ¶¶ 211-12.) Motorola's stock price closed at $15.75 on December 5, 2007. (*Id*.)

Meredith appeared at the Lehman Brothers Conference in San Francisco on December 6, 2007. (*Id*. ¶ 213.) Meredith "affirmed" earlier 4Q 2007 projections, specifically that earnings from continuing operations in 4Q would be "in the $0.12 to $0.14 range." (*Id*.) Meredith also affirmed that Motorola would experience "sequential improvement in our top and bottom line." (*Id*. ¶ 214.) In response to a question, Meredith echoed the characterization of Q3 as a "start or progress" and stated that he believed "that's sort of where we are." (*Id*. ¶ 215.)

At the end of the session, Meredith was questioned about Motorola's attempts to diversify its semi-conductor chip suppliers. (*Id*. ¶ 217.) Meredith responded that "we're in and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months. And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space." (*Id*.)

After the conference, based in part on Meredith's affirming previous earnings estimates, Motorola's stock price increased $0.56 to close at $16.31 on December 6, 2007. (*Id*. ¶ 221.)

## V. January 22, 2008: Estimates Questioned

On January 22, 2008, a research analyst at Merril Lynch's Telecom Equipment/Wireless Cellular division issued an estimate change report for Motorola. (*Id*. ¶ 225.) Based on "supply chain checks" that suggested "steeper than normal order declines in December," Merrill Lynch lowered

its first quarter ("1Q") 2008 earnings per share estimates from $0.12 to $0.09. (*Id.*) Merrill Lynch

also noted Motorola's decline in the orders it was placing with its suppliers for 1Q 2008 delivery.

(*Id.*)

**VI.    January 23, 2008: Motorola 4Q 2007 Results**

Motorola announced its 4Q 2007 and full-year 2007 results on January 23, 2008. (*Id.* ¶ 227.)

Motorola's mobile phone sales from 3Q 2007 to 4Q 2007 had improved by 7%. (*Id.* ¶ 219.)

Demand for Motorola's mobile devices had "slowed" during 4Q 2007 while competitors such as

Apple experienced growth. (*Id.*) Motorola reported earnings per share of only $0.04, due in part to

a $277 million settlement with a chip manufacturer, Freescale Semiconductor ("Freescale"), in

January 2008 that accounted for a loss of $0.07 per share. (*Id.* ¶ 227.) Motorola's earnings per share

based on continuing operations for 4Q 2007 were $0.14. (*Id.* ¶ 116) Motorola's revenue in the

mobile devices segment increased from $4.5 billion in 3Q 2007 to $4.8 billion in 4Q 2007 and sales

increased from 37.2 million units to 40.9 million units in the same period. (*Id.* ¶ 27.) Motorola's

4Q operating loss, however, increased to $388 million, up from $138 million the quarter before, due

in significant part to the $277 million Freescale settlement. (*Id.*)

Motorola issued earnings per share projections for 1Q 2008 of a loss of $0.05 to $0.07 and

stated that it expected to "lose market share in Q1." (*Id.* ¶ 227.) The market had expected 1Q

projections of up to $0.10 per share profit. (*Id.*)

During a conference call on January 23, 2008, in response to an analyst's question, Meredith

responded that the "Thanksgiving through the Christmas selling season was where we experienced

slower demand than we otherwise anticipated." (*Id.* ¶ 228.)

Motorola's stock price dropped 18.8%, or $2.31 per share, to close at $10.01 on January 23,

2008, bringing the stock to its lowest price since September 2003. (*Id.* ¶ 229.)

## VII. Class Period

Plaintiffs' class action is brought on behalf of all purchasers of Motorola common stock between the Class Period of October 25, 2007 and January 22, 2008. (*Id.* ¶ 1.) Specifically, Plaintiffs claim they suffered damage when Motorola's stock price declined as a result of its 4Q earnings release on January 23, 2008. (*Id.* ¶ 264.) Plaintiffs allege that Motorola failed to disclose material facts regarding its projected revenue, the demand for its products, its progress in turning around the mobile device division, and a legal dispute with Freescale, the settlement of which further reduced its 4Q 2007 earnings. (*Id.* ¶¶ 122-23.)

Plaintiffs filed suit on January 21, 2010, amending their Complaint on June 11, 2010 and again on December 3, 2010.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *See Murphy*, 51 F.3d at 717. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines if they plausibly give rise

to an entitlement to relief. *Id.* A claim has facial plausibility when the pleaded factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 1949.

Rule 9 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9. This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business of a firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Pursuant to Rule 9, a plaintiff must set forth "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Section 10(b) and Rule 10b-5 claims are subject to the even higher pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1)-(2) ("the PSLRA"). *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 551 U.S. 308 at 319 (2007). Under the PSLRA's heightened pleading standards, "a private securities complaint alleging that the defendant made a false or misleading statement must (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id*. at 321 (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)).

To establish liability under § 10(b) and Rule 10b-5, a plaintiff must prove that the defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused the plaintiff's injury. *See Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

**DISCUSSION**

Defendants move to dismiss Count I of the Second Amended Complaint—alleging violations of § 10(b) and Rule 10b-5—for failure to state a claim. Specifically, Defendants challenge whether Plaintiffs have sufficiently alleged that they made a misstatement or omission of material fact and whether that misstatement or omission was made with scienter. Defendants do not address the sufficiency of the remaining elements—whether the alleged misstatement or omission was made in connection with the purchase or sale of securities, whether Plaintiffs relied on the misstatement or omission, and whether the Plaintiffs suffered damages as a result—that are necessary to state a claim. This is presumably because Plaintiffs allege a "fraud-on-the-market" theory, under which Plaintiffs bought and sold in an open and efficient market and, as such, need not show individual and specific reliance. *See Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) ("[T]he fraud-on-the-market doctrine[] supplants 'reliance' as an independent element by establishing a more direct method of causation."). Defendants also argue that Plaintiffs cannot state a claim in Count II, which alleges that Defendants are liable as controlling persons under § 20(a), if Count I is dismissed.

**I.      Count I**

Plaintiffs allege that Defendants made material misstatements or omissions on October 25, 2007, November 14, 2007, December 6, 2007, and January 23, 2008. According to Plaintiffs, these misstatements or omissions dealt with: (1) Motorola's progress in turning around its mobile devices division; (2) its expected earnings; and (3) a previously undisclosed settlement with Freescale.

**A.      Progress in Turning Around Mobile Devices Division**

Plaintiffs allege that Defendants made material misstatements and omissions regarding their progress in "turning around" Motorola's mobile devices division. Specifically, Plaintiffs cite to the

following statements made on October 25, 2007: (1) Meredith's prediction that both revenue and the bottom line would improve in 4Q 2007; and (2) Zander's representations that Motorola was putting "operational discipline and execution back into Mobile Devices," that Motorola's 3Q could be "characterized by one word, progress," and that Motorola was "committed to returning" to the financial targets mentioned at the September 7, 2007 analyst meeting. Plaintiffs also cite to Brown's November 14, 2007 statement that unit sales and revenue would increase sequentially in 4Q 2007, which Meredith affirmed on December 6, 2007. Defendants respond that these statements were accurate predictions and, if found to be misleading, were merely corporate puffery that reasonable investors would not rely on.

### 1.    Material Misstatements and Omissions

Material misstatements and omissions occur when a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995). A statement is material if it would be viewed by "a reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279 at *14 (N.D. Ill. Nov. 14, 2000) (Kennelly, J.) (citations omitted). Discussing an issue, while withholding specific facts, can also mislead. *See, e.g., Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001) (" If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it."). Defendants, however, are not liable where the facts and circumstances allegedly "omitted or represented have actually been disclosed." *Silverman v. Motorola, Inc.*, 2008 WL 4360648 at *9 (N.D. Ill. Sept. 23, 2008) (Moran, J.) (citation omitted). To allege that a historical statement violated § 10(b), "the plaintiff must set forth sufficient facts to show that the

statement was either false or misleading because of omitted information." *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 785 (N.D. Ill. 2006) (internal quotations and citations omitted).

### a.    Revenue

Here, Plaintiffs' own Second Amended Complaint contains data confirming that Meredith's and Brown's predictions of increasing revenue and unit sales from 3Q 2007 to 4Q 2007 were accurate. From 3Q 2007 to 4Q 2007 unit sales of mobile phones increased from 37.2 million units to 40.9 million units. During the same period, revenue in the mobile devices division increased from $4.5 billion to $4.8 billion. Plaintiffs' claims that demand for Motorola mobile devices was actually dropping during this period and that mobile phones are seasonal and thus naturally increase during 4Q are insufficient to plead material misstatements or omissions. The challenged statements simply predicted an increase in revenue and unit sales over the coming quarter, a prediction that was proven accurate. Zander's statement that Motorola had made "substantial improvement in all key metrics" is borne out by the reduced operating loss of $138 million in Q3 2007 compared with a loss of $264 million in Q2 2007.

Moreover, Meredith's January 23, 2008 statement that sales from the Thanksgiving to Christmas period in 2007 were slower than expected does not make the omission of this information in statements made on October 25 and on December 6 material because the alleged misstatements and omissions occurred well before the slow Christmas sales would have been known. Finally, Plaintiffs' allegation that Motorola's top executives would have been aware of a decline in supply parts when they made these statements is irrelevant to a challenge to statements that merely predicted that sales figures would increase from one quarter to the next. *Cf. Silverman*, 2008 WL 4360648 at *9 (noting that omissions regarding problems plaguing a new product's rollout may have been

11

misleading because defendants stated the rollout was "on track."). As such, Plaintiffs fail to demonstrate a material omission.

Plaintiffs fail to allege what other information should have been included in the October 25th and December 6th statements because, as the documents cited in their Second Amended Complaint claim, Motorola's 4Q 2007 loss was based in large part on reduced Christmas/holiday sales. (Second Amd. Compl. ¶ 14.) Zander's description that 3Q was an example of progress is attested to by the documents and data referenced in Plaintiffs' Second Amended Complaint. That Motorola's incoming CEO, Brown, stated privately on January 4, 2008 that the company's 4Q 2007 performance "will be significantly worse than anybody's imagined," does not alter the fact that especially weak Christmas/holiday sales data could not have been known on December 6th, let alone October 25th.

### b. Demand for RAZR2

Plaintiffs' reliance on confidential witnesses who describe the RAZR2 as being a complete flop and cite Motorola's lack of new or exciting products as the reason 4Q sales were low, does not amount to an allegation that Motorola omitted material information. Nor can Plaintiffs rely on confidential witnesses who state that top executives knew that their products were not selling yet did not disclose this information. In fact, Motorola repeatedly and accurately stated the number of RAZR2 phones sold in 3Q and 4Q. Moreover, on December 6, 2007 Meredith, in response to a question about the "product hole" that Motorola had been facing, stated that he was "not satisfied" with progress on its new products in the mobile device division. Transcript Dec. 6, 2007 Lehman Bros. Annual Tech. Conf. Specifically, Meredith stated that Motorola was "not on time," that its "new product introduction process has not been crisp," and that Motorola is "not satisfied with where [it is]." *Id*; *see, e.g., In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007)

("Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored."). These statements, made at a conference relied upon by Plaintiffs in their Second Amended Complaint, adequately refute Plaintiffs' allegations that Defendants omitted material statements about the challenges its mobile devices division faced with respect to demand for its new products. *See, e.g., Silverman*, 2008 WL 4360648 at *9 (dismissing allegations of fraud based on RAZR price decrease because plaintiffs' own complaint contained a statement by defendants specifically mentioning the price reduction).

### 2. Corporate Puffery

"Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1132, 1164 (N.D. Ill. 2004) (citation omitted). "Scrutiny of vaguely optimistic statements . . . is 'especially robust' in cases involving a fraud-on-the-market theory of liability . . . because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." *Id.* (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1218 (1st Cir. 1996). "[I]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Statements regarding a company's "strong balance sheet" or its "proven record of growth" are immaterial puffery that no reasonable investor would rely on. *Silverman*, 2008 WL 4360648 at *9 ("Statements that the new products are 'competitive' or 'compelling' are . . . immaterial as a matter of law," as are statements that a company is "well-positioned to continue creating value" or that it has "substantial resources"); *see also Jones v. Corus Bankshares, Inc.*, 701

F. Supp. 2d 1014, 1027 (N.D. Ill. 2010) (collecting cases). Certain specific statements made within a broader vague characterization may nonetheless be considered material if they "reinforce factual misstatements and therefore contribute to ongoing deception." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003).

Here, Zander's October 25, 2007 statement that he was putting "operational discipline and execution" back into the mobile devices unit is loosely optimistic corporate puffery and, as such, is immaterial. *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (noting that statements using the words "strong" and "increased awareness" were vague puffery). Moreover, Plaintiffs do not allege that Defendants were not attempting to restore operational discipline in this division, only that they were aware of and failed to disclose an anticipated reduction in sales based on slowing demand for their mobile phones.

Similarly, while Zander stated on October 25, 2007 that Motorola's management team was "committed to returning the company to [its] financial targets as outlined during the September Analyst meeting," Plaintiffs do not dispute that Defendants were in fact committed to this approach. The Court finds Zander's general commitment to growth to be immaterial corporate puffery. *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (finding defendant's reference to its "commitment to create earnings opportunities" to be immaterial puffery). To the extent that Zander's October statement referenced specific growth targets from the September Analyst meeting, those targets were for a moderated outlook over a "two-to-three-year operating model" and fall under the analysis of forward-looking statements below. The Court also notes that the statements from the September Analyst meeting relied upon by Plaintiffs refer to a time-frame well beyond the Class Period.

Because Plaintiffs fail to allege any material misstatements or omissions regarding Motorola's attempts to turn its mobile device division around, the Court grants Defendants' Motion to Dismiss with respect to the allegations in Count I regarding the attempted turnaround of Motorola's mobile device division.

### B.    Earnings Projections

Plaintiffs allege that Meredith's projections on October 25, 2007 and December 6, 2007 that Motorola would earn between $0.12 and $0.14 for 4Q 2007, were false and are not covered by the PSLRA's forward-looking safe harbor provisions. Defendants respond that these earnings projections were accurate and, even if challenged, also contained cautionary language. Defendants further argue that Plaintiffs are unable to sufficiently plead scienter.

### 1.    Forward-Looking Statements

The PSLRA provides a safe harbor from liability for certain "forward-looking statements" that prove to be false. Forward-looking statements include statements (1) containing a projection of revenues or other financial items; (2) of the plans and objectives of management for future operations, including those relating to the products or services of the issuer; (3) of future economic performance; or (4) of the assumptions underlying or relating to the aforementioned statements. 15 U.S.C. § 78u-5(i)(1). Corporations and individual defendants may avoid liability for forward-looking statements that prove to be false if the statements are "accompanied by meaningful cautionary statements," are immaterial, or were not made "with actual knowledge" of the falsity or misleading nature of the statement. *Id*. § 78u-5(c)(1).

A mixed statement containing both present and future elements is not entitled to the safe harbor "with respect to the part of the statement that refers to the present." *Makor Issues & Rights,*

*Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (defendant stating that sales were "still going strong" constituted a mixed present/future statement).

Here, Plaintiffs' allegations regarding the sequential increase in sales and revenue have already been discussed and deemed immaterial. Defendants' specific predictions that Motorola's earnings per share from continuing operations would be in the range of $0.12 to $0.14 fall within the category of forward-looking statements. § 78u-5(i)(1). Motorola announced this 4Q 2007 estimate on October 25th and reaffirmed it on December 6th. Plaintiffs rely on Motorola's January 23, 2008 release of 4Q 2007 earnings per share of $0.04 to allege that the predictions were materially inaccurate. The $0.04 figure, however, included net charges of $0.09 per share related to a legal settlement with Freescale and to other costs associated with previously announced workforce reductions. Motorola's 4Q operating income before these special charges was $0.14 per share, in line with Defendants' forecasts. Moreover, Defendants' earnings per share predictions were specifically for "earnings per share from continuing operations" that excluded special charges. (Second Amd. Compl. ¶ 204.) The Court therefore finds that Defendants accurately predicted their 4Q 2007 earnings from continuing operations to be $0.14 per share.

To the extent, however, that Plaintiffs insist that Defendants' earnings projections were false in light of the net charges of $0.09 per share and the overall reduction in demand for Motorola mobile phones, the Court finds that Defendants included meaningful cautionary language in their predictions.

## 2. Cautionary Language

If a forward-looking statement is accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is "irrelevant, and the statement is not

actionable regardless of [a] plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d at 1112-13. "The PSLRA does not require the *most* helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (quotation marks omitted). "[I]t is enough to point to the principal contingencies that could cause actual results to depart from the projection." *Id.*; *see, e.g., Stavros*, 266 F. Supp. 2d at 843 (noting that cautionary language must be "more than boilerplate" and "specifically tailored to the company's business"). Cautionary statements may accompany the forward-looking statement or they may be incorporated by reference. *See, e.g., Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) (cautionary statements contained in SEC filings were "absorbed into the market" under the fraud-on-the-market theory).

The Court notes at the outset the factually similar case of *Silverman*, where analogous forward-looking earnings projections made by Motorola executives were found to be protected by cautionary language and thus within the PSLRA's safe harbor protections. *See, e.g., Silverman*, 2008 WL 4360648 at *12. In *Silverman*, the district court held that the cautionary language accompanying Motorola's press releases and conference calls, as well as its SEC filings, were sufficient to insulate alleged misstatements referring to its projected sales and revenue in 2006. *See, e.g., id.* (noting the press releases and conference calls contained "between 18 and 20 risk factors which might change the outcome" of Motorola's predictions and that Motorola's SEC filings contained "extensive and specific" risk factors).

Here, similarly, Motorola's press releases and conference calls were accompanied by cautionary language and also referred participants and listeners to additional risk factors "on pages

17

16 through 24 and item 1A of Motorola's 2006 Annual Report on Form 10-K and in other SEC filings."  Transcript of Oct. 25, 2007 Earnings Conference Call.  Specifically, Motorola addressed risk factors including: the level of demand for the company's products; its ability to introduce new products; and risks related to certain "key suppliers."  Oct. 25, 2007 3Q Press Release.  For example, Motorola's 2006 SEC 10-K filing cautioned that the markets for many of its products are "characterized by rapidly changing technologies, frequent new product introductions, short product life cycles and evolving industry standards" and that Motorola is "constantly exposed to the risk that [its] competitors may implement new technologies before [it does]."  Motorola also warned that if its strategic alliances and partnerships with industry leaders do not develop as expected, its "business could be adversely impacted."  Motorola stated at its conference calls that the risk factors described in its press releases and in its 10-K filings "in some cases have caused" its actual results to differ materially from its forward-looking predictions.  Transcript of Oct. 25, 2007 Earnings Conference Call.  Motorola also made abundantly clear that its conference call would contain "[a] number of forward-looking statements."  *Id.*

The Court finds that Motorola's cautionary statements addressed Plaintiffs' particular allegations in individualized terms—regarding demand for Motorola's mobile devices, its predicted growth, and its pending settlement negotiations with a key supplier, Freescale—and, as such, were sufficiently specific to provide a safe harbor.  *See Asher*, 377 F.3d at 734; *see, e.g., In re Midway Games*, 332 F. Supp. 2d at 1166 (finding risk factor stating "[w]e depend on market acceptance of new products" to be sufficient cautionary language).

Because the Court finds that Defendants' forward-looking earnings projections were either accurate or protected by sufficient cautionary language, the Court need not address whether

Defendants made these projections with actual knowledge that they were false. 15 U.S.C. § 78u-5(c)(1); *see, e.g., In re Midway Games*, 332 F. Supp. 2d at 1168 ("proof of knowledge of the falsity of a forward-looking statement is 'irrelevant' when the statement is accompanied by meaningful cautionary language.") (citations omitted). The Court therefore grants Defendants' Motion to Dismiss with respect to forward-looking earnings projections.

### C.     Freescale Settlement

Plaintiffs allege that Defendants misled investors by making material omissions and presenting knowingly false earnings projections when they failed to mention Motorola's settlement with Freescale until December 31, 2007 and then included the settlement cost as a special charge in their 4Q earnings. Defendants respond that the Freescale settlement information was not known on December 6, 2007 when the 4Q earnings projections were affirmed and, even if they were, Plaintiffs cannot allege Defendants knowingly made false statements.

### 1.     Material Omissions or Misstatements

As a preliminary matter, the Court finds that Motorola's decision to not disclose its settlement with Freescale until December 31, 2007 was not a material omission. Plaintiffs do not cite to any caselaw that requires companies to disclose settlement talks or confidential renegotiations of supplier contracts. *See, e.g., Hallberg v. Am. Agencies General Agencies, Inc.*, 2005 WL 563211 at *6 (N.D. Ill. Mar. 8, 2005) (Filip, J.) ("Thus, even assuming that a duty to disclose existed, there is no reason to think Defendants had any potential merger or IPO to disclose to Plaintiffs before the two sides reached and agreement and executed a settlement agreement."). Plaintiffs' Second Amended Complaint states that Freescale and Motorola renegotiated their contract agreement in February 2007 and extended it for at least two years. (Second Amd. Compl. ¶ 121.) Regarding the

settlement at issue here, Plaintiffs only allege that Freescale and Motorola had engaged in negotiations over a compromise agreement during 4Q 2007. (*Id*. ¶ 11.) Plaintiffs imply that Motorola's senior executives must have been aware of these negotiations, but Plaintiffs do not allege that Motorola and Freescale executed a settlement agreement before Meredith's December 6, 2007 statements. *See, e.g., Hallberg*, 2005 WL 563211 at *6 (dismissing complaint for failure to plead when the parties reached and executed a settlement). As such, "even assuming a duty to disclose existed," Plaintiffs do not plead facts alleging the settlement had been executed, and therefore Meredith was not obligated to disclose it at the Lehman Brothers Conference. *Id.*; *Cooperman v. Individual, Inc.*, 171 F.3d 43, 49 (1st Cir. 1999) ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all information.").

Here, unlike in *Silverman*, where the defendants stated that everything was "on track" but did not mention product delays, Meredith simply stated, accurately, that Motorola was in discussions with all of the named players in the chip industry. Meredith also stated that he would be finalizing those arrangements within the coming weeks and months—an accurate forecast of the Freescale disclosure three weeks later. Meredith concluded by telling investors that they should "watch" Motorola's relationship with its chip suppliers. Meredith made no mention of Freescale, nor did he make any "affirmative characterization" of the discussions—for example, he did not describe them optimistically or as "conservative" or "adequate." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'")

Plaintiffs' argument that Defendants "opened the door" to this subject with his response is therefore unavailing. *See, e.g., Anderson*, 140 F. Supp. 2d at 903 ("Merely mentioning a topic . . .

20

does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important."). To that end, the analysts cited in Plaintiffs' own Second Amended Complaint do not appear troubled by news of the settlement. In fact, the analysts take the settlement as a positive sign, allowing Motorola to further diversify its chip supplier base to better compete in the 3G space. As Plaintiffs themselves note, "what really shocked analysts" at the January 23, 2008 meeting "was defendants' report that Motorola's Mobile Devices sales projection for 1Q08 was devastating." (Second Amd. Compl. ¶ 116.)

Because Plaintiffs have not cited to any cases requiring the disclosure of pending settlement negotiations, and because they have not pled facts alleging that Freescale and Motorola executed a settlement prior to the December 6, 2007 conference, the Court finds that Defendants did not materially omit any statements regarding the Freescale settlement by waiting to disclose its amount until December 31, 2007.

### 2. Future Statements

Plaintiffs allege that the failure to include information about the Freescale settlement in Motorola's 4Q 2007 earnings projections amounts to a failure to include cautionary language and thus negates the corresponding safe harbor protections.

For the reasons discussed above, the Court finds Defendants' forward-looking earnings projections to be accurate because they were explicitly and repeatedly based on "continuing operations" and did not reflect "special charges" such as a one-time settlement. Moreover, Motorola has incurred special charges similar to the Freescale settlement in recent years, including for charges associated with annual workforce reductions. *See, e.g., Silverman*, 2008 WL 4360648 at *13 (noting that past stock trading history of Motorola executives demonstrated that certain stock sales at issue

were not suspicious in scope or timing).  Notably, in April 2007 Motorola reported 1Q 2007 special

charges of $0.11 per share, substantially larger than the $0.07 per share special charge at issue here.

Even if the Court were to consider these forward-looking statements inaccurate, they would

nonetheless be protected by the meaningful cautionary language referred to and accompanying

Motorola's press releases, conferences, and SEC disclosures.  As such, the Court grants Defendants'

Motion to Dismiss with respect to omission of Freescale-related charges until December 31, 2007.

Since the Court finds that Defendants' forward-looking earnings projections were either accurate or

protected by sufficient cautionary language, the Court need not address whether Defendants made

these projections with actual knowledge that they were false.  *See In re Cutera Sec. Litig.*, 610 F.3d

at 1112-13 ("if a forward-looking statement is identified as such and accompanied by meaningful

cautionary statements, then the state of mind of the individual making the statements is irrelevant,

and the statement is not actionable regardless of the plaintiff's showing of scienter.").

## II.    Count II

Because Plaintiffs fail to state a claim for violations of § 10(b) and Rule 10b-5, their control

person liability claims in Count II must also be dismissed.  *See, e.g., In re Ulta Salon, Cosmetics &*

*Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (dismissing control person

liability claims when § 10b claims were denied).

## CONCLUSION

For the reasons stated, the Court grants Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint.  The case is dismissed with prejudice.


So ordered.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 28, 2011